IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

NOVARTIS PHARMACEUTICALS CORP.,       )
                                      )
      Plaintiff,                      )
                                      )Civil No.
      vs.                             )1:24-CV-1557-MJM
                                      )
ANTHONY G. BROWN, et al.,             )Baltimore, Maryland
                                      )September 4, 2024
      Defendants.                     )10:04 a.m.
_____)

**THE ABOVE-ENTITLED MATTER CAME ON FOR
PRELIMINARY INJUNCTION HEARING
BEFORE THE HONORABLE MATTHEW J. MADDOX**

A P P E A R A N C E S

On Behalf of the Plaintiff PhRMA:
      PHILIP J. PERRY, ESQUIRE
      ANDREW J. PRINS, ESQUIRE

On Behalf of the Plaintiff AbbVie, Inc.:
      MATTHEW S. OWEN, ESQUIRE
      MEREDITH M. POHL, ESQUIRE

On Behalf of Plaintiff AstraZeneca Pharmaceuticals, LP:
      ALLON KEDEM, ESQUIRE
      MICHAEL PICHINI, ESQUIRE

On Behalf of the Defendants:
      JOSHUA CHAZEN, ESQUIRE

(Computer-aided transcription of stenotype notes)
Reported by:
Ronda J. Thomas, RMR, CRR
Federal Official Reporter
101 W. Lombard Street, 4th Floor
Baltimore, Maryland 21201

(10:04 A.M.)

THE JUDGE:  Good morning, everyone.  You may be seated.

THE CLERK:  The matter now pending before this Court is Civil No. 24-cv-1557-MJM, Novartis Pharmaceuticals Corporation v. Brown, et al.  This matter now comes before the Court for the purpose of a preliminary injunction hearing.

Counsel for the Plaintiffs, followed by counsel for the Defendant, will you please introduce yourselves for the record.

MR. PERRY:  Good morning, Your Honor.  Phil Perry for Pharmaceutical Research and Manufacturers of America or PhRMA for short.

THE JUDGE:  All right.  Good to meet you.

MR. PERRY:  Good to meet you too, Your Honor.

MR. PRINS:  Good morning, Your Honor.  Andrew Prins also for Plaintiff PhRMA.

THE JUDGE:  Good morning.

MR. KEDEM:  Good morning, Your Honor.  Allon Kedem on behalf of AstraZeneca Pharmaceuticals.

THE JUDGE:  Good morning.

MR. PICHINI:  Good morning, Your Honor.  Michael Pichini also on behalf of AstraZeneca Pharmaceuticals.

MR. OWEN:  Good morning, Your Honor.  Matthew Owen from Kirkland & Ellis on behalf of AbbVie.

THE JUDGE:  Good morning to you.

**MS. POHL:**  Your Honor, Meredith Pohl also from Kirkland & Ellis on behalf of AbbVie.

**THE JUDGE:**  Okay.  Thank you.  Pleased to meet all of you.

**MR. CHAZEN:**  Good morning, Your Honor.  Joshua Chazen from the Maryland Office of the Attorney General on behalf of the Defendants across all of the cases.

**THE JUDGE:**  All right.  Good morning.  So this is a consolidated civil case comprised of four lawsuits filed by the Plaintiff pharmaceutical companies and PhRMA against the Maryland Attorney General as well as the Maryland Board of Pharmacy.

I'm planning to hear oral argument today on the pending motions for preliminary injunction.  I previously held a hearing to hear oral argument on the motion for preliminary injunction filed by Novartis, also consolidated in this case. At that time, several other motions were still being briefed. Once those motions were on their way to having their briefing completed, I scheduled this hearing to hear oral argument on the remaining motions for preliminary injunction.

Although the issues are generally and largely overlapping between the various motions, there is some degree of lack of overlap or some special issues that are raised in some motions but not others.

So, with that, I'm not sure if the Plaintiffs have come to

an agreement about who will go first.  Have they?

MR. PERRY:  We have, Your Honor.

THE JUDGE:  Very good.  Then I'll be pleased to hear from you, Mr. Perry.

MR. PERRY:  Thank you, Your Honor.  We have, in fact, tried to economize in order to serve the purposes of this hearing, and we have split up times and the issues to some extent.

I'd like to begin with the structure and key provisions of the federal state, the 340B statute, because I think that that statute, its text and Congress's intent, will drive the outcome of appeal and the conflict preemption issues here.

THE JUDGE:  If you don't mind, could you bend the microphone a little bit so it's a little closer to you just to make sure you're picked up adequately.

MR. PERRY:  Is that better?

THE JUDGE:  That sounds great.

MR. PERRY:  Okay.  Thank you so much.

Mr. Kedem, for AstraZeneca, will cover some of those issues.

THE JUDGE:  Okay.

MR. PERRY:  But also patent preemption, another form of preemption that multiple of the parties here have raised.  Mr. Owen, for AbbVie, will cover again some of those issues along with his takings claim and I think he may address the

replenishment model in some detail.  Time permitting.

Let me start with the nature of the federal program here.  It's a unique program.  It's a form of federal subsidy that essentially transfers funds from private parties, drug manufacturers, to a list of 15 statutorily-identified types of healthcare facilities.  The type of transfer of funds is in discounted prices.  Sometimes extremely low prices.  The D.C. Circuit recently called those discounts:  Strikingly generous, often pennies per unit.  And in reality it's often pennies on the dollar.

Your Honor referred to the Novartis hearing a moment ago, from a few weeks ago, Maryland's counsel acknowledged during that hearing, and I'm quoting here, "That the purpose of HB1056" -- which is the Maryland statute -- "is to improve and expand upon the federal program."  And it is, in fact, materially different than the federal program.  And that difference can be sharply seen if the Court takes a close look at Pages 460 to 464 of the recent D.C. Circuit case, along with the Third Circuit case, *Sanofi*.

The best sense of what Congress intended in the 340B statute can be seen in the Supreme Court's decision in *Astra v. Santa Clara County*.  That was a dispute on one hand between a group of covered entities, that's these healthcare facilities, and the drug manufacturers.  The case was argued in the Supreme Court not long after Congress amended 340B to include a new set

of provisions.

So the Supreme Court addressed all of those provisions in some detail, particularly Page 119 to 122, and because preemption turns on congressional intent, that discussion of congressional intent is really critical.  Let me highlight a few parts of that discussion.

First, as the Supreme Court said, the interdependent nature of the two programs requirements, that's 340B and Medicare -- Medicaid is also related -- means that an adjudication of rights under one program must proceed with an eye towards the implications for another.  That's important because that means that the federal agency has to control how 340B operates.

Likewise, the Supreme Court said, if the federal agency is, quote, "unable to hold the control rein, shape the program, make sure the program operates as intended," quote, "the risk of conflicting adjudications would be substantial."

But perhaps the most important part of the *Astra* case is at the very end, Pages 121 and 122, where the Supreme Court described the purpose of the recent amendment that Congress had made to 340B, and the Supreme Court said this, "Congress opted to strengthen and formalize the federal agency's enforcement." Congress knew that there were these disputes between covered entities and drug manufacturers, and so it made the new adjudicated framework the proper remedy.  That's the federal

framework which is the detailed framework you find in subsection D of the 340B statute.  It was the proper remedy for covered entities complaining of overcharges and other violations of the 340B statute.

So the United States during that case called the 340B statute, quote, "the exclusive remedy," for claims between drug manufacturers and covered entities.  And it is the exclusive remedy.  It was intended to be the exclusive remedy.

But this case turns not only on that exclusive remedy but a key provision at the beginning of the 340B statute and that's 340B(a)(1) or 42 U.S.C. 256b(a)(1).  It's commonly known as the shall-offer provision.  It's got two components that are important here.

The first component requires drug manufacturers to enter into a federal contract.

THE JUDGE:  I'm sorry, could you cite the statute again to me.

MR. PERRY:  Sure.  It's 42 U.S.C. 256b(a)(1).

THE JUDGE:  Okay.

MR. PERRY:  It's the first provision of 340B.  It is the source of drug manufacturer's obligation to provide 340B pricing.  So, two sentences.  The first one requires that drug manufacturers sign a federal contract and that federal contract, in fact, contains the restrictions and the requirements in this particular provision.

The second sentence is why it's called the shall-offer provision.  Each such agreement shall require the manufacturer offer covered 340B drugs at the specific 340B ceiling price.

Now, that is the specific provision that was interpreted by the D.C. Circuit in the *Novartis* case earlier this year and then earlier in the Third Circuit case.  The question in both of those two cases was under the federal statute, under that shall-offer provision, what is the obligation of drug manufacturers to make an offer.

Remember, they only have to make an offer.  The question is, is that offer accepted.  So, what is the obligation?  Surely it's a ceiling price offer but it also contains other terms.  It must contain other terms.  And here's how the D.C. Circuit addressed it.  The offer may contain both price and non-price terms.  Indeed, an offer must contain some terms to be on the bare price to be definite enough to bind the contracting parties and non-price terms typically include provisions about the place and manner of delivery.

So this is federal court, both in the D.C. Circuit and the Third Circuit, interpreting the word "offer" and what Congress intended the delivery obligations to be under the federal programming.

So, in particular, in the D.C. Circuit --

THE JUDGE:  I'm not sure I understand how you're linking offer and delivery.

MR. PERRY: All right. So the question is, what is a drug manufacturer required to do under the federal program. The answer is, make an offer. Make an offer which can be accepted. The question is then what does federal law require in that offer.

Remember, there is no way for a state to compel you to make that offer. That is purely a federal offer. It's tied to the Medicaid program. It's a voluntary part of the Medicaid and Medicare program. It's not -- you can't compel without, as Mr. Owen will address, creating an unconstitutional taking drug manufacturers to sell their prices [sic] for pennies on the dollar. It's a voluntary participation in a federal program.

What the Federal Government has done, what Congress has done, has said you have to make an offer. Then the question is, what has to be in that offer. And the answer is given at Pages 460 to 464 of the D.C. Circuit case. What do you have to offer as to delivery? What terms do you have to offer?

There were two particular terms at issue in the D.C. Circuit case. One is called a claims data requirement, which I'll address in a few minutes. That's basically the drug manufacturers insist that they understand what these 340B drug prescriptions are before they agree to provide the discount. The second is a one contract pharmacy requirement. Again, this is laid out at Pages 460 to 464.

The entire question there is what does the federal program

require you to do as to delivery under this shall-offer provision.  And it's an important question.  You can see why it's important at Pages 456 to 458 of the D.C. Circuit's opinion where the Court describes what has happened over the last 10 years, and that is, this program has grown 800 to 1,000 percent and become far more costly than Congress ever intended.

Backing up.  The question here is what the shall-offer provision actually requires under federal law and it's answered.  It's answered in the D.C. Circuit case, it's answered in the Third Circuit case, and the answer is you can create a condition on selling and delivering products particularly as to accepting orders.  You can create a condition and if the covered entities don't agree to those reasonable conditions there is no sale.

So those reasonable conditions included this claims data condition, which is addressed in the briefs and addressed in the Scheulen declaration we put forward, and a one contract pharmacy condition.

THE JUDGE:  Are you saying the D.C. Circuit read the statute to provide a right to set those conditions?  Or was it simply silent, in other words, leaving your clients at liberty to set those conditions?

MR. PERRY:  What the D.C. Circuit said and the Third Circuit said was Congress did not intend that there would be an

opportunity for some outsider, including a state, to come in and compel you to deliver to every contract pharmacy in the United States.

Instead, you have to make a reasonable offer, it has to be a *bona fide* offer, it has to have reasonable delivery terms and those terms have to effectuate the purpose of the federal program.  But you are not required to go out and do something far more significant, nor can somebody else at the Federal Government dictate that.

If there is a dispute as to what the offer has to contain, that's an issue -- this is why I went through the *Astra* case -- that is resolved through the program that Congress put forth for resolving disputes, including, as appropriate, alternative or, excuse me, administrative dispute resolution under subsection D of the statute.

So the question is, under federal law what is required in the offer and the answer is provided in that case, and that answer is dramatically different than what Maryland is trying to compel here.  Night and day, two different programs.

What Maryland is trying to do is change the nature of the federal program to make it far more extensive to extend this federal subsidy far further than what Congress intended.

Now, if I might, Your Honor, focus on the two specific conditions that we put forward in our declarations that drug manufacturers employ here.  One is this claims data condition

and the second is the one contract pharmacy condition.

Let me just back up and say something about the practical reality of how orders are placed.

There are a number of distributors and wholesalers involved in this process.  It's rare, if it ever happens, that a drug company is dealing directly with the pharmacy or with a discovered entity.  Instead, it's an ordering system that is maintained by distributors or wholesalers and the orders are placed with that particular system.

And if someone tries to order a drug, tries to place an order for a drug, and that person cannot place an order because the policies, the claims data policies or the one contract pharmacy policies, aren't being complied with that order, that order does not go through and there is no sale.  There is no transaction, there is no purchase.  That's how the system works.

So here's the point about the claims data provision.  Gilead, in particular, as set forth in the Scheulen declaration, provides that if someone wants to buy at a 340B price they have to be willing to cooperate and provide claims data.  It's just logical.  You need to understand if you are Gilead or any other member of PhRMA what type of 340B prescriptions are seeking this type of discount.  It's something that's been fundamental to this program for a long time.  That claims data condition is something that Maryland

does not seem to object to.

Now, in their brief, their reply brief at Page 29, they said something that sounds like they don't object to claims data, that sounds like they believe that this claims data is necessary under the federal program for drug manufacturers to effectuate their federal rights.  But it's not perfectly clear, and I hope that counsel for Maryland will clarify that.

If they oppose claims data, if they think that violates 1056, that is absolutely conflict preempted.  And that's because claims data, as our briefs explain, is a necessary prerequisite for drug manufacturers to operate under the federal system, to exercise their rights to audit, as explained in our briefs, and then to exercise their rights to seek a remedy if there's a problem with the claims.

So that's claims data.

And Page 29 is where they address it.

The one contract pharmacy policy is a policy that was in place for the federal program for something like 14, 15 years, probably about half the duration of this program only one contract pharmacy can be used.  Judge Katsas, in the D.C. Circuit opinion, describes it, explains why it was reasonable and explains why drug manufacturers can impose that requirement now.

But, here is the real point.  The point is that when a drug manufacturer puts these conditions, if they're reasonable,

Case 1:24-cv-01557-MJM   Document 59   Filed 09/10/24   Page 14 of 152   14

if they're *bona fide* conditions, on the federal offer, the covered entity or the pharmacy, whoever is placing the order, has to either accept them or not.  And if they don't accept them there's no sale.

So what Maryland is trying to do here is create a situation where they change the nature of that federal offer. They want the federal offer to be different than federal law requires.  They want that federal offer to have different delivery terms than the federal law requires.  Again, the contrast between 460 to 464 in the D.C. Circuit case and Maryland statute could not be more stark.  That is conflict preemption.

Now, I'd like to address if I could, briefly, what the -- what the State's counter-arguments are.

First, they argue that they're really not regulating pricing at all, they're only regulating delivery.

In the Novartis hearing a few weeks ago they phrased it this way, they are regulating delivery at the 340B price.  Your Honor was questioning -- their counsel I think was Mr. Feldman at that time -- and he said that repeatedly.

There's no way to pull apart delivery and price.  They are regulating price.  It's a fiction that they're not regulating price.  The two following statements are essentially the same: Sell me a car for one dollar and deliver a car to me priced at one dollar.  There is no substantive difference.

In our briefs, we cited a number of cases, including the Engine Manufacturers opinion written by Justice Scalia, that says when a court is looking at preemption in this context look at the substance.  Don't just look at the words.  A state cannot go out, hunt through a federal program's statutory authority or regulatory authority, try to find something that's not explicitly addressed, and then change the way the program works by adding some term.  They have to comply with Congress's general intent and that's the lesson of the *Engine Manufacturers'* case, the *Volkswagen* case, and several other cases we cited.

Now, I would also say that the actual state statute doesn't just regulate delivery, and the text of it is set forth in § (c).  It says, "A 340B manufacturer may not directly or indirectly deny, restrict, prohibit, or limit the acquisition of a 340B drug by, or the delivery of a 340B drug to a pharmacy."

Acquisition and delivery have to be different.

**THE JUDGE:**  Have to be?  I'm sorry.

**MR. PERRY:**  They have to have different meanings, otherwise acquisition by is complete surplusage.

Now, if you take a look at Black's Law Dictionary, acquisition and acquire mean to come into ownership of including through purchase.  It's nothing to do with delivery.  Their own statute defeats their defense in this case.  The text

of their statute does.

I'll also note in both of our declarations, the Scheulen declaration and Costello declaration, it's clear that in practical terms these covered entities or pharmacies can order the drugs they want, the only question is -- and those drugs will be delivered -- but the only issue is can they get them at a 340B price.  That's true as to all of the drugs at issue. That's the only practical question and our declarations address that.

Now, during briefing a different issue arose, and we filed a proposed surreply on this.  The State, I think, became aware as we briefed this of how the ordering system works.  In other words, if you don't accept the delivery terms in the federal offer, there is no sale.  That's important because their statute requires a purchase by a covered entity for it to apply.

I think Your Honor was asking these questions in the Novartis hearing.

So they changed their theory.  They argued something different.  They argued that the statute actually has a different term that's relevant.  It's a term that says a 340B manufacturer may limit -- excuse me.  It's in the definitional section.  What I just read is relevant, but 340B drug includes a drug that would have been purchased but for the limitation in subsection C.

The limitation under subsection C they say means a violation of subsection C, but that's not what the plain text means. And, in fact, the legislature in what's called a fiscal and policy note, which is available at the website for the legislature on HB1056, says that particular provision that I read has to do with the purchase being prohibited by the U.S. Department of Health and Human Services.

So here's what that all means, in the briefing since we first argued this case, or since Novartis first argued this case, they've changed their theory. They've interpreted now some different provision in the statute to mean something new. Okay, that's their interpretation, but here's what that interpretation, right or wrong, actually means.

They think they can actually regulate the content of the federal offer under 340B. They're saying that even if there's no purchase, the state can come in and say this is what must be in your offer. That is entirely a job for the federal government and the federal agency to oversee. That's what *Astra* basically says, that's the import of the very detailed statute we're talking about, that's the meaning of (a)(1).

THE JUDGE: Do you think that reading of the statute, the Maryland statute, is correct?

MR. PERRY: I have real doubts about it, Your Honor, but that is their reading. And if that's the State's reading, we need an injunction. Their reading is different than the

legislature's reading of it according to the fiscal and policy note.  But if that is their reading and they're going to enforce, we need an injunction.

So one other point before I yield to my colleagues, Your Honor.  Frequently throughout the briefing here Maryland argues that there is silence in the federal statutory regime, in the federal contract, and that that silence creates a gap that they can fill.

Of course I just explained the *Engine Manufacturers'* case and Justice Scalia's opinion, but there are many, many other cases that say when Congress has chosen not to address something that has preemptive effect.  And the analysis has to be done with an eye towards the substantive impact of the state law.

The Arizona case is one principal example of that Supreme Court case.  There's a provision that's addressed at Pages 403 to 407 of that case that has to do with the ability of unauthorized workers, aliens under the immigration laws to work.  And the question Congress addressed was should we punish that criminal, should we punish the actual people seeking employment criminally?  And they decided no.  They would punish the employers.  They would do some things about fraud, but they wouldn't punish that.

The state of Arizona came in and said no, no, we want to punish that.

So, here's what that particular part of the decision is about, 403 to 407.  It's not about immigration doctrines or the unique power of the Federal Government over immigration, what happened was in 1986 Congress passed the statute, that's the statute that's addressed.  Before 1986, the states could do what they later sought to do.  But after 1986, when Congress decided not to do something that the state wanted to do, that has preemptive effect.  That's important.

Now, the State argues repeatedly that that's just an immigration case.  You can ignore the Supreme Court's decision in Arizona, the Fourth Circuit doesn't ignore it.  The Fourth Circuit in the case we cited, *American Petroleum*, applies that same portion of that Arizona case to renewable fuels.

The Fifth Circuit in *TelTech* does the same thing for phone spamming.  It's a doctrine that widely applies, not simply an immigration doctrine.

The Ninth Circuit in *Volkswagen* to vehicle emissions.

The Eighth Circuit in *Forest Park* and, in fact, many, many cases that address housing and urban development issues make the same principal point.  That is, when Congress decides not to do something that does not create a gap that a state can fill.  That's an important component to the field and conflict preemption arguments here.

And with that, Your Honor, with an eye towards the amount of time we have today, I'd like to yield to my colleagues.

But, if possible, I'd love to reserve a little bit of time for rebuttal.

**THE JUDGE:** Thank you.

**MR. KEDEM:** Thank you, Your Honor. May it please the Court, Allon Kedem on behalf of AstraZeneca Pharmaceuticals.

While we agree with Mr. Perry on field preemption and his other arguments, I'm going to focus here, subject to the Court's direction, on obstacle preemption.

Our argument that HB1056 imposes additional costs on manufacturers under state law based on their participation in the federal program by essentially forcing them to issue discounts for contract pharmacy sales, effectively capping the price for those sales.

The Court is by now very familiar with the core dispute between the parties about whether this law regulates pricing or distribution, so I'm not going to repeat what we said in our briefs.

And, anyway, I don't think I could put it anymore succinctly than the Court itself did at the Novartis hearing when you said, quote, "If they don't honor the discounted price under 340B, that would violate the statute so their pricing decision is essentially regulated by HB1056." That's exactly correct.

And, crucially, Defendants have never disputed that their law would be preempted if in fact it regulates pricing. They

just argue that it doesn't.

So, I'd like to use my time, again, subject to the Court's questions and direction, to highlight three additional aspects of the case that make unmistakably clear the fact that this law does, in fact, regulate pricing and then respectfully suggest two ways for the Court to handle that issue.

The first is that as Mr. Perry just said, HB1056 applies not just to drugs that are purchased but also to those sought to be purchased by a covered entity at 340B prices.  In their effort to defend this law, initially Defendants took the position that this law merely regulates the delivery of drugs after they've already been purchased.  So it's the delivery of already-purchased drugs.

It became very clear early on that that wasn't going to work because under a policy like AstraZeneca's there's no purchase in the first place.  The drugs are just not offered at the 340B price if the purchase is being made for a contract pharmacy sale at a non-designated contract pharmacy.

So, instead, they rely on the provision that Mr. Perry identified A(4)(ii), which talks about drugs that would have been purchased but for the limitation imposed by the manufacturer.

So that's what now we have from defendants.  They talk about drugs that are purchased, or would be purchased, or sought to be purchased.

The key point here is we're not talking about delivery of already-purchased drugs.  We're talking about what's being offered for sale in the first place; and in particular when they say that the drugs would have been purchased but for the limitation, what they mean is would have been purchased at the 340B price if that price had been offered.  So, essentially, all we're talking about is it's a violation if you don't offer the right price.

And again, Your Honor, you put it exactly the right way at the Novartis hearing, quote, "That's the exact meaning of regulation, that it prescribes certain conduct, and if the conduct is the price that the manufacturer ultimately charges and that runs afoul of the statute, doesn't the statute regulate price?"  The answer, of course, being yes.

The second thing I want to highlight is the State's own declarations.  If you look at the covered entities whose declarations the State relies upon, they're, I think, primarily in the PhRMA briefing but that's cross-referenced in our preliminary injunction briefing.  They talk about being forced to buy at full price because discounts were unavailable and all of the revenue that they've lost as a result of that.

So I point you in particular to Exhibit D, the Lindamood declaration on behalf of an entity called Healthcare for the Homeless.  Paragraph 11 says, quote, "Unfortunately, manufacturers now require that undiscounted prices be paid on

drugs purchased from pharmacy locations other than our designated contract pharmacy."

Paragraph 12, it says that the organization, quote, "Lost more than 50,000 in rebates over a four-year period because we couldn't access drugs at the 340B price."

And then later on in the same paragraph it's talking about under policies like ours the organization, quote, "Is required to pay full price for such drugs.  This in turn has resulted in financial losses."

Other declarants talk about similar losses in revenue.  In Exhibit A they talk about the loss of about a million dollars per year in revenue; Exhibit B it's about 1.2 million over 18 months and so on.

All of their discussion is about restoring access to discounts so they can generate revenue.  So I think that, again, highlights the fact that we're talking about a pricing restriction.

The third thing that I want to talk about, and this is going to be elaborated on I think by my colleague, Mr. Owen, is the replenishment model, which again makes unmistakably clear we're just talking about pricing because everything relevant under the replenishment model happens on paper after the fact.

First, drugs are distributed to the pharmacy in exactly the same way.  They're packaged the same way, put on the same trucks, they get to the pharmacy the same way, and they're put

in neutral inventory the same way.  They're also dispensed to the patients in most cases exactly the same way.

But, after the patient picks up the drugs -- and usually they or their insurance pays full price -- someone, usually a third-party consultant called a third-party administrator, makes a decision about whether that prior sale was eligible for a 340B discount or not.

At that point, the covered entity gets in touch with the wholesaler to request a replenishment sale at the 340B price. Again, the drugs come in exactly the same way and go back into the neutral inventory.

And then the wholesaler requests a charge-back from the manufacturer for the value of the 340B discount and that makes the wholesaler whole.

So the replenishment model is just essentially a financial accounting exercise that happens after all of the sort of what we normally think of as the normal distribution has already occurred and because of AstraZeneca's policy and other policies by manufacturers that have adopted similar policies, that after-the-fact financial accounting is not happening the same way.

But the replenishment model, again, just highlights that all of this is about the flow of money, the change in the flow of money.  Whether it's a smaller amount because of the discount or a greater amount because no discount is available.

It's not about any change in the delivery or distribution of drugs.

So, along with the other arguments we've made in our briefs, we think these three features, the fact this law restricts prices in which drugs have to be offered; second, the State's own declarations which talk about the loss of access to discount pricing and the revenue that they've lost; and, third, the after-the-fact financial nature of the replenishment model all confirm that this law regulates pricing.

I'm happy to pause there if you have any questions?

**THE JUDGE:**  Yes.  I'm not sure how much or the extent to which this goes to the issue of obstacle preemption.  I think I can anticipate what counsel for the Attorney General is going to say here because I think they said something similar last time around when I investigated and probed this issue is that there's a difference between regulating the price in the sense of setting the price and prescribing that that's the price that the product must be offered at and enforcing a price that's -- that may be prescribed by another -- in another regulation.

So, I guess the way it applies here is that it's the 340B statute that sets the price, even if that informs the way that the Maryland statute gets enforced.  So in that sense it's not a price regulation because it's the federal statute that's regulating the price because that's where the price is actually

set.

MR. KEDEM:  I'm glad that you asked that question because it highlights something said in response to our PI motion that frankly we don't understand.

One of two things has to be true.  Either Maryland's law merely enforces obligations that manufacturers already have under the federal 340B Program or it imposes new obligations that they wouldn't otherwise have.  It has to be one or the other.

If it's merely an attempt by the state to enforce pre-existing obligations under section 340B, then obviously it's preempted because no state has the right to enforce a federal drug program or a federal benefits program.  They cannot as a matter of state law enforce preexisting federal obligations.  So, obviously it has to impose some new obligation.  I don't think there's any mystery as to what that obligation is because we have federal courts telling us that the 340B Program and the obligations that manufacturers assume under the 340B Program does not include the obligation to make these discounts available for contract pharmacy sales, at least beyond the one contract pharmacy policy that AstraZeneca has.  That was the express holding of the Third Circuit.  That's what the injunction that AstraZeneca got by the Delaware District Court, that's what the D.C. Circuit says.  That these discounts do not have to be extended to contract pharmacy sales beyond

the one contract pharmacy policy.

I would also point out that it contradicts the entire premise of their preemption argument to say that this Maryland law imposes no new obligations.

The entire premise of their argument is that these laws talk about different subjects.  That one talks about pricing and offering, and the other just imposes a delivery obligation.  Well, those two obligations have to be different or another way that they talk about it is they say it fills a gap.  Filling a gap is imposing a new obligation.

I would also point you back to the declarations, right, they talk about all of the millions of dollars of revenue that they would get if we comply with the law as opposed to doing only what the 340B Program itself requires us.  All of that money is the financial obligation that this law imposes on manufacturers above and beyond what we would otherwise be obligated to do under state -- under federal law.

So I just don't think it works for them to argue that all of this is doing is enforcing the federal obligation.

THE JUDGE:  Even if it is a new obligation in there with respect to delivery or distribution, that doesn't mean there's a conflict between that obligation and those under the federal statute, does it?

MR. KEDEM:  So, Your Honor, I think that it does, and I think this gets to the sort of two different ways to look at

it, which I can run through and hopefully this will answer your question.

So, one way to look at this is to say preemption cares about substance, not labels.  If it walks like a duck and quacks like a duck then it's a duck and not a rabbit.

And, here, HB1056 looks and acts exactly like a pricing regulation.  It -- a violation under the law consists of charging -- or I guess what they're now saying is offering the wrong price.  It has nothing to do with the way drugs are shipped or stored or dispensed.  It has nothing to do with delivery.  And the reason that AstraZeneca is in trouble under Maryland's law has nothing to do with the way that its drugs are delivered or that they can't be accessed.

AstraZeneca's drugs are available all over the state at any pharmacy that wants them, albeit not always at 340B prices.

So you can just say, when you're deciding what to do with all of this, that this waddling and quacking animal is a duck, that HB1056 regulates pricing.  And at that point I don't think Maryland has any argument that a regulation of pricing is not preempted.

But the other approach, and I think this gets to your question, Your Honor, is to say I don't actually even need to decide whether in some abstract sense this is about delivery or pricing because regardless we can all agree it's about money and whether the money stays with the manufacturer who gets to

charge full price or instead goes to the covered entity who gets access to discount pricing.  And whether that's an obligation about pricing obligation or not, it's a new obligation above and beyond what the manufacturers are required to do under federal law.  It's a new state-imposed obligation.

And here's the key part, it's an obligation that is imposed by the State of Maryland if, but only if, a manufacturer chooses to participate in the federal 340B Program.

So now the cost of participating in this federal program is not just what the manufacturer was offered by the Federal Government when they signed up for the program but it's the additional cost that Maryland is imposing on them.  They also have to consider that cost as well.

Every dollar of benefit under this law for a covered entity is a cost on a manufacturer.  Every dollar that goes into the pocket of a covered entity comes out of the pocket of a manufacturer.

My friends from the State, again, these declarations talk about millions of dollars in lost revenue.  What they're really talking about is millions of dollars of additional cost under State law for participating in the program.

So to put a really fine point on it, according to the declaration in Exhibit A, Maryland's law makes it roughly a million dollars more expensive just with respect to that one

covered entity for manufacturers to participate in the federal 340B Program.  Exhibit B talks about 1.2 million over 18 months and so on.

If you add up all of the revenue from all of the covered entities in the states, you now know the full cost that Maryland's law imposes on manufacturers for participating in the program above and beyond what they agreed to when they signed up with the program by signing an agreement with the Secretary of HHS.

The result is what the Supreme Court has called an extraneous pull on the federal program.  It leaves the Federal Government with less to offer the manufacturers to entice them to participate in the program and reduces its economic leverage.

We have not seen a case and defense have never cited any in which there was a federal benefits program comes along with certain benefits and burdens.  Here, the benefit is you get access to Medicare and Medicaid; the burden is you have to make these discounts available for an identified universe of sales. And then, some state was allowed to come along and say, actually, if you participate in this federal program here are some additional obligations that you have, costly obligations, for complying with state law.

I was trying to come up with an analogy, and the best I could come up with was the following:  Imagine that the

Government said to federal contractors who want to be food vendors for the military, so like Taco Bell or Hardees or something like that, that you have to make your food available for 50 percent off for veterans at mall food courts.  If you want to join our program, if you want to be a contractor, that's what you have to offer.

And then a state like Maryland came along and said, "Actually not only do you have to offer it at mall food courts, you have to offer it at all of your retail locations."  And then they try to defend that law by saying "Actually we're just regulating the delivery of half off food."

I think first we recognize that that law regulated pricing not delivery no matter what they called it.  But even putting that aside, and regardless, it obviously imposes a far greater obligation on those who choose to participate as federal vendors.  And it makes it that much more costly undermining the Federal Government's leverage introducing what the Supreme Court has called this extraneous pull.

States are simply not allowed to use a voluntary participation in a federal program as leverage to extract additional benefits or, to say the same thing another way, to impose additional costs on those who choose to participate.

Again, this is not just some industry-wide regulation like all of the pills sold within Maryland have to include a tamperproof container.  That would be one thing.  It is imposed

solely on those who participate in this federal program.  If the federal program ceased too exist, this all would have absolutely no effect.

I was trying to come up with a good analogy here, and my son is obsessed with animals and so the best analogy I could come up with is like a remora fish that attaches itself to a shark, but then I decided that that analogy actually didn't work.  That remora fish continues to exist even if the shark doesn't.  Here, this program would cease to exist entirely if the federal 340B Program went away because all it does is attach itself to the program and impose additional obligations on those who voluntarily choose to participate in the program.

THE JUDGE:  All right.  At this point are we transitioning off the preemption by 340B?

MR. KEDEM:  So, Your Honor, I think the arguments go both to 340B preemption and also patent preemption because patent preemption is focused on whether there is in fact a regulation of price.

But I want to emphasize, even if you decide that this isn't a regulation of price, but merely some other type of new obligation, it would still impose a severe financial cost, which Defendants themselves have attempted to measure through these declarations on the manufacturers that participate.  And it's that additional cost that they can't impose on participants in the federal program.

**THE JUDGE:** That additional cost goes to irreparable harm, does it go to preemption?

**MR. KEDEM:** It does, Your Honor. So, and I'm happy to talk about irreparable harm. The reason it goes to preemption is that states are not allowed to make it that much more expensive for those who choose to participate in a voluntary federal program. That's the extraneous pull that the Supreme Court talked about in *Buchmann* and other cases, and that's where it lines up with the idea of preemption.

**THE JUDGE:** Understood.

**MR. KEDEM:** So just quickly on irreparable harm. I think both sides actually agree that money can be irreparable harm if there's no way to get it back, and here the discounts mandated by HB1056 are unrecoverable because there's no mechanism under state or federal law to get it back.

For the first time we heard in its response brief the State make the argument, and I'm just quoting now, quote, "There is a mechanism that exists for Plaintiffs to recover the costs incurred if the Court later concludes that HB1056 is unconstitutional."

But the State doesn't say what that mechanism is, and it drops a footnote making very clear that the State itself will not pay the money back. It believes that it has sovereign immunity so there's no way to get the money back from the State.

The State's response in its brief also contradicts what the State told you at the Novartis hearing.  You asked the question, quote, "Is that correct that there's no way for them to recover the discounts that they would have already issued in the interim?"  Meaning during the course of the litigation.

And Mr. Detrick said, quote, "That's my understanding."

So that's also consistent with our understanding.  We're not aware of any way that we could get these discounts back for discounts that are extended during the course of the litigation.

THE JUDGE:  Now, Maryland's not the only state that's enacted legislation like this.  In fact, the more recent legislation in other states is largely identical in terms of the language.

Have there been any other courts that ruled in your favor on the preemption issue?

MR. KEDEM:  No, Your Honor.  As far as we know, there are only two state laws that have been ruled upon.  One stayed in Arkansas and the other Mississippi there's been a district court ruling, but it's now pending on appeal.  It's still early days.  There are a number of states that are considering these issues.  I think that actually matters quite a bit, though, because we're not just talking about the millions of dollars of additional costs that Maryland would impose on top of the federal program, we're now talking about the costs imposed by

potentially 50 other states.  And so it makes participation in the federal program that much less undesirable and it, thereby, undermines the Federal Government's offer that, you know, participation that amount as well.

**THE JUDGE:**  Thank you.

**MR. KEDEM:**  Thank you, Your Honor.

**MR. OWEN:**  Good morning, Your Honor.  Matthew Owen from Kirkland & Ellis on behalf of AbbVie.  I would like to associate myself with the remarks concerning preemption that my colleagues have presented this morning, but I'd like to focus at the beginning of my presentation on the takings claim that AbbVie has brought, but I do want to circle back to preemption before I sit down because I think the two arguments relate to one another.

Essentially, the State is caught in a vice.  In order to escape preemption, in other words, in order to convince the Court that this state law is not entangled with a federal scheme, it has to convince you that it imposes something new and something different than what is regulated by the federal 340B statute, exactly as Mr. Kedem has said.

The problem that I have is that the nature of that new obligation is the requirement that AbbVie sell property to a private person, a third-party, either a covered entity, or ultimately a contract pharmacy like CVS and Walgreen's, that it doesn't want to sell its property to.  That kind of compelled

transfer of private property is indisputably a taking unless there is some defense to a takings claim that might be presented in the case.

I think that the easiest thing for me to do concerning the takings claim this morning is just to walk the Court through the three things and the only three things the State has tried to say in defense of our takings claim.

In the opposition brief to our motion for preliminary injunction, the State advanced three arguments. The first of those arguments I think they have since repudiated.

The first of those arguments is found on Page 14 of the State's opposition brief in the AbbVie case. And what it says is that the federal law -- strike that -- that the Takings Clause does not invalidate the Maryland law because it only applies to drugs that have already been sold and therefore are no longer AbbVie's property. This is basically the same dispute about the meaning of the statute that the Court has explored at the Novartis hearing and then again this morning.

The problem with this argument is that -- there are two. The first is it's not what the Maryland law says, and the second is it's no longer even the State's position for the reason that my friends on the Plaintiffs' side of the case this morning pointed out, that in the motion to dismiss briefing that is in parallel taking place in this case, the Government's position, the Attorney General's position is, well, actually

the Maryland law also applies to any drug that was offered for sale at the 340B purchase price, even if it wasn't sold, and therefore it applies to drugs that would have been sold but for the limitation.

Now, if that's true, Your Honor, first thing you say is that argument number one, in their opposition brief on the Takings Clause no longer exists because it's only a defense that we've already sold the drugs.  And, second, it makes perfectly clear that this statute enacts a taking because if I own property, and I offer to sell it as AbbVie does -- and you can see this in the record, the Exhibit 1 to our preliminary injunction motion attaches two other attachments, Exhibits 1B and 1C, which are AbbVie's policies -- those policies make clear that AbbVie will offer to sell drugs at the covered -- at the 340B price to covered entities provided that they are not delivered to an unlimited number of contract pharmacies. That's the offer.

The D.C. Circuit in *Novartis* and the Third Circuit in *Sanofi* had said that offer, essentially, discharges our obligation under the 340B statute.

The problem is covered entities in the State of Maryland don't like that offer.  They want to reject it and replace it with a new offer, which is, we want you to deliver them to any contract pharmacy in the state whenever a covered entity so directs.  That was exactly the position that did not prevail in

both the D.C. Circuit and the Third Circuit cases.  The gist of which is we have the right to offer the drugs for sale at the 340B price, but only if the covered entity agrees not to deliver them to contract pharmacies in unlimited fashion.

Because that's our offer, the State's position is, well, even if they don't accept that offer you still have to deliver them to the contract pharmacy at the 340B price even though you don't want to.  And that's a compelled transfer, and it's a taking.

We know that from a number of pretty settled Supreme Court rulings.  The proposition that an A to B forced transfer of property is unlawful is as old as the Republic, *Calder v. Bull* said so in the 18th Century, the Supreme Court has reaffirmed it repeatedly, including in *Midkiff* and even in *Kelo v. City of New London*, which is probably the high watermark of what the Supreme Court would allow in terms of transfers of private property for public use that might get into the hands of another private person.  Even in that case, the Court emphasized that the purpose of the transfer was to ameliorate a blight and that it could not be allowed if it were for the benefit of a private person or any identifiable class of people rather than the public as a whole.

This statute goes well beyond that.  It identifies on the face of the statute exactly who's supposed to get the benefit of our property, which is a pharmacy, a for-profit entity like

CVS or Walgreens who gets to get our property without paying for it and then sell at full price and keep the difference. That is not a public use recognized by the Supreme Court and it is clearly a taking.

The other case I would point the Court to is *Horne v. Department of Agriculture*. There was a very lengthy discussion in that case in which the Chief Justice explained that the Takings Clause applies equally to private property that is to personal property to chattels like drugs or in that case raises as it does to land. That's important too because the Government's arguments in this case amount to a claim that they can regulate the sale of drugs, and, therefore, and ultimately the delivery of drugs, and that because they can do that under police power they can also force us to deliver drugs at the particular price when we don't want to deliver them or sell them at all in the first place.

The Government's -- the Attorney General's brief goes on to make two other points. The first one I think having been both repudiated and not correct.

The second one is reliance on the Voluntary Participation Doctrine. This goes from Page 14 through about Page 17 of their opposition. As we have explained in our reply, the voluntary participation doctrine doesn't apply in this case because that doctrine says that if I give you a benefit, I can ask you to give up your property rights in exchange. There's a

bargain for exchange, in this case, between Congress and the Department of Health and Human Services and AbbVie and the other Plaintiffs in this case.

That bargain is reduced to a contract called a PPA, which is described in the *Astra* case and enumerated in the statute and that's the bargain. In exchange for access to Medicare and Medicaid, you have to agree to give up some of your property rights. You have to be willing to transfer, to sell at below market, confiscatory penny prices some of your drugs to certain enumerated entities. That's the bargain.

Every single case that the Government cites in defense or reliance of the Voluntary Participation Doctrine involves the situation where a person took a benefit from one sovereign in exchange for giving up something and then turned around and sued the same sovereign for a taking. That's not what the situation is here.

Maryland has not conferred any benefit itself on AbbVie or the other Plaintiffs in exchange for this requirement and its brief is very clear about this.

Maryland believes, it says that Plaintiffs' decision to participate in the 340B Program is voluntary. As is their decision to participate in the Medicaid and Medicare Part B programs. That's Page 15 of their brief. Those programs, the 340B Program, Medicaid Program, and Medicaid Part B, those are all federal programs. And it's true, our participation in

those programs may mean that AbbVie can't bring a takings claim against the Federal Government arguing about the kinds of conditions or things we have to do to participate in them.  But Maryland didn't create those programs, and we don't have a PPA with Maryland.  We only have one with the United States.

The only case that the Attorney General cites in their brief where they claim this wasn't true, I think, is on Page 17, it's the *Pharm PAC* case.  And I would urge the Court to read this case with care.  It's a little hard to follow.

But what I understand was going on here is that in Medicare and Medicaid there are -- there's a lot of interplay between the federal and state governments because unlike in the 340B Program, Medicaid and Medicare invite the states to participate.  And, in that case, the Federal Government enacted something called MAC regulations and the state did some things to implement those regulations but the regulations themselves were federal.

The Plaintiffs brought a large number of claims against both the Federal Government and the State Government, and I would describe them as *Lochner*-like claims.  They are in the nature of these actions by both the Federal and State Government kind of unduly interfere with our liberty.  That kind of thing.  And those arguments were rejected.

But the takings claim -- and this is at Page 1243 of that opinion -- says that it was the MAC regulations that did not

constitute a taking because of voluntary participation.  That's just the federal regulation.  There is no state MAC regulation in the case as far as I can tell.  That case doesn't discuss the problem I'm describing where you're attempting to assert voluntary participation against -- in defense of some other sovereigns program.  There's no discussion of that in the case at all.

But I wanted to make sure I highlighted it because it really gets to the right point.  If the Federal Government creates a regulation of a spending clause contract, they can ask you to give stuff up.  Maryland cannot come along and say, "We'd like to raise the price of participation in a federal program."

As Mr. Kedem and Mr. Perry pointed out, that is a preemption problem.  But for this purpose it's also a takings problem because it means that we did not voluntarily participate in the Maryland law.

The last thing that the Attorney General says, this is a regulatory takings case, and that is also not right.

The regulatory takings doctrine governs when the state tells a property owner how it can use its own property.  Not when it tells a property owner when it must give up its property.

The first thing to notice about this reliance on regulatory takings is that it is inconsistent with the State's

previous argument on Page 14, where they started in the taking section of their brief, that this law only applies after we did give up the property in the first place.  And now they say, the State, it applies to drugs that we offered for sale or would have sold but did not.

As long as the law takes property that we own and forces us to give it to someone else so that they own it, that is a physical taking, not a regulatory taking.

The confusion, I think, in the cases about this arises because sometimes the Supreme Court and courts of appeals use the same phrase "per se taking" to mean two different things. One is, every kind of physical taking of property is a per se taking.  The second is, sometimes a regulatory taking, as in the *Lucas* case they cite, can amount to a per se taking if it diminishes the value of your own property to zero.  That also counts as a per se taking but the label is confusing.

The issue, as the Court explained in Judge Thacker's opinion for the Court in -- I'm sorry -- I'll think of it in a second, I lost the note -- for the Fourth Circuit, the difference is whether you have to give up the property or not. If you give up the property that's a per se taking.  If you keep the property but the regulation prevents you from using it at all, so it has no economic value, that's also a per se taking.

The labels are confusing, but our claim is that in this

case we have to give up our property and because we have to give up our property that is a per se taking.

Even if it were a regulatory taking, however -- and I want to talk about the replenishment model in a moment because I think this explains this -- we would state a claim for regulatory taking, and we have.

The elements of a regulatory taking are to evaluate first the economic impact on the plaintiff.  And here, as our declaration suggests -- this is Mr. Scheidler's declaration paragraphs 19 through 22, it's Exhibit 1 to our preliminary injunction motion -- these policies that Maryland would like us to reinstitute cost AbbVie millions and millions of dollars.

Second, they interfere with AbbVie's investment-backed expectations because the drugs that we are selling are the product of research and development and equity investment by my client.

And third, the character of the Government action here is not to facilitate some public benefit in the usual nature of a regular -- a public use regulation.  Here, the effect of the regulation is to transfer the economic value of one private person's property to a different private person, including for-profit companies that Congress has specifically excluded from participating in the 340B Program.

For all of those reasons, I think the state is out of defenses to our takings claim.

In summary, they agree now that the regulation applies not just to drugs that we have sold but in fact drugs that we refused to sell.

Second, the Voluntary Participation Doctrine does not apply as a defense because we don't participate in their program.

And third, the Regulatory Takings Doctrine doesn't apply because we lose physical title to the property.

That brings me to the statute itself.  I just want to emphasize to the Court the word "acquisition" in the statute.  As we talk about preemption and the takings claim, the tendency of the Government is to describe this statute as a delivery regulation.  For all of the reasons Mr. Kedem explained earlier, it's not.  This statute is a price regulation in its effect, but on the face of the statute it says "acquisition."  That AbbVie cannot prohibit, deny, or interfere with the acquisition of its own property by someone else.  On the face of the statute that constitutes a compelled transfer.  It's just phrased in the negative.  Instead of you must allow someone to acquire your stuff for free, it says you may not prohibit them from acquiring your stuff at penny prices.

On the face of the law, that is a direct regulation or a direct command to facilitate the acquisition of private property by a third person.

I'd like to talk for a moment, unless the Court has

questions, about the takings claim.

**THE JUDGE:** Well, I'm coming back to the same question that I believe I previously asked Mr. Perry which is whether or not you agree with the interpretation of the statute that you hear the State giving with respect to offer?

**MR. OWEN:** I think that there is some warrant in the text of the statute for what they are saying. I don't think that's the best reading of the statute for the principal reason. I don't think that because if you interpreted it to mean that it would be unconstitutional. And I'm sure that the proper -- that for that reason that a interpretation of the statute that say it's unlawful for you to refuse to sell your own property you ever offered it under conditions that someone wouldn't accept, now you have to give it to them for a penny. I agree, if that were what the statute meant that would be unconstitutional so it would be available to the Court to interpret it another way.

But from our perspective, the Government has made extremely clear how they intend to enforce the statute.

So I agree with Mr. Perry, if that's the interpretation that they're going to use, and they're going to enforce, then we need protection against that interpretation because otherwise, Your Honor, we're not violating the statute.

AbbVie's policy, as the record makes clear, is we will not sell the drugs at 340B prices if these delivery to contract

47

pharmacy conditions are going to be insisted upon.

If our drugs never become 340B drugs in Maryland, and we can continue to use our policy free of interference, that would be okay.  But I think that the right interpretation of the statute to avoid constitutional problems is almost certainly that that's not right.

Unless the Court has any other questions about takings?

THE JUDGE:  No.

MR. OWEN:  I want to talk for a moment about preemption.  I don't want to rehash anything you've heard already, but I want to make a couple of points at a higher level.

I think the preemption arguments in this case can and they're supposed to get into the weeds and the details of how the program works and a lot of using different language, acquisition, offer, delivery, et cetera, about the federal scheme and the state scheme, and that's appropriate.

But I want to describe for the Court at a really high level, and I want to return to the original preemption case that the Supreme Court decided about the law of this state, which is *McCulloch v. Maryland*.

*McCulloch v. Maryland* involved a law of Maryland imposing a tax on any bank in the state that was not chartered by the legislature.  Now, the only bank in Maryland that was not chartered by the Maryland legislature was the Second Bank of

United States because back then you had two banks.  Federally chartered banks, and there was exactly one, and everything else was a state bank.

The purpose of the law, unlike this law, didn't actually refer to the federal entity on its face.  The purpose of the law was to regulate and tax federal instrumentality created by Congress.  That was the only thing that it did and the Supreme Court invalidated.  And the reason it gave is that when the state taxes the operations of the Government of the United States, it acts upon institutions created not by their own constituents, but by people over whom they claim no control.  And states have no power by taxation or otherwise to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government.

I think at 50,000 feet, that's what's going on here.  Maryland passed a law that explicitly refers to a federal program by name.  The only thing it applies to are transactions that are regulated directly by the Federal Government.  The Supreme Court has held in *Astra v. Santa Clara* that a federal agency has exclusive authority to enforce the provisions of that federal program to the point of excluding private lawsuits to vindicate the exact kinds of claims that the Maryland Attorney General now wishes to be able to pursue in state court.  And the defense of the statute interpreted in the end

cannot get around, that is the Attorney General's attempt to defend it cannot get around that basic point.

This is a statute around a federal program, and what it is attempting to do is reverse the opinions of the D.C. Circuit and the Third Circuit that say that to comply with that federal program and thereby get access to Medicare and Medicaid patients for your drugs, which is what Congress is offering the drug companies, and access to a market, you want access to this market, we need you to pay something.  And Congress has set a price at X level.  And Maryland says, you know what, it is a -- it is a crime in Maryland not to go further than that.

You have to offer the 340B price under conditions that the federal courts say you don't have to offer them to comply with 340B.

And they did that not through a general law of application about delivery, right, for example, as we mentioned in our brief, you could imagine a state law that really would be an exercise of its police power delivery obligations.

For example, you could say any drug has to be transported in a temperature-controlled truck, that way it will, you know, be preserved from harm or deterioration or disease.  Okay.  That would be -- and applying that law to 340B purchases would probably not be preempted because that law is general and it really is about delivery.  This law is not general, it only applies to 340B sales.

And as my colleagues have pointed out to the Court, it doesn't really regulate delivery in the first place. The only thing it really regulates is the price. It is a command to offer drugs for sale at penny prices when the drug company doesn't want to do that and when Congress has said you don't have to. And at a very high level, that is either a taking or preemption or both. And in order to escape one, the preemption argument, I think the Government has kind of walked itself into a takings problem on the other end.

I wanted to describe for the Court, if the Court would be -- if the Court would find it valuable -- how the replenishment model works. And I think this is relevant to two parts of our claim.

The first is to the extent that the Court were inclined to view the matter as a regulatory taking, I think this describes the economics and the character of the Government action, and it certainly describes the public interest in enjoining the law. I don't want to go on at great length about this, but I think it would be helpful to explain if I might what the evidence in the record shows.

For that purpose, we have a very small demonstrative deck we've shared with the Government. I'm not going to walk through all of it, but if it would be helpful for the Court I might show a few slides.

**THE JUDGE:** All right.

MR. OWEN:  I'd like to start with slide five, if I might.  The citations to the relevant exhibits are on each of these pages.  But I think the matter is sufficiently complicated that it might help to visually depict how this works.  How it works is this:  As an initial matter -- we can turn to the next slide -- let's say commercial pharmacy orders 10 units of a particular drug.  Let's make up the price at $100.  Those are blue.

And then a 340B covered entity wants 10 units of the same drug.  Let's say they get 99 percent discount to a dollar.  So their price is 10.  These are two separate orders that get received.

If you turn to the next slide, what happens is AbbVie and other drug companies put them in a box, and they ship them to a pharmacy in an indistinguishable way.  That's what our declarant explains this is how it happens.  Once they leave, they go in an undifferentiated inventory or shipment in the same package to a pharmacy.

If you look at the next slide, that undifferentiated stock is added to the general inventory or sometimes called the neutral inventory of the pharmacy.  That is, they all go on the shelf, no segregated inventory, no maintenance of independent title.

And what we're citing here for the Court's convenience is not just our own evidence, what we're citing here is the

declaration of Rear Admiral Pedley, an official of HHS who executed a declaration describing how the system works.  That's in the record.  It's Exhibit 2, I believe.

If you turn to the next slide, what happens is customers, patients, they come into the pharmacy, and they present their prescription, and they pay the full price.  No matter who they are.  They pay whatever price they would normally pay.

The 340B status of that patient is not known to anyone at the point of sale because the point of contract pharmacy arrangements is not to provide discounted drugs to 340B patients, who are supposed to be patients most in need of discounts, the point is to provide the difference between a penny and the full commercial price to CVS.  That's the point of the operation.

The next slide explains that after that the contract pharmacy, like CVS or Walgreen's, in conjunction with a third-party administrator, goes back and retroactively calculates how many drugs they believe they dispensed to a 340B patient.

Our declarants explain, we don't know how they do that. What their definition of patient is could be and can be very expansive.

In other words, suppose, Your Honor, that my colleague Ms. Pohl had been to a 340B hospital and she was in law school many years ago and that person -- she might be considered a

340B patient for years and years and years. We don't know because the calculation is black-boxed. It's a secret. They calculate -- and on this graph we hypothesize that of 10 recent dispensing events maybe seven of them were for 340B patients, according to the contract pharmacy. All of those people paid full price.

Then on the next slide it explains that an order is then placed back to AbbVie to replenish those drugs at the 340B price.

Now, what that means of course, as you'll see in a second, is not that those drugs get shipped in a special box and they're protected from the kind of diversion that the federal law prohibits. No, they go back in the same box to be put on the same shelf to be dispensed to anyone. And that's what the next couple of slides show is that imagine that your next need for order is 70 percent 340B and 30 percent commercial according to your algorithm instead of paying a thousand dollars you pay $300 and keep the difference.

The next slide, imagine if they were all 340B drugs you thought, well, then you would pay $10 for the whole thing.

And then, finally, slide 14 at this point shows the cycle. Once you place the replenishment after enough of these calculated accumulations have occurred, you just order more drugs from AbbVie or another drug manufacturer, they -- you can see they kind of magically turn blue again. They get shipped

to the pharmacy and put on the general inventory shelf, and they can be sold to anyone at full price.

Now, that means -- I'll show you one or two more slides. The next one is just to summarize. The manner of the drug delivery is the same because it is literally the same as commercial pharmacies -- commercial orders not subject to regulation under the statute. Maryland law only applies to 340B delivery, but there is no such thing as 340B delivery. It is the same as commercial delivery. And it is literally the same because the drugs that are ordered at 340B prices become commercial drugs instantly.

Patients pay full price for them almost always and the drug price paid to AbbVie is lower and that, as the next slideshows, is the point.

The spread. What we are really talking about here is revenue versus cost. All of the revenue from the 340B Program comes from 340B patients and their insurance companies for -- insurance companies for whom to whom they pay premiums. The cost is what commercial pharmacies and covered entities have to pay us.

So when you read in declarations that certain covered entities are likely to lose millions of dollars if our policies are allowed to remain in force, two things you'll notice about those declarations.

The first is the only source of revenue, the place those

millions of dollars come from is just the spread between the full price they're already charging and what they have to pay us.  It is not that they're going to provide that discount to patients because if that were true they wouldn't have a net revenue loss.  The revenue loss comes from chargeable price for stuff you buy for a penny.

The second thing I would urge the Court to notice is that it demonstrates conclusively that the Plaintiffs in this case are right, that this law is not about delivery.  Delivery rules don't -- are not worth the kinds of millions and millions of dollars that the Government says are at stake.  What does generate millions and millions of dollars in revenue shifts from one for-profit company to another are price regulations.  They are rules about requiring us to sell more drugs at a penny to be sold at full price than we want to.  That's the only way that the -- that the law is worth the amount of money that the declarants and the Attorney General say it is.  It's not about delivery.

The remainder of the deck I won't belabor the Court with, but if you examine it you'll see it's just excerpts from our declarations and the evidence in the record, but the high-level point for the Court is that I am not aware of any evidence in the record from the Attorney General suggesting that allowing the pharmaceutical companies to restrict contract pharmacy delivery will do anything to effect the manner in which 340B

drugs are delivered or anything other than the price that they have -- that we are paying for them.

So for all of those reasons, and the ones I explained before, we would urge the Court to enter an injunction to prevent the irreparable injury to AbbVie both from a violation of its property rights in the form of taking its property and also because it would effectuate an unlawful preemption -- I'm sorry -- that it runs afoul of the preemption doctrine.

If the Court would like to hear about irreparable injury I can do that very briefly, but I think it's adequately covered in our papers.

THE JUDGE:  No, I don't think I need to ask any questions about that or hear anything more about that.  But I did have a question about the graphic.  I think step five was the black box algorithm.  It's a mystery to me why that's a mystery to you all if the 340B statute and program give you a right to audit, if there's any sort of questions concerning diversion or any question concerning whether or not the discounts have been applied to drugs sold to persons who were not patients of the covered entity.

MR. OWEN:  Your Honor, I'm very glad you asked that. The reason is because it is not actually so that we have an unfettered right to audit.  I promise that if any of our clients were able to obtain this algorithm through an audit we would do so.

57

The problem is that 340B statute does not provide an unfettered right to audit.  In fact, it is highly restrictive.

The audit rules say that the Secretary of HHS can determine the scope, frequency, and duration of audits.

In 1996, the Secretary of HHS at HRSA, its component agency, issued some guidance and the gist of that guidance, which is cited for other propositions in the briefs -- and we could obviously furnish the Court with a more precise citation if helpful.

What those say is that a manufacturer can't just audit a covered entity, it has to have reasonable grounds to do that.  How do you get reasonable grounds to audit someone without getting the audit to get the evidence is a Catch-22 that goes around and around.

Second thing is, HHS will not allow you to audit a covered entity if anyone else is auditing them.  In other words, HHS has a rule that a covered entity can only be subject to one audit at a time.  And probably, if memory serves, but I don't want to get it wrong and maybe someone will correct me if I do, only one audit every three years, I think, something like that.

So, although you might think in the abstract that manufacturers could take advantage of the audit rules to get all of this information and then pursue claims against covered entities that are engaged in diversion, we really can't do that because HHS has limited severely our ability to conduct audits.

And so for the purpose of putting that in the framework of a preliminary injunction motion, what I would -- the way I would describe it for the Court is that is not an adequate remedy at all. It is not an adequate remedy at all because it is so severely regulated.

So, in order for us to use audits to sort of pursue claims against every single Maryland entity that might try to take advantage of it or the Attorney General might try to enforce this law on behalf of would not be feasible and probably wouldn't even really be allowed.

And maybe if I could just ask to show the last slide, maybe this would help. The reason that we think this is so important is that -- I just want to show the Court the very last slide which is the text of the diversion statute. The diversion statute says that with respect to any covered outpatient drug that is subject to an agreement under this subsection, that's the PPA, a covered entity shall not resell or otherwise transfer the drug to a person who is not a patient of the entity.

Now, the contract pharmacy is not a patient of the entity. Again, the record is very clear, they get all of the drugs for their own general inventory to give to whoever comes in the door and pay full price and on its face that seems to be a serious problem under the diversion statute.

But, in order to go further, even if you lay that sort of

big ticket diversion problem aside, if you wanted to get into the weeds and decide which of these dispensing events were and were not properly called a 340B dispensing event and justified replenishment order under this complicated wheel that we showed you, you would first have to know who is a patient of the entity.  And patient definition is a -- is a unilateral thing that covered entities, their third-party administrators, and contract pharmacies apply sort of in secret without telling us what they're doing.  And we don't really have a way to know that without, again, reasonable grounds to conduct the audit and HHS's permission and hopefully no one else has asked recently.  Those are the hurdles.

THE JUDGE:  Even if the audit rules are difficult for you to overcome, it sounds like your position is that the contract pharmacy arrangement in and of itself is a diversion.

So doesn't the 340B Program give you a remedy against diversion?

MR. OWEN:  340B Programs -- the 340B Program doesn't give us a remedy against diversion.  The 340B Program allows us to audit, if on permission, particular covered entities and then maybe we could pursue claims under the ADR scheme.  But otherwise you kind of have to -- but even that scheme now ultimately depends on HHS enforcement.

I also don't want to take the categorical view that all contract pharmacy arrangements constitute diversion because we

Ronda J. Thomas, RMR, CRR - Federal Official Reporter

don't always know all of the details of contract pharmacy arrangements but certainly many of them do.

Any contract pharmacy arrangement in which the drug itself goes to a patient, a person who is not a patient of the covered entity, that's diversion.  And we know from the record and from OIG reports -- and I think it's completely undisputed between the parties -- that after 2010 when HHS changed its mind about how this program should work -- because, remember, before 2010 we were basically exactly like the pharmaceutical companies who are before you now want to have it work today.

From 1996 until 2010 the rules were you could have one contract pharmacy if you maintained title and if you had, your know, for a time segregated inventory, and only if you didn't have an in-house pharmacy.  And we might be a little more generous than that now, but basically what's going on here is pharmaceutical companies have enacted policies that very closely proximate how this program ran for almost all of its existence.

And then, in 2010, HHS decided it would loosen the reins a little bit and say, okay, how about instead of one contract pharmacy, you need one under these strict controls that prevent diversion, how about we let you do it to an unlimited number of contract pharmacies with no controls to prevent diversion.  And that went on for a long time, and it caused an explosive growth in the program of a thousand percent by multiple, 4000 percent.

**THE JUDGE:**  Yeah, I understand the history well enough.  The point I'm trying to get to is how do you distinguish the contract pharmacy that's received an unlawful diversion of a 340B drug versus one that hasn't?

**MR. OWEN:**  In order to know that, Your Honor, there's either two ways of answering that question.  Either if they maintained title and the segregated inventory and agency relationships with the covered entities, which were the things that the Eighth Circuit thought were important in the *McClain* case about the Arkansas law.  That's very critical about that case.  This is exactly why the Eighth Circuit ruled in favor of Arkansas are the questions the Court is asking now.  Because if, if there's an agency relationship between the covered entity and the pharmacy, and if the covered entity maintains legal title to the drugs, then, if you look at the diversion statute, they would not have transferred the drug to someone who isn't the patient.  They would own it themselves.  And then if it is then further dispensed to a person who really qualifies as a patient of the covered entity, in that case there would be no diversion.

But here, either one of two things would cause diversion.  One, if they don't maintain an agency relationship and legal title to the drugs.  And we know they don't because as I said, Admiral Pedley's declaration, who runs the 340B Program, admits that they put them in the general inventory of pharmacies which

doesn't maintain legal title.  And no one wants to show us the contracts between the covered entities and the contract pharmacies that would allow us to learn whether there's agency relationship.

In fact, in the opposition brief into AbbVie's PI motion in this case, one of the things that the Attorney General said is that our declarant wasn't sufficiently informed about that point because he didn't review any of the contracts between the covered entities and the contract pharmacies to learn whether there's an agency relationship.  This diversion statute is what that's all about.  Of course we don't have access to that, so if we preview for the Court we may ask the Court for some limited discovery to get the contracts and sort this out to see if there is a problem along those lines in Maryland.

The second way it would be diversion is that ultimately if the drug does go to someone who is not a patient of the covered entity.  And whatever -- under the best reading of the word "patient" in the statute, that's a federal statutory term.  It eventually has to be interpreted for whatever it means.  But if the drug ultimately leaves the pharmacy and gets into the hands of someone who isn't really a patient anymore or wasn't properly treated as a patient of the covered entity that would be diversion two.

The policies that pharmaceutical manufacturers have put in place are, at a really high level, outlining some details

basically designed to go back and insist on something that was very close to what the agency insisted on in 1996 and then for exactly these reasons. And then when this got litigated a couple of years ago, basically the issue in the D.C. Circuit and the Third Circuit was can we go back to that, or is the agency right that we have to allow unlimited contract pharmacy use without these anti-diversion controls. And the answer unanimously from two panels of two courts of appeals was, you do not have to participate in this. The 1996 basic rule was fine. And you don't have to sell drugs to contract -- to covered entities or contract pharmacies if they're going to do this with them. Put them on their replenishment wheel and hand them out to people without knowing if they're a patient. We can impose these limits.

And, ultimately, what Maryland is trying to do here is say, you know what, we just want to go back to the 2010 interpretation of the federal statute by force on state law, and basically you can't do that because it's both preempted because it conflicts with federal law and it's a taking because ultimately we don't want to sell drugs under these conditions.

THE JUDGE: All right. Thank you very much.

MR. CHAZEN: Your Honor, with permission, can I bring a water bottle up to the podium?

THE JUDGE: Yes, you may. Thank you.

MR. CHAZEN: Thank you, Your Honor. The State has the

authority to regulate the distribution of 340B drugs.  Plain and simple.  There is no clear intent by Congress to preclude states, including Maryland, from enacting their own public health laws aimed at maximizing the availability of 340B drugs.  And there is not a likelihood of success by Plaintiffs for that reason alone.

In fact, not only is Plaintiffs' success unlikely, it's not possible on this facial challenge to HB1056.

We've talked a lot about the statute and without sort of making it elementary, I think going back to the basics is pretty important.

And in a read of HB1056 that is not in effect, its aim is to deter manufacturers like Plaintiffs or the organization that represents manufacturer interest from interfering with a covered entities' contract pharmacy arrangements.  It ensures that patients of covered entities can conveniently access their medication.  It does not mandate that manufacturers sell drugs at 340B discounted prices to any party in transactions that would violate the 340B Program.  And it does not entitle any party, other than covered entities, to purchase discounted drugs through the 340B Program.

For purposes of deciding the constitutionality of HB1056 and ultimately whether preliminary injunction should issue in this case, the focus needs to be, as one of my colleagues pointed, not only on the words of the statute but what it

purports to regulate, the substance.  It is not the focus of this facial challenge to look at what the ramifications or effects of the law might be to these Plaintiffs.  And that's what the Eighth Circuit in *PhRMA v. McClain* held last year.

The Federal Government has traditionally regarded state law as a complementary form of drug regulation and has long maintained that state law offers additional and important layer of consumer protection that complements federal regulation. That's one of the reasons our democracy exists, this complement of federal and state law interacting with one another.

I want to focus on the replenishment model briefly because it is a complete red herring in this case, Your Honor.  The argument that HB1056 itself promotes or encourages a proliferation of contract pharmacy transactions ignores the law itself.

A covered entity can only transfer title of 340B drugs to its patients.  That is very clear.  They do this through a contract pharmacy arrangement.  That is also clear.  And this distinction is key because an issue regarding diversion, as Your Honor was sort of getting to by covered entity, is in fact covered by the federal statute, not HB1056.  Beyond that, a manufacturer servicing covered entities in Maryland must comply with the covered entities' delivery instructions.

The Court today, or in its ruling, can only hold that Plaintiffs are likely to succeed on the merits that HB1056 is

unconstitutional if the law is unconstitutional in all of its application, that comes from *United States v. Salerno*, 481 U.S. 739.  Plaintiffs throughout these cases reference and in some instances allege methods other than replenishment model.  In PhRMA's complaint at Paragraphs 54 to 59, in AbbVie's complaint at Paragraph 40, and in AstraZeneca's complaint at Paragraphs 32 and 34.

Any penalties that get enforced through HB1056 are aimed at the exact activity that the Third Circuit and D.C. Circuit says falls outside the purview of the 340B Program.

And these cases which the Plaintiffs universally hold sacrosanct as not only binding law, but relevant in this case, which it is not, all those two cases hold is that the 340B statute is silent as to drug distribution requirements.  And beyond that holding, those cases have no effect on what this Court decides to do today.

In turning to preemption -- and I'm going to lump probably both types of preemption together, Your Honor -- compliance with both Maryland and federal law is not impossible.  And there can be no doubt that a state law that regulates health and safety falls within a state's traditional powers.  It's not immigration.  It's not fast food restaurants operating as federal contractors.

HB1056 prohibits manufactures from refusing to deliver 340B drugs to contract pharmacies only when they are specified

by the purchaser, which is the covered entities, to maximize the covered entity patients access to these drugs.  Under federal law, the manufacturers have already agreed to provide the discount.

The Supremacy Clauses text does not indicate that states cannot regulate by reference to preexisting federal programs. That text indicates that federal law governs despite a conflict with state law, and states have the power to enact regulations by reference to federal law.

I don't believe any plaintiff across all four cases that are not consolidated have cited any case to support the opposite.

As Your Honor has pointed out, and as Plaintiffs seemingly point out, section 340B does not explicitly mandate how delivery is to occur.  I've said it before, we've said it in the briefing, it's silent as to delivery.  That is a fact confirmed by multiple courts across this country.

This same statutory silence that does not implicitly mandate that manufacturers deliver to any contract pharmacy designated by a covered entity does not show that Congress intended to preclude states from enacting their only public health and consumer protection-driven regulations.

Criticism of section 340B's effectiveness in achieving its own purposes cannot give rise to a conflict preemption claim when a state statute is not inconsistent with § 340B's

expressed terms.  And the Defendants would rely on *Chamber of Commerce v. Whiting* at 563 U.S. 582 for that proposition.

So here's what we know.  HB1056 does not require a manufacturer to offer 340B drugs below applicable ceiling prices.  If it did, that would be a violation of preemption.  It does not expand the definition of what a 340B healthcare provider is because HB1056 specifically references the definitions in the federal statute.  And it does not expand the remedies available to a covered entity when a manufacturer overcharges it for 340B drugs.  Those remedies are outlined in the federal statute at well.

It does prohibit manufacturers from interfering with covered entities ordering delivery of these drugs to pharmacies for dispensation and that's something that § 256b neither requires nor precludes.

Plaintiffs with the focus on AbbVie, although I believe other counsel for the other parties today, at least one of them, mentioned the term "acquisition."

And the argument, as the State sees it being made by the Plaintiffs, is that HB1056 means that the law compels direct sales to pharmacies.  But HB1056 itself defines a 340B drug as one deemed purchased by a covered entity.  If the drugs are not purchased by a covered entity, HB1056 does not apply.  And in the statute itself at § (c)(1), the pharmacies contract with for authorization from a covered entity confirming that it

addresses distribution of drugs not the sale of drugs directly to pharmacies.  That's what's in § (c)(1).

THE JUDGE:  You said (c)(1)?  Is that what you were referring to?

MR. CHAZEN:  I was, Your Honor.  And I know there are different attachments going around but in the text of HB1056 I'm looking at Page 3 and the second full paragraph from the bottom.

So we have these clauses, and we can get into the focus on acquisition, but it's the acquisition of the 340B drug by a pharmacy that is under contract with or otherwise authorized by a covered entity to receive the drugs on behalf of a covered entity or circling back, the acquisition or delivery of a 340B drug to that same pharmacy.

If Maryland intended to use the statute to require manufacturers to sell drugs to anyone other than covered entities, the legislature would use different language much like its federal counterpart.  And we heard it today, it could have said "shall offer."  But instead, the state says, denied, restrict, prohibit, discriminate against or otherwise limit. There are differences, and there's an intent behind the purpose of why legislature has the law.

These arguments as to preemption fail from the start because HB1056 covers the topic to which courts have said the federal statute is silent to.  These are delivery terms.  The

federal statute is silent.  Federal Government certainly hasn't spoken to it and federal courts maintain that the statute is silent itself.

And there's no description in the law, the federal law, § 256 that prohibits the state or any state from regulating in this area.

And that's where the preemption claim on the likelihood of success fails, Your Honor.

**THE JUDGE:**  I'm going to step back for a moment.  You said that HB1056 doesn't provide a remedy for overcharging; is that correct?

**MR. CHAZEN:**  That is correct in the read through, Your Honor.

**THE JUDGE:**  All right.  So if any of the Plaintiffs made a delivery upon an order by a covered entity but refused to honor the price ceiling, HB1056, an enforcement action under HB1056 couldn't do anything about that.  They would have to go and seek relief at the federal level?

**MR. CHAZEN:**  That's correct, Your Honor.

There are, I think, across these months there's been a couple different points that have been made that the State is somehow altering its argument.  But I think there are two distinctions that need to be made clear.

The first is, the last time the State was before Your Honor in the Novartis case, Novartis wasn't focused on the

third prong in HB1056.  And it's important to what a 340B drug means, and it is a covered outpatient drug under federal statute.  It's been subject to an offer for reduced prices by the manufacturer under the statute and, a conjunctive, is purchased by a covered entity.

So in terms of Your Honor's question, there are only certain components that HB1056 regulates and that has to be beyond the scope of what federal law regulates, otherwise it would be preempted.

The State concedes of course that if the same topics were covered by the state law, if the delivery was referenced, it wasn't silent but it was referenced in the federal statute, a state regulation would be preempted.  But that's not the case. HB1056 enforcement is driven by the delivery terms.

If there was an action against any of these Defendants, or any other manufacturer, they would be entitled to make defenses and one could include, as Your Honor has indicated, that there are remedies available to the covered entity when a manufacturer overcharges it for 340B drugs under the federal statute.  That's not in the state statute.

**THE JUDGE:**  And they can only go to the federal level for that -- if there was a dispute over the charge, dispute over the price, that has to be resolved at the federal level, not through HB1056?

**MR. CHAZEN:**  It has to be because HB1056 has nothing

to do with pricing, Your Honor.

THE COURT: Do you appreciate that your colleague said something different the last time they were here?

MR. CHAZEN: I can appreciate that. And I think a better understanding from the State as to what the law purely indicates, there was a narrower focus from Novartis and that doesn't change what the state said and how it plays into context here.

But the key distinction is that there are remedies available to a covered entity when a manufacturer overcharges it for 340B drugs that are not part of the HB1056 which deals with delivery. And HB1056 is also an enforcement action, enforcement being brought by the State. Whether that's the Consumer Protection Division at the Office of the Attorney General or the Maryland Board of Pharmacy, that's what this law covers. And I think perhaps the State got caught up in maybe over-spreading.

But what's clear, what's before Your Honor today in our preliminary injunction is the law itself. The State can't overread the law, it can't underread the law. The law is what it says and the substance has to be given to the words that are in it.

But the remedies, HB1056, to be clear and to restate it, does not require -- I'm sorry -- HB1056 does not expand the remedies available to a covered entity when a manufacturer

overcharges it for 340B drugs.

And ultimately that holds because, as I said, Your Honor, HB1056 is a statute that covers delivery and delivery alone. All references that it covers pricing, there's no credibility to that claim when the federal statute mandates the price at which it must be set. That's set by the Federal Government.

The State cannot come in and say, oh, your drug costs two cents; no, it's now a penny. That's not allowed for 340B drugs, Your Honor.

And nothing that's covered in the federal statute is also covered by HB1056 and that's clear.

And so I'm happy to answer any further questions on preemption or whether they come up in moving forward.

But to move things along, Your Honor, we've heard a little bit about Takings Clause claims. There is no requirement under HB1056 for a sale to private pharmacies. The law only permits by its definition a sale to covered entities for it to be a 340B drug at the 340B prices. I think everybody agrees to that.

If the CVS down the street called up and said I want to order 100 pills of AbbVie drug, they are not a covered entity, they are not entitled to the pricing that a covered entity may be entitled to.

There can be no Takings Clause claim based on an incorrect statement that HB1056 requires a sale to private pharmacies

because that's not what HB1056 mandates.  That states might require 340B drugs to be distributed for dispensation at pharmacies, though, that was foreseeable because that's how the prescription pharmacy market works in the United States healthcare system.

Most of us go to a private pharmacy to pick up our drugs, that's just the inherent truth.  And even if it is a taking, which Defendants do not concede, the purpose is a public one as it facilitates Marylanders access to medications for which manufacturers have already agreed to provide a discount.

In *Monsanto*, 467 U.S. at 1016, equitable relief is not available to enjoin an alleged taking of private property for a public use when a suit for compensation can be brought against the sovereign subsequent to the taking.

A lot of this is cart before the horse at the end of the day.  This is a facial challenge to a law, and in the allegations themselves it's clear that Plaintiffs across the board in all of these cases have said that other models exist.

So the question is, is the law constitutional under other models.  And that's only if the Court gets to that juncture of the road, which we would submit the Court would not need to get this far down the path.  But if it does get this far down the path, there's been no argument presented that HB1056 cannot apply to another model.  And you've only heard about one model, and yet other models are referenced in these complaints.  That,

in and of itself, shows that the motions for preliminary injunction must fail, Your Honor.

We did not hear today as to the extraterritoriality argument by PhRMA on its motion for preliminary injunction, nor the excessive fines argument made by AbbVie in its motion. And I'm not going to assume that it's waived of course because it's in the papers. This is not a Dormant Commerce Clause violation. HB1056 applies to transactions involving covered entities in the State of Maryland and servicing their patients.

There are other states who have laws, we can't speak to what's pending in other states, but I'm not aware for example that Idaho has a law that's similar to HB1056. And nothing in HB1056 prohibits or precludes any manufacturer, presuming it's in line with federal and Idaho law, from adopting the policies that it wants to implement regarding one contract pharmacy transactions.

As for the excessive fines argument, in its reply AbbVie says that the State did not reference any case from the circuit and that is incorrect. AbbVie does so in its reply, and on Page 21 the Defendants site a Fourth Circuit opinion, *United States v. Talebnejad*, 460 F.3d 563. But even if it didn't, there's nothing precluding the Court from relying on cases outside of the circuit. But it also helps to show that there aren't a lot of cases that focus on an excessive fines regulation, particularly at a motion for preliminary injunction

stage, because they're actually has to be the threat of a fine, and there's no matter, investigation, or action.  As far as I know, AbbVie hasn't received a letter from the State that it's under investigation for it's policies and in violation of HB1056.  That's where the excessive fines analysis comes in, not in this case on a facial challenge.  But there is Fourth Circuit law cited by the Defendants as to that.

Lastly, I want to just focus a little bit on delivery.  I think that's why we're here, Your Honor, to be honest.  And the 340B Program itself does not provide HHS or HRSA with jurisdiction over disputes regarding distribution of drugs.  HRSA has jurisdiction over disputes between covered entities and manufacturers regarding pricing, overcharges, refunds, and diversion of 340B drugs to those who do not qualify for those discounts.

The federal statute itself, the title, is Limitation on Prices of Drugs Purchased by Covered Entities, and that's where this case should end because if the federal statute is silent, there is no case cited by any plaintiff that says a state cannot regulate in an area in which the Federal Government has not, as a general proposition.

Ultimately, HB1056 is narrow in scope.  It's scope does not focus on anything that the federal statute focuses on and it does not constitute a taking of private property by any of the Plaintiffs, including AbbVie.

I don't want to foreclose, I know counsel --at least one counsel from the other side had a brief mention of irreparable harm and balance of the equities and public interest.  The State will rely on its briefing if this Court needs to get to that point past the first prong.  So I don't want to use the Court time to rehash that, otherwise, I'll yield my remaining time.

THE COURT:  All right.  Thank you, Mr. Chazen.

MR. CHAZEN:  Thank you.

MR. PERRY:  Your Honor --

THE COURT:  I'm sorry, Mr. Perry, but I think it may be time for a break at this point.  We're, I guess, two hours in the hearing.

MR. PERRY:  Okay.

THE COURT:  I guess this will give you a little bit more time to prepare your rebuttal if you want to use it for that purpose, but one thing I'd like to have you address when we come back is the extraterritoriality argument that I see argued in the brief but I didn't hear much about that today.  I guess I just want to probe the reason for that.  All right.

MR. PERRY:  Thank you, Your Honor.

THE COURT:  Okay.

THE CLERK:  Ten minutes?

THE COURT:  Yes, 10 minutes.

THE CLERK:  All rise.  This Honorable Court is now in

recess.

**(There was a break at 12:00 noon to 12:13 p.m.)**

**MR. PERRY:**  Your Honor, speaking on behalf of all my colleagues for the moment.  I think I can do this briefly, but they'd like also an opportunity to rebut for just a brief time.  Maybe five minutes each.

**THE COURT:**  That's fine.

**MR. PERRY:**  Thank you, Your Honor.  I want to get to extraterritoriality, but if I might make three quick points first.  I think between the transcript of the Novartis hearing a few weeks ago and what the State said today, I think we have some important admissions that show preemption applies.

Of course, there were those by Mr. Feldman around Page 37 of the transcript, 55 and thereafter, making it clear that there's the statutes regulating the delivery of 340B priced drugs.  You can't tease those concepts apart.  It's about pricing.

And then I think he just said -- Mr. Chazen -- in response to your question:  If we, the drug manufacturers, deliver these drugs but at commercial prices then the remedy is at the Federal Government level.  Of course we do.  We deliver all of these drugs at commercial prices.  That's in the record in the declarations of Mr. Scheulen and Mr. Costello.  And I'm sure my colleagues will tell you where you can find that in the materials they have provided.

In particular, I'd like to point out what the Federal Government thinks its enforcement authority is.  And there is a rule governing Administrative Dispute Resolution the Federal Government has issued.  Of course their enforcement authority is multitiered.  It has multiple different components to it, you can see it in § (d) of the statute.

But the ADR, which is the type of forum where either the covered entities or the drug manufacturers can initiate a claim, the Federal Government believes that as to claims by a covered entity that has been overcharged by a manufacturer it has authority to address that, including claims that a manufacturer has limited the covered entities' ability to purchase covered outpatient drugs below the 340B ceiling price.  In other words, the Federal Government thinks it has authority to do exactly what my friend for the State has said they cannot do.

So you'll find that at 61 FR 28657.

Now, I also argued earlier about the particular type of condition on offers that's addressed in the D.C. Circuit case for claims data.  Mr. Owen identified a particular manufacturer audit policy.  You can find that policy, again, 61 FR 65409, Number of Audits is the topic in part that Mr. Owen was addressing.  But it says, "A manufacturer shall conduct an audit only when it has documentation which indicates there's reasonable cause."  That's why we need claims data.  We have to

be able to identify duplicate discounts and diversions and all the other sorts of things that avail us of the opportunity to get permission to conduct an audit and eventually, if necessary, to go through ADR, or any of the other types of remedies under the federal statute.

So I think there should be no doubt that the state law is preempted as to claims data and also as to the one contract pharmacy policy.  And of course we continue to rely on Pages 460 to 464 of the D.C. Circuit case for that.

My friend also mentioned facial challenges versus as-applied challenges.  That of course wasn't an issue that was addressed in the briefing in our case, perhaps it was in the other cases.

First of all, as you can tell from my argument here, this is not purely a facial challenge.  We have specific declarants that tell the courts what their policies are and we're saying that those policies cannot be lawfully addressed by this State's statute.  So not purely facial.

But, second, the distinction between facial and as-applied challenges doesn't really apply in a preemption case.

Now, the Arizona case which we talk about, you can find that principle on Page 410, since we haven't briefed it I could read into the record now about a half dozen cases that say this facial versus as-applied distinction should not apply in a preemption case.  And of course it couldn't apply in a field

preemption context because the statute's invalid entirely. It's invading the federal field. When you have conflict preemption, the cases say this distinction doesn't have it either.

Again, that Arizona case -- and if the Court would like further briefing with a considerable amount of case law we'd be happy to file a short brief on that.

With that, let me turn to the extraterritoriality question that you identified. This comes, I think, back in part to the many layers of folks involved in the commercial transactions with pharmacies and with covered entities.

If you look at the State's Statute HB1056 and if you take a look at what in particular was attached to the State's initial brief, that version of the statute with the markups, it's clear that the State legislature realized the complexity of these transactions even at the outset.

They originally proposed, and this is marked off on the version they supplied to the Court, to regulate manufacturers, wholesale drug distributors, third-party logistic providers, agents, and affiliates of all of those people because they know that there are many, many parts of these transaction that occur entirely outside the state.

Now, we cited two cases on this proposition that I think are important. One is the *Frosh* case which is a Fourth Circuit case; another is the *Ellison* case which is a District Court

case in Minnesota.  They're both about efforts to regulate drug pricing.

Now, this extraterritoriality principle is not eliminated by the Supreme Court's recent decision in *Pork Producers* we say, and you can find it in Footnote 1.  But if you take a look at *Ellison* and *Frosh*, what you'll find is that when the state tries to regulate transactions that are occurring entirely out of state there is a line that they cross.  It's a Commerce Clause line.  It might be a Dormant Clause.  It might be a line that's based on the horizontal separation of powers that's sort of intrinsic in our process, but the state has admitted it cannot regulate things beyond its borders.

The transactions, as far as I know, almost all of them between the manufacturers and the distributors out of state. Between the manufactures, the distributors, and then the distributors and the out-of-state contract pharmacies, entirely out of state.

Now, if some of those drugs happen to find their way into Maryland, I don't know how anyone would know that.  Especially not the manufacturers.

So at least some portions of those transactions, that chain of events, should not be subject to regulation by Maryland.  And I think the *Ellison* case, which analyzes this in detail, that's the District of Maryland case came out after *Pork Producers* provides a good set of guidelines for the Court

to analyze that question.

I think I'd like to yield to my colleagues now if I might, Your Honor.

**THE COURT:**  Just one question.  Going to what you were speaking of about the distinction between the facial challenge and as-applied challenges and as-applied challenges and how that distinction doesn't apply in the preemption context.  What I interpreted Mr. Chazen's argument to be getting at is I have to judge this statute on its face rather than an interpretation that makes it run afoul of federal law.

**MR. PERRY:**  Well, I think the notion that he's trying to get at, Your Honor, if I might, is that in an as-applied challenge you're looking at a very specific application.

In a facial challenge, sometimes the question is does the state win the case if they can come up with any set of circumstances that doesn't violate the law.  That particular principle does not apply to preemption case and that's because the state didn't have authority to do what it did under the Supremacy Clause of the United States Constitution.

Think about field preemption, it's the easiest example.  When field preemption concepts apply, the state just can't touch the issue.  It can't touch the issue no matter if it can invent some type of issue where there might not be a conflict or not.  It can't touch it.

In conflict preemption context it's clear in this case

given the conditions we put forward that there is a conflict.

So I really don't think the facial issue applies, but we're very happy to brief that further in our case because we haven't had an opportunity to brief it and provide you with case law that supports those propositions.

THE COURT:  The conflict that you are putting your finger on, at least part of it, is the notion that the 340B Program gives you the right to restrict access to the 340B priced drugs, restricted to certain contract pharmacies but not others?

MR. PERRY:  Yeah.

THE COURT:  Or make decisions about which contract pharmacies you'll honor the price for and which you won't?

MR. PERRY:  So if I might put it --

THE COURT:  Yes, go ahead.

MR. PERRY:  So this is a voluntary program.  It's a program that is conditioned on participating in Medicare and Medicaid.  I think Mr. Owen said this pretty clear, and so I hope I can be just as clear, and that is, when you sign up for this program, when you sign up for 340B and you get reimbursed as a consequence when you sell to Medicaid and Medicare and hospitals that are servicing those programs, you agree to a specific set of things.  That's all you agree to.  You don't agree to a whole range of discounts that go beyond the scope of the federal program.  You agree to a bargain with the Federal

Government.  And that bargain, as the D.C. Circuit has clearly explained at Pages 460 to 462, does not include an obligation to ship to every contract pharmacy in the world.  That's far beyond what you agreed to when you signed up for the federal contract under (a)(1) and the federal program.

When states come along -- it's not just Maryland, it's other states, and we'll see what happens in the legislative terms next year -- they are trying to fundamentally change the obligation you have to make an offer.  And the effect of that is to expand the scope of this 340B Program eight-fold, 10-fold, maybe 100-fold.

Some of the analysts information we put forward say the program started in its early days as maybe a 5 billion-dollar program and maybe in 2026 it's on pace to be a 160 billion-dollar program.  Perhaps bigger than Medicare Part B.  Perhaps bigger than the drug benefit for Medicaid entirely.  It's swallowing the entire program.

The impact on drug companies is tremendous.  It's changed the bargain that they make when they entered the federal contract tremendously.  It's a very different program and that's because the scope of what you're being asked to do is fundamentally different.

Again, pages I think 456 to 458, the D.C. Circuit explains what's happening.  You have opportunistic efforts to find what they are claiming are 340B patients who are generally not.  We

need claims data to determine that.

Let me make one final point, which I think is derived from your question.  *Astra* basically said you have to make a uniform process for addressing what Congress wanted for overcharges or other violations for example of the shall-offer provision.  There has to be one process.  That makes sense.

Now, what Maryland is saying is, no, I can run a completely parallel process, and I can impose criminal penalties and civil penalties.  But if you think that you're not obligated because some of these prescriptions aren't real 340B patients or because the covered entities aren't qualified because they're engaged in diversion or something else, if you think that you have a defense to my claim, sorry, we won't hear your defense in the state suit.  You have to go to the federal ADR process and figure that out over two or three decades, if it's even possible.  Mr. Owen mentioned why it's probably not.

So what they're essentially doing is illustrating exactly why *Astra* was right.  Exactly why this has to be a single federal program that allows us, when we're confronted with some claim that we owe more discounts than we provided, to put on our defenses.

The State is trying to add a tremendous scope to this program.  And if you read their briefs carefully, you'll find that they're saying if you have defenses bring them in the federal proceeding.  All of that shows you that the federal

proceeding ought to be the exclusive proceeding for resolving these types of things.  It can be enforcement under the various number of things that are set forth under (d)(1) in the federal statute or even ADR according to the Federal Government.

THE COURT:  Am I missing something, what you described just now seems to be the opposite of *Astra*?

MR. PERRY:  *Astra* is saying it's a single federal proceeding.

THE COURT:  Right.  And that's the way it should be.

MR. PERRY:  Yeah, right.

THE COURT:  So now you're taking issue with the State saying go to the Federal Government with that dispute.

MR. PERRY:  What I'm taking issue with is the State creating a parallel state proceeding that is different from the federal proceeding.  It can only be the federal proceeding and you can't have a separate parallel state proceeding.  And what I'm illustrating is how crazy that is because what they're saying is take your defenses to our criminal charges and put them on at the federal level.

THE COURT:  Oh, I understand what you're saying.  But that's presuming that the State will come after you for pricing decisions.

MR. PERRY:  Well, they say they will.

THE COURT:  They seem not to be saying that anymore.

MR. PERRY:  I hope you're right, Your Honor.  Thank

you.

**THE COURT:** Thank you.

**MR. KEDEM:** Thank you, Your Honor. Three points briefly. First, you've heard a lot from my friend today from the State about the presumption against preemption. He argues this is just a general health and safety regulation.

In *Buchmann*, the Supreme Court said there's no presumption against preemption of a state law if what it regulates, quote, "is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law." That's the case here.

Our obligations towards 340B covered entities originate from the 340B statute, are regulated by § 340B, and will terminate if and when AstraZeneca ever ceases to participate in the 340B Program. So no presumption against preemption applies.

Second, on the question of the facial challenge. I think part of what my friend was saying is that covered entities don't always use the replenishment model. So if our argument totally depends on the use of the replenishment model, it can't be the basis for our facial challenge. But that's not our argument at all.

We do think that the replenishment model lays bare a lot of the things we're talking about and makes unmistakably clear the fact that their law regulates pricing and nothing else.

Our argument would hold just as much if no one used the replenishment model.

And I think the Defendant is just a little bit confused, if I could respectively suggest on this point.  Our argument is not that the replenishment model is diversion or that it requires us to sell to the pharmacies.  We accept for purposes of this argument that the sales are to the covered entities; but there's no doubt that it requires discounts be made available for a broader range of sales than the 340B Program itself requires.

So our final point -- and I can't really believe that we have to focus on this -- but what exactly does this law do?  I think there's been a lot of confusion about this.  Why is it that our policy and the policy of the other Plaintiffs are in violation of this law?

From the State originally, you asked Mr. Feldman:  If they delivered at a different price you would say that's a violation of the statute.  I'm not sure I read it that way but that's what you seem to be saying.

Mr. Feldman said:  That's how we read it.

Today, from Mr. Chazen, I think you got a slightly different answer.  And Mr. Chazen, I didn't hear him talk about the provision A(4)(ii) which talks about drugs that would have been purchased and whether it's a violation not to make those drugs available so they can't be purchased in the first place.

And, honestly, I'm not totally sure what to do with all of this other than to agree with my friends Mr. Perry and Mr. Owen that if that's what the State really means, what they said today, that our policies don't violate the statute, then so long as that's enforceable and you can put it in an opinion that would be great and satisfactory.

But we have been threatened with not just civil fines, but criminal sanctions for going forward with the policies that we'll have today.  So because this is a preliminary injunction motion, we need some sort of reassurance that we're not going to face exactly the same harms that we've cited in support of our preliminary injunction motion if we go forward with our policies today.

And, finally, the final point is just this, whether we call it a delivery obligation or denying access to 340B drugs, or access to discounts, or you say it's a pricing statute, the question is, does this state law require something above and beyond what federal law itself requires?  If the answer is no, great, we can shake hands and go our separate ways.

But if it does do what they seemed to have been saying that it does, and if it requires us to pay all this money that their declarants say that we should be paying, all of this revenue that they talk about, the millions of dollars, that is a new obligation under state law for participating in the federal 340B Program.  And that's why it would be preempted

because no state is allowed to take voluntary participation in a federal program and impose new costly obligations on top of it dollar for dollar.  They've essentially put a dollar figure on it through their own declarations.  That's the cost of this obligation just for a handful of covered entities under Maryland law.  And of course we have all of the other states that could do the same thing and that is the new additional obligation that we are saying states are not allowed to impose for fear of preemption.

THE COURT:  Thank you.

MR. KEDEM:  Thank you.

MR. OWEN:  Thank you, Your Honor.  Matthew Owen again for AbbVie.  I only have a few points.  But I'd like to kind of begin where Mr. Kedem ended.  I also don't know what the State of Maryland thinks this law does.  There are two or three different versions of it apparently on offer.  One of them that I think I heard from Mr. Chazen today was that if we deliver drugs to contract pharmacies, that is entities under contract with 340B entities at commercial prices because that's what our policies require because we will not sell them under any other conditions, that this law has nothing to say about that.  If that's true, then we don't really have a dispute here, so long as there is a piece of paper and order of the Court that we can rely on for the rest of the litigation to protect us if we proceed on the understanding that what Mr. Chazen said is

correct, that we don't have anything to fear from this statute if we charge commercial prices, full commercial prices for drugs delivered to contract pharmacy.

Until this morning, I had not thought that's what the State believed, and partly because of their briefing on the motions to dismiss in our cases, and the PhRMA case, which we called to the Court's attention about this other provision of the statute which they say brings into its ambit drugs that we didn't sell at all that ever offered for sale under these conditions or would have been sold if we had imposed those conditions --

THE COURT:  You're referring to A4A?

MR. OWEN:  Yes.  And I think that we just all need some clarity I think --

THE COURT:  Sorry, A(4)(ii)?

MR. OWEN:  A4(ii) -- would have been purchased but for the limitation.

I can imagine more than one interpretation of the statute. As I said, I think a statute that an interpretation that required us to sell stuff that we didn't sell but would have if they had agreed to a higher price would be unconstitutional. But I didn't hear what Mr. Chazen had to say about that this morning either.  And I think that when we leave here today it would be very hopeful if the Plaintiffs knew whether the Government's view is that we even have a dispute at whether our

policies violate the statute. And if they don't, and we can obtain an opinion of the Court or an order that we can rely on with some security from enforcement, we may be able to kind of take the temperature down about this litigation. But if not, if we can't get that clarity, then I think it underscores more forcefully that we do need a preliminary injunction because we are likely to succeed eventually in the merits of either our takings or preemption claims. That's the first point I wanted to make.

The second point is there was -- to return to the takings point for a moment. Couple of things.

First of all, as far as facial versus as-applied challenges, that critique is not available for the takings claim because it is a facial one. If indeed the statute requires us to compel to sell property under conditions we don't want to, that is, every time we deny, prohibit, or interfere with the acquisition of our own property by anyone, we're allowed to do that under the Fifth Amendment, and so in every case if the statute indeed requires us to sell stuff that we don't want to sell, that is always a taking, and so it's not a facial challenge problem.

Second, the next thing that I heard from the Government was that it would be for public use under the *Kelo* cases. I do want to call the Court's attention to *Kelo's* actual language on this point. I agree that *Kelo* is, as I said, a high watermark.

It's a five-to-four decision that allowed the transfer of a private person's home to a developer, but only, only to remedy economic blight effecting the public at large as an indivisible whole.

What *Kelo* said is that the sovereign may not take the property of A for the sole purpose of transferring to another private party, B, even though A is paid just compensation. And later it said that the court had consistently forbidden takings for the purpose of, quote, "conferring a private benefit on a particular private party," or, quote, "to benefit a particular class of identifiable individuals," unquote.

Anything beyond that, even under *Kelo*, is not for public use. And as I say, on the face of this statute it is about 340B drugs which have to go to contract pharmacies identified in the statute, covered entities enumerated in a federal statute, or there are patients who have to be a group of identifiable individuals in order to comply with the diversion statute. No one contends that this benefits the public as a whole. It benefits a segment of a public. So the public use doctrine does not apply here.

The third thing I think I heard Mr. Chazen say is that there would be a remedy for just compensation on the backend. I don't think that's the position they took in their brief. They said there would be a sovereign immunity bar, I believe, to such a claim for just compensation.

In any event, the compensation would be for drugs which are consumables.  They leave our possession, they go into patients, and they're destroyed.  The people who get them and profit from them are third parties, not the state.  We don't really have a remedy to go after them either, they're not the people who took the property.

So, in our view, the only way to secure the Plaintiffs' property rights is an injunction forbidding the Government from trying to force the transfer in the first place.

The last broad point I wanted to make, Your Honor, is just to go back.  Mr. Chazen said on behalf of the Attorney General that this statute regulates delivery and delivery alone.  I think that's a quote.

This statute says the word "acquisition" by a pharmacy.  I don't know what the Attorney General's position is on the word "acquisition," but I know that every time they describe a statute in writing or out loud they just don't use the word "acquisition" it's in the law.  And I don't know whether the Government would agree to an injunction against that word if they don't think it means anything.  But we think it is -- it's sourced a lot of the takings problems.

Finally, on the same point, I just want to make it very clear under the 340B regime.  I think there may be some confusion.  We do not have an obligation under the 340B law to sell to covered entities either if they are going to direct

delivery to contract pharmacies.

I think part of what the Government has said here today is don't worry, we're not requiring sales to contract pharmacies. Not notwithstanding the word "acquisition," which they just ignore. But even if you ignore it, the word "acquisition," their defense is a law doesn't require sales to contract pharmacies so it's okay.

And our point, I think the point you've heard from all of the Plaintiffs today, is we don't have to sell to the covered entities either. All we have to do is make them an offer on reasonable terms and one of those terms can be we won't sell it to you at this price if you're going to deliver it to contract pharmacies. If you want to buy them to deliver to contract pharmacies, you have to pay full price, otherwise we're not selling it to you, except in conforming with our policies which are in the record.

For that reason, if those policies don't violate the statute which is where we started, fine. If they do violate the statute, then we need an injunction. But the issue is not just sales to contract pharmacies. The issue is we don't have an obligation to sell to the covered entities to be delivered to a contract pharmacy at the 340B price. We only have an obligation under our federal contract to offer the drugs at the 340B price to the covered entities on reasonable terms. And it is federal law, as confirmed by two circuits, that these are

not reasonable terms.  We don't have to make these sales under these conditions.  And Maryland is basically just trying to say, yes, we do.

I thank the Court for its indulgence.

**THE COURT:**  Thank you, Mr. Owen.

Mr. Chazen, I would like to hear from you again.  At the last hearing I do believe I asked this question of your colleagues as well as counsel for Novartis, but what is it specifically that the Plaintiffs in this case are doing that would run afoul of HB1056?

**MR. CHAZEN:**  So, in reading from the statute, the conduct that HB1056 intends to regulate comes from a denial, restriction, prohibition, discrimination against, or otherwise limitation of either the acquisition of a 340B drug by a pharmacy that is under contract with, or otherwise authorized by a covered entity to receive 340B drugs on behalf of the covered entity; or, if the manufacturer denies, restricts, prohibits, discriminates against, or otherwise limits delivery of a 340B drug to a pharmacy that is under contract with, or otherwise authorized by a covered entity to receive 340B drugs on behalf of the covered entity.

That's what the State intends to regulate as a result of this law, Your Honor.

**THE COURT:**  Well, I asked a different question.  So I think we've heard a lot from the State in terms of its briefing

as well as the exhibits that they've attached to their briefing about their model, and what they've been doing, the policies that they've been implementing that has the effect of restricting, I think, has the effect of restricting access to 340B priced drugs at contract pharmacies.

Based upon the various, I guess, models that you've heard that the -- and the practices that you've heard that the Plaintiffs have engaged in, what is it -- I mean, I guess you can go in any order you want to, but if there's any one way of identifying, among the practices that you've heard, that would violate HB1056, I want an explanation of how that practice violates the Maryland statute?

MR. CHAZEN:  So an example of a practice is the one contract pharmacy restriction.  So that would be a violation because it's preventing the covered entity from directing and it's a denial of the covered entity directing where to deliver those 340B drugs that it purchased.

THE COURT:  Okay.  One thing that I've heard today is that that restriction occurs at the offer level.  So it's part of the offer.  In other words, I think probably Plaintiffs' counsel can explain it better than I can, but the restriction lives in the offer, not in the delivery.  How would the state respond to that, if you know?

MR. CHAZEN:  Sure.  So certainly -- I guess I will take it in two steps.  So, in focusing on the offer piece, so

delivery may be a term of an offer but it is a term of an offer not regulated by federal law and that's what the State law intends to regulate.

There's no opportunity for Maryland to preempt the federal statute because the federal statute is silent as to that. We heard about the D.C. Circuit and the Third Circuit cases, they're very clear, that 340B federal statute is silent as to that.

The same is perhaps true for payment terms, limitations of liability, insurance requirements, but those terms are not regulated by either federal or state law and can be negotiated.

So certainly in Maryland Statute HB1056 references -- and I don't think -- I thought I referenced it when I was up here the first time, Your Honor, but under (a)(4)(i), there's an "and." So, it's a 340B drug means -- is a covered outpatient drug under the federal statute and has been subject to an offer for reduced prices by a 340B manufacturer under the federal statute and is purchased by a covered entity.

And then part two: A 340B drug includes a drug that would have been purchased but for the limitation under subsection C.

So that's what covers it. I understand that there's confusion. I'm not attempting to shy away from it or avoid the obvious that it's stated in the statute.

And if that's where the level of concern comes from at the moment, that it's really this romanette (ii) piece under that

section, the State is intending to regulate a term of an offer that isn't regulated by federal law and that's where the drugs get delivered.

I think that's in the briefing as well.  I think there were points made that perhaps I stood up here and said something for the first time.  I personally don't feel that way.  But I think that covers the conduct in which this law intends to regulate.

**THE COURT:**  All right.  Thank you, Mr. Chazen.

**MR. CHAZEN:**  Thank you.

**THE COURT:**  I'll call a 15-minute recess.

**THE CLERK:**  All rise.  This Honorable Court is now in recess.

(A recess was taken from 12:47 p.m. to 1:01 p.m.)

**THE COURT:**  Thank you all.  You all may be seated.

I appreciate the hour is getting late and folks are probably waiting for lunch, but I appreciate a little bit more of your time to render a ruling orally in the interest of expediency and efficiency.

So this matter consolidates four civil actions filed by pharmaceutical companies against the Maryland Attorney General and the Maryland Board of Pharmacy and Members of the Board to challenge the constitutionality of a Maryland statute the parties refer to as HB or House Bill 1056.

Plaintiffs Novartis Pharmaceuticals Corporation,

Pharmaceutical Research & Manufacturers of America, AbbVie Incorporated, and AstraZeneca Pharmaceuticals LP each filed a civil action to enjoin enforcement of HB1056 and seeking related declaratory relief.

I note that AbbVie suit named several other drug manufacturers as Plaintiffs, referred to as the AbbVie Plaintiffs.

The Plaintiffs in each suit filed a motion for preliminary injunction against enforcement of HB1056.  The Court heard oral argument on Novartis' preliminary injunction motion on July 1st before motions on the other cases had been fully briefed.  The remaining motions are now briefed and the Court heard oral argument on them today.

For reasons I will explain, I will deny the motions for preliminary injunction.  For several years, many healthcare providers that served underinsured and underserved patients in communities in Maryland have participated in the federal drug pricing program known as the 340B Program.

As a condition of having their drugs covered by Medicaid and Medicare Part B, drug manufacturers are required by the 340B Program to enter into a pharmaceutical pricing agreement or PPA with the U.S. Department of Health and Human Services which obligates the manufacturer to sell their drugs at a discounted price to medical providers called covered entities. This requirement is codified in Title 42, United States Code

§ 256b.

Covered entities consist of certain categories of public and nonprofit hospitals, community centers, and clinics that provide medical services to poor and underserved Americans. Maximum prices for drugs sold to covered entities are determined by statutory formula.

A breach of 340B obligations may result in termination of the PPA, expulsion of the manufacturer from the program, and withdrawal from Medicaid and Medicare.

340B forbids covered entities from unlawfully reselling or diverting 340B priced drugs and seeking duplicate discounts via Medicaid.  To ensure compliance with the program requirements, participating manufacturers do have some avenues to audit covered entities and may themselves be audited.

HHS has delegated oversight and enforcement of the program to the Health Resources and Services Administration, or HRSA. That entity may seek to have HHS impose civil monetary penalties on manufacturers for overcharges.

The program also provides an ADR process to resolve disputes between manufacturers and covered entities.

PhRMA is a membership association that represents biopharmaceutical research companies and includes drug manufacturers among its members.  The remaining Plaintiffs are drug manufacturers that participate in Medicaid and Medicare Part B and are signatories, the PPAs with HHS, which obligate

them to offer 340B drugs to covered entities at discounted prices.

The 340B Program was established in 1992.  Since that time, the program has grown substantially.  Covered entities have entered into arrangements with pharmacies called contract pharmacies to dispense 340B drugs to patients of the covered entities.  These arrangements have proven necessary because covered entities often lack the resources to operate their own pharmacies, and the arrangements also tend to make the prescribed mediations more accessible to the covered entities' under-resourced patients.

A distribution model referred to among the Plaintiffs here as the replenishment model has been developed over recent years of the program.  According to the Plaintiffs, contract pharmacies sell drugs from their regular inventories later determined through a third-party administrator, which purchasers or patients of covered entities, and then purchase additional drugs at the 340B price on behalf of the covered entity to replenish the portion of their inventory that was sold to that entity's patients.

The covered entity contract pharmacy and third-party administrator divide the spread between the 340B discounted price and the reimbursement from the patient's insurer, if the patient is insured.

The Plaintiffs contend that expansion and the use of

contract pharmacies has resulted in unlawful transfers and duplicate discounting.  In recent years, Plaintiff drug manufacturers began placing restrictions on a number of contract pharmacies, which it would recognize for certain covered entities.  HHS took the position that these practices violated the 340B statute and issued violation letters to drug manufacturers that engaged in these practices.  Litigation ensued.  And several of these cases, including *Sanofi-Aventis v. HHS* and *Novartis v. Johnson* courts held that 340B did not require participating drug manufacturers to deliver 340B drugs to an unlimited number of contract pharmacies.

Thereafter, Plaintiffs continued on with their policies and practices by which they restrict delivery to 340B priced drugs to contract pharmacies.

In May of this year, the State of Maryland enacted House Bill 1056 which took effect on July 1st.  HB1056 forbids manufacturers of 340B drugs from directly or indirectly denying, restricting, prohibiting, discriminating against, or otherwise limiting the acquisition of 340B drugs by contract pharmacies, or delivery of 340B drugs to contract pharmacies.  Violations constitute an unfair abusive or deceptive trade practice under Title 13 of the commercial law article of the Maryland Code and may subject the manufacturer to investigation and enforcement actions by the Maryland Attorney General or the Maryland Board of Pharmacy.  Enforcement actions may result in

civil fines, other civil liability, and misdemeanor penalties.

In this consolidated civil action, Plaintiffs seek preliminary and permanent injunctive relief against enforcement of HB1056 as well as a declaratory judgment that the statute is unconstitutional.

Currently pending are four motions for preliminary injunction. It's well-established that a preliminary injunction is an extraordinary remedy that is never awarded as of right. To prevail on a motion for preliminary injunction, a plaintiff must demonstrate, first, that it is likely to succeed on the merits of its claims; two, that it is likely to suffer irreparable harm in the absence of preliminary relief; three, that the balance of the equities tips in its favor; and, four, that an injunction is in the public interest.

At this stage, likelihood of success on the merits is the most important factor, but each of the four factors must be satisfied to obtain preliminary injunctive relief, and they must be satisfied by a clear showing.

For these propositions, I'm citing *Winter v. Natural Resources Defense Council*, 555 U.S. 7, a case from 2008. *Vitkus v. Blinken*, 79 F.4th 352, a Fourth Circuit case from 2023. Here, the Court will focus on likelihood of success on the merits of the Plaintiffs' constitutional claims.

I'll start with takings. At the request of preliminary injunction against an enforcement of HB1056 in part on the

grounds that it violates the Takings Clause of the Fifth Amendment and the excessive fines clause of the Eighth Amendment, each of which applies to the states via the Fourteenth Amendment.  The Takings Clause provides that private property shall not be taken, quote, "be taken for public use without just compensation," end quote.

"The classic case of a taking occurs when the Government directly appropriates private property for its own use," end quote.  That's *Horne v. Department of Agriculture*.

But even a regulatory burden on private property, quote, "can be so burdensome as to become a taking," end quote, that's *Murr v. Wisconsin*, this can occur when the regulation, quote, "denies all beneficial or productive use of the property," end quote, or the regulation, quote, "impedes the use of property," end quote, so significantly as to call for compensation considering, first, quote, "the economic impact of the regulation on the claimant; two, the extent to which the regulation is interfered with distinct investment-backed expectations; and, three, the character of the Government regulation," end quote.

Those three factors are commonly referred to as the *Penn Central* factors for the Supreme Court's 1978 decision in *Penn Central Transportation Company v. City of New York*.

No taking occurs where a person or entity voluntarily participates in the voluntary program regulated or activity.

Specifically, quote, "the Government price regulation does not constitute a taking of property where the regulated group is not required to participate in the regulated industry," end quote. That's *Baker County Medical Services v. U.S. Attorney General*. Eleventh Circuit case from 2014.

I would also cite for the same proposition, *Franklin Memorial Hospital v. Harvey*, the First Circuit case from 2009 in *Garelick v. Sullivan*, a Second Circuit case from 1993.

Takings for private benefit are generally forbidden. As AbbVie emphasizes, the government, quote, "may not take the property of A for the sole purpose of transferring it to another private party, B, even though A is paid just compensation," end quote. That's *Kelo v. City of New London*.

The issue turns on whether the regulation serves a public purpose in consideration of the "great respect federal courts owe to state legislatures and state courts in discerning local public needs," end quote. That's also from *Kelo*.

In *Eli Lilly v. United States Department of Health and Human Resources*, which was a District Court case from the Southern District of Indiana, the District Court rejected the argument AbbVie asserts here that an unconstitutional private taking occurs when the government requires that a drug company transfer its drugs to contract pharmacies as condition of obtaining coverage of its drugs under federal health insurance programs. The Court reasoned that the plaintiff's voluntary

participation in these programs "foreclosed the possibility that the statute could result in an imposed taking of private property," end quote, and the Court agrees with that reasoning.

I'm also persuaded by the District Court's decision recently in *AbbVie v. Fitch* in the Southern District of Mississippi, the opinion that issued on July 22nd this year, where the court found a Mississippi statute substantially similar to HB1056 not to unconstitutional taking.

HB1056 does not compel drug manufacturers to transfer their products either to the government or to a private party. The statute only applies to drug manufacturers who voluntarily participate in the Medicaid and Medicare programs.

AbbVie is not compelled to participate in these programs. AbbVie appears to argue that although it voluntarily participates in these federal programs, 1056's status as a state law requires some additional benefit to justify the state's requirements.

This Court is not persuaded by this argument and finds the cases that AbbVie cites in support of it do not actually support that proposition. Plainly, the products at issue are transferred through sales to covered entities, not confiscation by the Government.

Moreover, consideration of the *Penn Central* factors suggest that HB1056 is not so onerous as to constitute a regulatory taking. AbbVie has not made an adequate showing

that HB1056 economic impact on AbbVie is so severe as to render the statute a taking.  Nor has AbbVie shown that HB1056 interfered with distinct investment-backed expectations.

The history of the 1040B [sic] program and litigation surrounding it suggest that regulations requiring delivery and forbidding restrictions against delivery to contract pharmacies were foreseeable.  The character of HB1056 also suggests that it is not a taking.

In *Penn Central*, the Supreme Court recognized that a taking is less readily found in a case where the governmental interference with property arises from a public program that adjusts to benefits and burdens of economic life to promote public welfare.  This character of regulation stands in contrast to a physical invasion of property by the government. The character of the regulations at issue here is akin to the former and is not the latter.

In sum, at least at this stage of the litigation, the Court finds that AbbVie has failed to make a clear showing that HB1056 is a classic taking or regulatory taking under the Fifth Amendment.  But even if HB1056 does constitute a taking in the sense of *Kelo*, AbbVie has not made a showing that it is not a taking for a public purpose and is instead a taking for private use.

In *Kelo*, the Supreme Court emphasized that a public purpose for a taking is conceived broadly to reflect the

Court's, quote, "longstanding policy of deference to legislative judgments in the field," end quote, that's the *Kelo* case.

The Court finds that the purpose of HB1056, to protect the continued operation of providers that count as covered entities, to be a cognizable public purpose and AbbVie has fallen short of demonstrating the likelihood of success on its takings claim.

AbbVie's success of the fines argument is equally unveiling.  The Eighth Amendment provides, quote, "excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted," end quote.

The excessive fines clause, quote, "limits the government's power to extract payments as punishment for some offense," end quote, that *United States v. Bennett*, a Fourth Circuit case from 2021.

Both criminal penalties and civil sanctions intended to punish may fall within the scope of the excessive fines clause. That's *Korangy v. USFDA*, Fourth Circuit case from 2007.

Such penalties will be deemed constitutionally excessive only if they are, quote, "grossly disproportional to the gravity of the offense."

Courts must weigh a number of factors to determine whether a fine was grossly disproportional; including, one, the amount of the forfeiture and its relationship to the authorized

penalty; two, the nature and extent of the offending activity; three, the relationship between the charged offense and other offenses; and, four, the harm caused by the charged offense. That's the *Bennett* case.

In *Bennett*, for example, the Fourth Circuit determined that a forfeiture imposed in a criminal case was not unconstitutionally excessive considering the maximum possible monetary penalty for the offense at issue, as well as the nature, circumstance, and seriousness of the offense, among other factor.

In the instant case, by contrast, AbbVie complains of only hypothetical penalties that will be imposed upon enforcement of hypothetical violations of HB1056.

A claim is not ripe for adjudication if it rests upon, quote, "contingent future events that may not occur as anticipated or indeed may not occur at all," end quote. That's *Texas v. United States*, Supreme Court case from 1998.

Challenges under the excessive force fines clause are, quote, "generally not ripe until actual or impending imposition of a challenged fine," end quote. That's *Farina v. MTA*, SDNY case from 2019, which quotes *Cheffer v. Reno*, an Eleventh Circuit case from 1995.

The Court finds that AbbVie's excessive force claim is not ripe and is not likely to succeed on the merits of that claim.

Turning to preemption. All Plaintiffs in this case assert

claims that HB1056 is preempted by federal law.  The Court does not find the Plaintiffs are likely to succeed on any of these claims.  The Supremacy Clause of Article 6 of the U.S. Constitution provides that federal law, quote, "shall be the supreme law of the land," end quote, not notwithstanding any contrary law of any state.

Congress may preempt, that is to say invalidate, a state law through federal legislation.  It may do so through expressed language in the statute.  But even where as here a statute does not refer expressly to preemption, Congress may implicitly preempt a state law either through field preemption or conflict or obstacle preemption.

In either situation, federal law must prevail and the preemption state law is without effect.  Quote, "The purpose of Congress is the ultimate touchstone," end quote, of the preemption analysis.  And that's *Malone v. White Motor Corporation*, 1978 case, and *Cippollone v. Liggett Group*, a case from 1992.

There is no contention in this case that Congress has expressly preempted state legislation like HB1056.  Instead, Plaintiffs argue that HB1056 is subject to both field preemption and conflict or obstacle preemption.  The preemption issues presented in Plaintiffs motions are practically identical to those addressed by the Eighth Circuit Court of Appeals in *PhRMA v. McClain* earlier this year.  That's 95 F.4th

1136.

These issues have also been addressed in recent District Court decisions in the Southern District of Mississippi where legislation substantially similar to HB1056 has been enacted, including *AbbVie v. Fitch*, *PhRMA v. Fitch*, and *Novartis v. Fitch*.  This Court has reviewed the foregoing cases finds them to be persuasive and agrees with their conclusions as to preemption.

As to field preemption, Congress may implicitly foreclose any state regulation in a particular area irrespective of whether state law is consistent or inconsistent with federal standards.  That's *Arizona v. United States*.

Here, the Plaintiffs argue that the Federal 340B Program is a unified, regulatory scheme reflecting a pervasive regulatory framework and predominating federal interest.  In *McClain*, the Eighth Circuit recognized the pricing ceilings imposed by 340B, the authority granted to HHS to administer and enforce 340B, and prohibitions against covered entities diverting 340B drugs to nonpatients of the facility and against duplicative discounts.

340B also includes mechanisms to ensure compliance, including penalties for noncompliance, reporting requirements imposed on participating manufacturers, and authorization for HHS and manufacturers to audit covered entities.

Noncompliant manufacturers and covered entities can be

fined and noncompliant covered entities may also be excluded from the program altogether.

When disputes arise as to pricing, payment, or diversion, the parties to the dispute are required to go through a dispute resolution process provided by HHS.  Notwithstanding the program's complexity, the Plaintiffs have not made a clear showing that it is so pervasive as to occupy a field that HB1056 has invaded.

As the Eighth Circuit recognized, and indeed other courts before it recognized, 340B does not speak to or regulate delivery or distribution of drugs to patients or the acquisition of drugs by contract pharmacies as agents of covered entities.  HB1056, on the other hand, regulates delivery to and acquisition by contract pharmacies.

Ultimately, the Plaintiffs have failed to show or persuade the Court that the 340B Program leaves no room for states to supplement it as to the matter of drug delivery.

As the Eighth Circuit noted in *McClain*, when it comes to pharmaceuticals, the Federal Government has, quote, "traditionally regarded state law as a complementary form of drug regulation," and has long maintained that state law offers an additional and important layer of consumer protection that complements federal regulation.

Ultimately, the Plaintiffs here failed to show that the federal interests reflected in 340B are so dominant that the

federal system is assumed to preclude enforcement of state laws on the same subject.  State interest in public health are pronounced and well-established by a long history of recognition in the law as reflected in the fact that pharmacy has traditionally been regulated at the state level.  This is also reflected in the legal presumption that, quote, "state or local regulation of matters relating to health and safety is not invalidated under the Supremacy Clause," end quote, that's *Hillsborough County v. Automated Medical Laboratories*, Supreme Court case from 1985.

Some of the Plaintiffs here contend that the Eighth Circuit in *McClain* did not take adequate account of the Supreme Court's decision in *Astra USA v Santa Clara County*.  In *Astra USA*, the Supreme Court held that healthcare facilities that purchased drugs from 340B participating manufacturers cannot seek recourses for overcharges by suing the manufacturers under a theory that the facilities are third-party beneficiaries of the manufacturer's PPAs.

The Court based this holding on the fact that the 340B statute does not provide a private right of action against overcharges but instead vests authority to oversee compliance in HHS.  The Court did not conclude that in 340B Congress intended for the Federal Government to occupy a field to the exclusion of state regulation of 340B drug delivery.

Neither *Astra USA* nor the 340B statute itself stands for

the proposition that a state is preempted from regulating delivery of 340B priced drugs in a matter of HB1056 as that statute is written.

Thus, Plaintiffs' reliance upon *Astra USA* is misplaced. Indeed, the 340B statute is silent as to the matter of delivery. In *Sanofi-Aventis v. HHS* and *Novartis v. Johnson*, the Third Circuit and the D.C. Circuit respectively held that the drug manufacturers' practices of limiting distribution to contract pharmacies did not violate 340B; but that holding does not amount to a grant of immunity for these practices against state legislative intervention. The courts of appeals in those cases recognized that the 340B statute is silent as to the matter of delivery to contract pharmacies.

Here, the Plaintiffs cast congressional silence as congressional intent to preempt or some sort of right to engage in conduct which the statute is silent on.

The Plaintiffs appear to argue that Congress' silence as to the delivery of 340B drugs to contract pharmacies is somehow evidence of its intent to preempt state regulation of delivery to contract pharmacies.

For their part, neither the Third Circuit in *Sanofi*, neither the D.C. Circuit in *Novartis* said anything of that sort. And this Court finds that the Plaintiffs' argument fails as a matter of logic and a matter of law. The fact that the 340B statute does not specifically require unlimited delivery

to contract pharmacies does not mean that the statute itself limits or restricts delivery to contract pharmacies, or that it preempts any state law that would require delivery to contract pharmacies.

These cases do not stand for the proposition that 340B confers a right on drug manufacturers to restrict delivery to contract pharmacies.

Moreover, when Congress intends to preempt a state's exercise its traditional police powers, it is expected to do so in clear terms, that is, by speaking directly about the matter and not remaining silent about it.

This Court finds that Congress' silence in the 340B statute on the matter of delivery to contract pharmacies leaves room for states to exercise their traditional police power through legislation.

For these reasons, the Court does not find that the Plaintiffs' field preemption claims are likely to succeed.

Turning to the conflict preemption.  Conflict preemption may occur where, quote, "compliance with both state and federal law is impossible," end quote, or, quote, "the state law stands as an obstacle to the accomplishment and execution of the four purposes and objectives of Congress," end quote.  That's *California v. America Corporation*.  As well as, I guess it's *Oneok v. Learjet*, a Supreme Court case from 2015.

Here, the Plaintiffs fail to identify any conflict between

the requirements of 340B and HB1056 such that compliance with both statutes is impossible.  The Plaintiffs have also failed to show that HB1056 stands as an obstacle to accomplishing and executing the purposes and objectives of the 340B statute.

The Plaintiffs fail to identify any obstacle HB1056 poses to drug manufacturers seeking to comply with 340B's requirements.  To the contrary, like the Arkansas statute challenged in *McClain* and the Mississippi statute recently challenged in the Southern District of Mississippi, the Maryland statute assists in fulfilling the purpose of 340B.

Plaintiff suggests that some conflict between Congress's omission to address contract pharmacy arrangements in 340B and HB1056's requirement that manufacturers deliver 340B drugs to contract pharmacies, the Court perceives no conflict there.

Congress's omission to address delivery to contract pharmacies cannot be interpreted as a prohibition or restriction against it, nor as an entitlement conferred to drug manufacturers to place their own restrictions upon it.

Plaintiffs also cite a conflict between HB1056 -- I'm sorry -- 340B's enforcement mechanisms.  Again, the Court perceives no conflict at this stage.  The 340B statute provides for enforcement of the price ceilings and exclusivity of discounts prescribed by that statute, that is, enforcement against overcharges, drug diversion, and duplicative discounts.

It does not purport to offer any relief or dispute

resolution process for manufacturer's refusal to deliver 340B priced drugs or restrictions or interference against drug delivery.  HB1056 for its part provides what 340B does not, enforcement against restrictions on delivery to contract pharmacies.

Because the Plaintiffs have failed to make a clear showing of any conflict between 340B and HB1056, this Court cannot find that they are likely to succeed on the merits of their claims as to conflict or obstacle preemption.

Next, the Plaintiffs claim that HB1056 is preempted by market exclusivity provisions for drugs found in various federal laws, including federal patent laws.

In support of this argument, the Plaintiffs cite the Federal Circuit's decision in *Bio v. District of Columbia*, a Federal Circuit case from 2007.

That case involved a challenge to D.C.'s Prescription Drug Excessive Price Act, which prohibited drug manufacturers and licensees from selling or imposing minimum resale requirements for a patented prescription drug that resulted in the drug being sold in the District of Columbia for an excessive price.

The Federal Circuit found this law to be conflict-preempted by federal patent law.  The Court recognized the statutory scheme of incentives that has developed to provide market exclusivity rights to manufacturers who invest resources in the research and development of new drugs.  The

Court cited legislative history from the Hatch-Waxman Act generally affirming the uncontroversial proposition that enhanced profits to innovators in the pharmaceutical field is central to that statutory incentive scheme.

Turning to the challenged D.C. law.  The Court held that the D.C. law limited the full exercise of the exclusionary power the drug manufacturers derive from a patent by penalizing high prices, thereby, rebalancing the federal statutory framework of incentives as it relates to new drugs, contrary to Congress's goals.

To be sure, the D.C. law specifically targeted patented drugs and specifically targeted the prices set for those drugs. Specifically, the D.C. law prescribed that a *prima facie* case of excessive pricing could be established where the wholesale price of a patented drug was over 30 percent higher than the comparable price in certain high-income countries.  The burden would then shift to the defendant to prove that this wholesale price for the patented drug was not excessive.

By prescribing this price control and penalizing high prices, the challenged D.C. law set itself up as an obstacle to the purposes of federal patent laws, that is to say, to provide financial incentives for innovation through a period of market exclusivity.

HB1056 does nothing of that sort.  It does not target patented drugs.  Even if patented drugs fall within the scope

of 340B drugs, HB1056 does not set prices for those drugs.  The federal 340B statute does that.

In *Bio*, the Federal Circuit recognized that the objective of rewarding innovation and keeping prices reasonable for consumers are, quote, "in dialectic tension," end quote, and that Congress is charged with balancing these goals.

The price ceilings challenged here are prescribed by Congress itself in the 340B statute, not in HB1056.  Thus, the Plaintiffs fail to show that the Maryland statute upsets the balance or bargain achieved between Congress and innovators in the pharmaceutical industry.

If anyone has chosen to upset that great bargain it was Congress itself.  The fact that for the Plaintiffs to comply with the Maryland statute affects its bottom line is not enough to establish conflict preemption by federal patent laws or other federal laws that provide for forms of market exclusivity.

In summary, at this stage, the Court finds that the Plaintiffs are falling short of establishing that HB1056 is likely to be preempted by federal law.

Now, turning to the Plaintiffs' Dormant Commerce Clause or extraterritoriality arguments.  A little bit of legal background is in order.

The Dormant Commerce Clause, the jurisprudence that is developed surrounding the Dormant Commerce Clause arises as a,

quote, "negative implication," end quote, of Congress's power to regulate commerce among the several states under Article I of the U.S. Constitution.

The Supreme Court and the Fourth Circuit have recognized the prohibition against extraterritorial regulation embodied in the Dormant Commerce Clause.  This principle against extraterritoriality is derived from the notion that, quote, "A state may not regulate commerce occurring wholly outside its borders," end quote.

The Supreme Court has stated that although incidental regulation of interstate commerce by the states is not forbidden by the Commerce Clause, quote, "direct regulation is prohibited," end quote.  That's *Edgar v. MITE Corporation*, Supreme Court case from 1982.

More specifically, the Commerce Clause forbids the operation of a state statute that, quote, "directly interferes with the burdens on interstate commerce regardless of the purpose for which it was enacted," end quote.

The Commerce Clause also, quote, "precludes the application of a state's statute to commerce that takes place wholly outside the state's borders whether or not the commerce has effects within the state," end quote.

In *Edgar*, the Court invalidated an Illinois statute directly regulating takeover offers for shares of corporations that either were based in Illinois, had a certain percentage of

its assets represented in Illinois, or had certain percentage of its Illinois-based shareholders.

The Court held that the statute violated the Commerce Clause by directly regulating transactions across state lines, including those wholly outside the state of Illinois.

The Court noted that tender offers for shares of publicly-held corporations are commonly communicated to shareholders across the country and abroad, and the challenged statute encompassed corporations with shareholders scattered around the country.

As to the corporation that was the target of the tender offer in *Edgar*, only 27 percent of its shareholders lived in Illinois.  If the party making the tender offer was from outside of Illinois, like the plaintiff in that case, then the challenged statute, quote, "could be applied to regulate the tender offer which would not affect a single Illinois shareholder," end quote.

Thus, the Court concluded that the challenged statute was, quote, "a direct restraint on interstate commerce with a sweeping extraterritorial effect," end quote.

Novartis and PhRMA in this case contend that HB1056 will have an impermissible and extraterritorial effect on prices involved in drug manufacturers' out-of-state transactions with wholesalers and distributors.  This Court disagrees.

Insofar as it regulates delivery to -- delivery of drugs

to or acquisition of drugs by contract pharmacies, HB1056 does not target out-of-state transactions, and its operation does not directly restrain out-of-state transactions as a practical matter provided that the covered entities are located in Maryland.

The Court does not find that HB1056 targets drug manufacturers' transactions with out-of-state wholesalers or distributors.  Out-of-state drug manufacturers may respond to the requirements of HB1056 by altering terms of its transactions with wholesalers and distributors, but that choice does not render HB1056 an unconstitutional extraterritorial regulation.  The statute does not in itself set requirements for the terms of out-of-state sales.  To the extent that it applies to Maryland-based covered entities and Maryland-based contract pharmacies, the only transactions the statute sets requirements for are sales or orders of drugs and deliveries or acquisitions of drugs that occur in Maryland.

The Plaintiffs' reliance upon *Association for Accessible Medicines v. Frosh* is misplaced.  The Maryland statute challenged in *AAM*, or as was referred to earlier in this proceeding as *Frosh*, prohibited drug manufacturers and wholesaler distributors from, quote, "engaging in price gouging in the sale of an essential off-patent or generic drug," end quote.  That statute prohibited certain increases in the prices of certain drugs not justified by costs of production and

distribution.

The Fourth Circuit identified several factors in this anti-price gouging statute that in combination violated the Dormant Commerce Clause.

First, the statute was not triggered by any conduct that takes place within Maryland; second, the statute controlled the prices of transactions that occurred out of state; and, third, the statute, if similarly enacted by other states, would impose a significant burden on interstate commerce involving prescription drugs.

Here, no clear showing has been made that HB1056 exhibits any of these factors.

First, HB1056's requirement that 340B drug manufacturers permit delivery of 340B drugs to contract pharmacies is not triggered by out-of-state conduct.  It is trigged by an order or claim placed by a 340B covered entity in Maryland.

Second, HB1056 does not directly control prices involved in out-of-state transactions in the way the anti-price gouging statute did.

The statute challenged in *AAM*, by its own terms, targeted upstream transactions that occurred outside of Maryland.  It prohibited manufacturers and wholesale distributers from engaging in price gouging in the sales of drugs made available for sale in Maryland, that is to say, the anti-price gouging statute targeted sales of drugs made available for sale in

Maryland, regardless of where targeted sales occurred.

The Maryland Attorney General acknowledged in *AAM* that the statute was, quote, "intended to reach the manufacturer's conduct in the series of wholesale transactions that occur upstream from the consumer retail sales," end quote.

The statute challenged in *PhRMA v D*.C. was similar in this regard, targeting upstream transactions and practically absolving local sales.

The instant case is not like *AAM* or *PhRMA v. D.C.*  In this case, the HB1056 is constitutionally permissible.  Even if HB1056, at least on a limited evidentiary record currently before the Court, even if HB1056 impacts the Plaintiff drug companies decisions in connection with negotiating out-of-state sales with wholesalers, those decisions are for the Plaintiffs to make.  HB1056 does not set terms of those transactions for the Plaintiffs, unlike the laws challenged in the *AAM* and *PhRMA v. D.C.*

So the Court does not find that the Plaintiffs are likely to succeed on their Commerce Clause claim as described.

Well, there's a third point.  Third, no clear showing has been made that the enactment of statutes similar to HB1056 in other states would impose a significant burden on interstate commerce involving prescription drugs.

If laws like HB1056 were enacted in every state, this Court does not see any way in which their requirements would

interfere with one another in the way that would hinder interstate commerce.  To the contrary, similar enactments nationwide may very well alleviate operational burdens on the Plaintiffs.

The Plaintiffs have failed to make a clear showing that the effects of HB1056 will have on out-of-state transactions is likely to be sufficiently direct to raise extraterritoriality concerns.

Upon review of the record before it, this Court does not see the requirements set in HB1056 or its enforcement mechanisms as targeting the prices involved in drug manufacturers' out-of-state transactions.

Just to touch on briefly here.  Novartis and PhRMA's arguments as to HB1056's extraterritoriality effects rely in part upon the Supreme Court's 1989 decision in *Healy v. Beer Institute*.  I find that reliance to be misplaced because just last year the Supreme Court clarified in *National Pork Producers v. Ross* the statute challenged in *Healy* did not run afoul of the federal commerce power simply because it had extraterritorial effects.  It made the finding that it was unconstitutional based upon its suppression of competition.  In other words, the statute's discriminatory and anticompetitive effects.

In the instant case, the Plaintiffs failed to identify or articulate any likelihood that HB1056 will have a similar

effect amounting to discriminatory suppression of competitive advantage vis-a-vis other drug manufacturers.

Notably, the Court in *National Pork Producers* emphasized the statutes challenged in the *Healy* line of cases were either pricing affirmation or price control statutes.

The Court also finds a lack of likelihood of success on any claim of Dormant Commerce Clause discrimination or the *Pike* test based upon a limited evidentiary record before the Court.

Now, since the Court finds a lack of likelihood of success on the merits is lacking, the Court need not proceed to the other factors required by the *Winter* case.

However, I'll note that where the Government is a party, the third and fourth factors of that test merge.  The Court does not find that a preliminary injunction in this case would on balance serve the public interest or that the balance of equities favors the preliminary injunction at the Plaintiffs' request.

Here, implementation of HB1056 would tend to increase the accessibility of 340B drugs to disadvantaged patients served by 340B covered entities, who may otherwise lack access to these drugs.  This is the apparent purpose of the statute and the Plaintiffs fail to make a clear showing that the public interest would be better served by an injunction against the enforcement of the statute.

Ultimately, a plaintiff seeking extraordinary remedy in

the form of preliminary injunction against enforcement of a duly-enacted Maryland State statute subject to an interpretation and does not appear to violate any federal constitutional provision, that is to say, the Maryland statute as I read it does not appear to violate any federal constitutional provision. And they seek this extraordinary relief on a limited evidentiary record, and the Court finds that their presentation is inadequate to demonstrate entitlement to this extraordinary relief. And for these reasons, the motions for preliminary injunction will be denied.

All right. I understand that there are also motions to dismiss. I have not heard oral argument on those motions, and I believe that in at least one case briefing is ongoing.

Is that correct, Mr. Chazen?

MR. CHAZEN: As I understand it, briefing on motions to dismiss are still ongoing in one case. I believe that is the AbbVie case because of amended complaint was filed, and we do have a motion to dismiss on file, and I believe that the opposition is pending but my colleagues will let me know if that's incorrect.

THE COURT: Okay. Mr. Owen.

MR. OWEN: Mr. Chazen is correct, Your Honor. I believe the opposition brief would be due some time next week and it was on my agenda to catch Mr. Chazen in the hall and ask if we might agree to an extra week or so to file an opposition.

So if that's acceptable to the Court we'll confer and give you a stipulation.

THE COURT:  Okay.  Thanks very much, Mr. Owen.

The Court does find that in the interest of judicial efficiency it makes sense to rule on all of the pending motions to dismiss at once.  So once briefing is completed on AbbVie's motion, the Court expects to issue a ruling on those motions promptly.

Is there anything else that we need to address, Mr. Chazen?

MR. CHAZEN:  Thank you, Your Honor.  There is currently a motion for expedited discovery by AstraZeneca pursuant to a consent motion that Your Honor granted, I believe, yesterday.  The Defendant's response to that would be due next Wednesday, September the 11th.  In light of today's rulings, I'd ask that the Court stay a response by the Defendants until after a ruling on the motions to dismiss in the case.

MR. KEDEM:  Your Honor.

THE COURT:  Yes, go ahead, Mr. Kedem.

MR. KEDEM:  Your Honor, we agree in light of what you've said today that it would very greatly narrow the issues on which discovery would be appropriate.  There is, however, at least one issue that we think would speak directly to something that you've just said about your preliminary view, which is,

how does this statute apply, what exactly does it require.

If we could have at least discovery on that one issue, I think it would take you from a preliminary situation in which you basically just had to rely on the words of the statute and nothing else and actually see nuts and bolts how it is that the State would enforce a statute and whether, in fact, it does what you have read it to do and nothing else or instead it actually does, in fact, do what we are claiming that it would do.  And that is something on which we would very much like to take discovery in advance on your ruling on the motion to dismiss.

THE COURT:  Thank you.  I think I probably will need written briefing on that.  I understand that you have a reply that would be due after the State files its opposition.

MR. KEDEM:  That's correct.

THE COURT:  What I would say is that you can make those arguments in the reply and then the state would have an opportunity to file a surreply.  Since I expect that you'll be raising new arguments based on today's ruling.  If you need an opportunity to respond to that, I can entertain that request, but it may not be necessary.

MR. KEDEM:  Thank you, Your Honor.

THE COURT:  Anything else for us to address from your perspective, Mr. Perry?

MR. PERRY:  Nothing, Your Honor.

**THE COURT:** Anything else from you, Mr. Kedem?

**MR. KEDEM:** No, Your Honor.

**THE COURT:** Mr. Owen?

**MR. OWEN:** Just very briefly, Your Honor. I think that we had mentioned at a status conference that we had with the Court that we had been meeting and conferring with the Government about a similar expedited discovery motion, and we just agreed to table it until after the hearing. So we may wish to just simply associate ourselves with AstraZeneca's request for efficiency if that would be all right without filing additional papers.

**THE COURT:** Yeah, I think that would actually be preferable than filing a separate motion. So I appreciate that.

Anything else from your perspective, Mr. Chazen?

**MR. CHAZEN:** No, Your Honor. Thank you.

**THE COURT:** Thank you all for your patience today and enjoy your lunch and the rest of your day.

**THE CLERK:** All rise. This Honorable Court is now in recess.

(Court adjourned at 1:48 p.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, Ronda J. Thomas, Registered Merit Reporter, Certified Realtime Reporter, in and for the United States District Court for the District of Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 8th day of September 2024.

_____
Ronda J. Thomas, RMR, CRR
Federal Official Reporter

MR. CHAZEN: [16]   13/3 63/22 68/25 69/4
70/12 70/19 71/25 72/4 77/9 97/11 98/13
98/24 100/10 129/15 130/11 132/16
MR. KEDEM: [16]   2/18 20/4 26/2 27/24
32/15 33/3 33/11 34/17 35/6 88/3 91/11
130/19 130/21 131/15 131/22 132/2
MR. OWEN: [13]   2/23 35/7 46/6 47/9 51/1
56/21 59/18 61/5 91/12 92/13 92/16
129/22 132/4
MR. PERRY: [28]   2/10 2/14 4/2 4/5 4/16
4/18 4/22 7/18 7/20 9/1 10/24 15/20
17/23 77/10 77/14 77/21 78/3 78/8 83/11
84/11 84/14 84/16 87/7 87/10 87/13 87/23
87/25 131/25
MR. PICHINI: [1]   2/21
MR. PRINS: [1]   2/15
MS. POHL: [1]   3/1
THE CLERK: [5]   2/4 77/23 77/25 100/12
132/19
THE COURT: [36]   72/2 77/8 77/11 77/15
77/22 77/24 78/7 83/4 84/6 84/12 84/15
87/5 87/9 87/11 87/20 87/24 88/2 91/10
92/12 92/15 97/5 97/24 98/18 100/9
100/11 100/15 129/21 130/3 130/20 131/12
131/16 131/23 132/1 132/3 132/12 132/17
THE JUDGE: [37]   2/2 2/13 2/17 2/20 2/25
3/3 3/8 4/3 4/13 4/17 4/21 7/16 7/19
8/24 10/20 15/19 17/21 20/3 25/11 27/20
32/13 33/1 33/10 34/11 35/5 46/2 47/8
50/25 56/12 59/13 61/1 63/21 63/24 69/3
70/9 70/14 71/21

## $

$10 [1]   53/20
$100 [1]   51/8
$300 [1]   53/18

## 1

1,000 percent [1]   10/6
1.2 million [2]   23/12 30/2
10 [6]   10/5 51/7 51/9 51/11 53/3 77/24
10-fold [1]   85/11
100 [1]   73/21
100-fold [1]   85/11
101 [1]   1/24
1016 [1]   74/11
1040B [1]   109/4
1056 [3]   13/9 100/24 104/16
1056's [1]   108/15
10:04 [2]   1/7 2/1
11 [1]   22/24
1136 [1]   113/1
119 [1]   6/3
11th [1]   130/15
12 [1]   23/3
121 [1]   6/19
122 [2]   6/3 6/19
1243 [1]   41/24
12:00 [1]   78/2
12:13 [1]   78/2
12:47 [1]   100/14
13 [1]   104/22
14 [5]   13/18 36/11 39/21 43/1 53/21
15 [3]   5/5 13/18 40/23
15-minute [1]   100/11
160 [1]   85/15
17 [2]   39/21 41/8
18 [2]   23/12 30/2
18th [1]   38/13
19 [1]   44/10
1978 [2]   106/22 112/17
1982 [1]   122/14
1985 [1]   115/10
1986 [3]   19/4 19/5 19/6
1989 [1]   127/15
1992 [2]   103/3 112/18
1993 [1]   107/8
1995 [1]   111/22
1996 [4]   57/5 60/11 63/2 63/9
1998 [1]   111/17
1:01 [1]   100/14
1:24-CV-1557-MJM [1]   1/5
1:48 [1]   132/21
1B [1]   37/12
1C [1]   37/13
1st [2]   101/10 104/16

## 2

2007 [2]   110/19 119/15

2008 [1]   105/20
2009 [1]   107/7
2010 [2]   105/11 119/10
2014 [1]   107/5
2015 [1]   117/24
2019 [1]   111/21
2021 [1]   110/16
2023 [1]   105/22
2024 [2]   1/6 133/12
2026 [1]   85/14
21 [1]   75/20
21201 [1]   1/25
22 [2]   44/10 57/13
22nd [1]   108/6
24-cv-1557-MJM [1]   2/5
256 [1]   70/5
256b [4]   7/11 7/18 68/14 102/1
27 percent [1]   123/12
28 [1]   133/6
28657 [1]   79/17
29 [2]   13/2 13/16

## 3

30 percent [2]   53/16 120/15
32 [1]   66/7
34 [1]   66/7
340B [198]
340B manufacturer [1]   16/22
340B's [4]   67/23 67/25 118/6 118/20
352 [1]   105/21
37 [1]   78/13

## 4

40 [1]   66/6
4000 [1]   60/25
403 [2]   18/16 19/2
407 [2]   18/17 19/2
410 [1]   80/22
42 [3]   7/11 7/18 101/25
456 [2]   10/3 85/23
458 [2]   10/3 85/23
460 [7]   5/18 9/16 9/24 14/10 75/21 80/9
85/2
462 [1]   85/2
464 [5]   5/18 9/16 9/24 14/10 80/9
467 [1]   74/11
481 [1]   66/2
4th [1]   1/24

## 5

5 billion-dollar [1]   85/13
50 [1]   35/1
50 percent [1]   31/4
50,000 [1]   23/4
50,000 feet [1]   48/16
54 [1]   66/5
55 [1]   78/14
555 [1]   105/20
563 [2]   68/2 75/21
582 [1]   68/2
59 [1]   66/5

## 6

61 [2]   79/17 79/21
65409 [1]   79/21

## 7

70 percent [1]   53/16
739 [1]   66/3
753 [1]   133/7
79 [1]   105/21

## 8

800 [1]   10/5
8th [1]   133/12

## 9

95 [1]   112/25
99 percent [1]   51/10

## A

a.m [2]   1/7 2/1
A4 [1]   92/16
A4A [1]   92/12
AAM [5]   124/20 125/20 126/2 126/9 126/16
AbbVie [46]   1/16 2/24 3/2 4/24 35/8
35/12 35/22 36/12 37/10 37/14 40/2 40/17
41/1 44/12 45/16 51/13 53/8 53/24 54/13
56/5 68/16 73/21 75/5 75/17 75/19 76/3

76/25 91/13 101/1 101/5 101/6 107/10
107/21 108/5 108/13 108/14 108/19 108/25
109/9 109/21 110/3 110/21 110/6 111/11
113/5 129/17
AbbVie's [9]   36/16 37/13 44/13 46/24
62/5 66/5 110/9 111/23 130/6
ability [3]   18/17 57/25 79/12
able [4]   48/24 56/24 80/1 93/3
about [107]   4/1 8/18 12/2 12/17 13/19
17/20 17/23 18/22 19/2 19/2 20/15 21/20
21/24 22/1 22/2 22/7 22/19 23/6 23/10
23/11 23/11 23/12 23/14 23/16 23/18
23/21 24/6 24/23 25/1 25/6 27/6 27/6
27/9 27/12 28/4 28/23 28/24 29/3 29/20
29/21 30/2 33/4 33/8 34/23 34/25 36/17
39/21 40/19 41/2 42/24 43/9 44/4 45/11
46/1 47/7 47/9 47/16 47/20 49/16 49/24
50/18 54/15 54/23 55/9 55/14 55/17 56/9
56/13 56/13 56/14 60/7 60/20 60/22 61/10
61/10 62/7 62/11 64/9 70/17 73/15 74/24
77/19 78/16 79/18 80/21 80/23 82/1 83/5
83/20 84/12 88/5 88/24 89/13 89/22 89/23
90/23 91/21 92/7 92/22 93/4 94/13 98/2
99/6 117/10 117/11 130/25 132/7
above [6]   1/10 27/16 29/4 30/7 90/17
133/9
above-entitled [2]   1/10 133/9
abroad [1]   123/8
absence [1]   105/12
absolutely [2]   13/9 32/3
absolving [1]   126/8
abstract [2]   28/23 57/21
abusive [1]   104/21
accept [6]   14/3 14/3 16/13 38/6 46/14
89/6
acceptable [1]   130/1
accepted [2]   8/11 9/4
accepting [1]   10/13
access [18]   23/5 23/14 25/6 29/2 30/18
40/6 49/6 49/8 49/8 62/11 64/16 67/2
74/9 84/8 90/15 90/16 98/4 128/20
accessed [1]   28/13
accessibility [1]   128/19
accessible [2]   103/10 124/18
accomplishing [1]   118/3
accomplishment [1]   117/21
according [7]   18/1 29/23 53/5 53/17 87/4
88/10 103/14
account [1]   115/12
accounting [2]   24/16 24/20
accumulations [1]   53/23
achieved [1]   121/10
achieving [1]   67/23
acknowledged [2]   5/12 126/2
acquire [2]   15/23 45/20
acquiring [1]   45/21
acquisition [24]   15/15 15/18 15/21 15/23
45/10 45/15 45/17 45/23 47/16 68/18
69/10 69/10 69/13 93/17 95/14 95/16
95/18 96/4 96/5 97/14 104/19 114/12
114/14 124/1
acquisitions [1]   124/17
across [7]   3/7 67/10 67/17 70/20 74/17
123/4 123/8
Act [2]   119/17 120/1
action [9]   44/17 50/16 70/16 71/15 72/12
76/2 101/3 105/2 115/20
actions [4]   41/21 100/20 104/24 104/25
activity [3]   66/9 106/25 111/1
acts [2]   28/6 48/10
actual [4]   15/12 18/20 93/24 111/19
actually [20]   10/9 16/20 17/13 17/14
25/25 28/22 30/21 31/8 31/10 32/7 33/12
34/22 36/25 48/4 56/22 76/1 108/19 131/5
131/8 132/12
add [2]   30/4 86/22
added [1]   51/20
adding [1]   15/8
additional [17]   20/9 21/3 29/13 29/21
30/22 31/21 31/22 32/11 32/24 33/1 34/24
65/7 91/7 103/18 108/16 114/22 132/11
address [14]   4/25 9/10 9/20 13/16 14/13
16/8 18/11 19/19 77/17 79/11 118/12
118/15 130/9 131/23
addressed [13]   6/2 8/14 10/17 10/17 15/7
18/16 18/19 19/5 79/19 80/12 80/17
112/24 113/2
addresses [1]   69/1
addressing [2]   79/23 86/4
adequate [4]   58/3 58/4 108/25 115/12

**A**

adequately [2] 4/15 24/10
adjourned [1] 132/21
adjudicated [1] 6/25
adjudication [2] 6/10 111/14
adjudications [1] 6/17
adjusts [1] 109/12
administer [1] 113/17
Administration [1] 102/16
administrative [2] 11/14 79/3
administrator [4] 24/5 52/17 103/16
 103/22
administrators [1] 59/7
Admiral [2] 52/1 61/24
admissions [1] 78/12
admits [1] 61/24
admitted [1] 82/11
adopted [1] 24/19
adopting [1] 75/14
ADR [6] 59/21 79/7 80/4 86/15 87/4
 102/19
advance [1] 131/10
advanced [1] 36/9
advantage [3] 57/22 58/8 128/2
affect [1] 123/16
affects [1] 121/14
affiliates [1] 81/20
affirmation [1] 128/5
affirming [1] 120/2
afoul [5] 22/13 56/8 83/10 97/10 127/19
after [18] 5/25 19/6 21/12 23/22 24/3
 24/16 24/20 25/8 43/2 52/15 53/22 60/7
 82/24 87/21 95/5 130/17 131/14 132/8
again [22] 4/24 7/17 9/23 14/9 21/2 22/9
 23/16 23/20 24/10 24/22 29/19 31/23
 36/18 53/25 58/21 59/10 79/21 81/5 85/23
 91/12 97/6 118/20
against [36] 3/10 41/2 41/18 42/5 46/22
 57/23 58/7 59/16 59/19 69/20 71/15 74/13
 88/5 88/8 88/15 95/19 97/13 97/18 100/21
 101/9 104/18 105/3 105/25 109/6 113/18
 113/19 115/20 116/10 118/17 118/24 119/2
 119/4 122/5 122/6 128/23 129/1
agency [12] 6/12 6/14 17/18 48/21 57/6
 61/7 61/13 61/22 62/3 62/3 63/2 63/6
agency's [1] 6/22
agenda [1] 129/24
agents [2] 81/20 114/12
ago [6] 5/11 5/12 14/17 52/25 63/4 78/11
agree [19] 9/22 10/14 20/6 28/24 33/12
 40/7 45/1 46/4 46/15 46/20 84/22 84/23
 84/24 84/25 90/2 93/25 95/19 129/25
 130/21
agreed [6] 30/7 67/3 74/10 85/4 92/21
 132/8
agreement [5] 4/1 8/2 30/8 58/16 101/21
agrees [4] 38/3 73/18 108/3 113/7
Agriculture [2] 39/6 106/9
ahead [2] 84/15 130/20
aided [1] 1/22
aim [1] 64/12
aimed [2] 64/4 66/8
akin [1] 109/15
al [2] 1/6 2/6
albeit [1] 28/15
algorithm [3] 53/17 56/15 56/24
aliens [1] 18/18
all [90] 2/13 3/3 3/7 3/8 6/2 9/1 14/16
 16/7 17/8 22/7 22/20 23/14 24/16 24/23
 25/9 27/12 27/14 27/18 28/14 28/17 28/24
 30/4 30/4 31/9 31/24 32/2 32/10 32/13
 39/16 40/25 42/7 43/23 44/24 45/13 50/23
 50/25 51/21 53/5 53/19 54/16 56/3 56/16
 57/23 58/4 58/4 58/21 59/24 60/1 60/17
 62/11 63/21 66/1 66/13 67/10 70/14 73/4
 74/18 77/8 77/20 77/25 78/3 78/21 80/1
 80/14 81/20 82/13 84/23 86/25 88/22 90/1
 90/21 90/22 91/6 92/9 92/13 93/12 96/8
 96/10 100/9 100/12 100/15 100/15 106/13
 111/16 111/25 129/11 130/5 132/10 132/17
 132/19
allegations [1] 74/17
allege [1] 66/4
alleged [1] 74/12
alleviate [1] 127/3
ALLON [3] 1/18 2/18 20/5
allow [5] 38/16 45/19 57/15 62/3 63/6
allowed [11] 30/20 31/19 33/5 38/20
 54/23 58/10 73/8 91/1 91/8 93/18 94/1
allowing [1] 55/23

allows [2] 59/19 86/19
almost [4] 47/5 54/12 60/17 82/13
alone [4] 20/11 43/25 95/18 102/21
along [10] 4/25 5/18 25/3 30/16 30/20
 31/7 42/11 62/14 73/14 85/6
already [12] 21/12 21/13 22/2 24/17 26/6
 34/4 36/15 37/8 47/11 55/2 67/3 74/10
already-purchased [2] 21/13 22/2
also [49] 2/16 2/22 3/1 3/16 4/22 6/9
 8/12 15/12 16/2 21/8 24/1 27/2 27/11
 29/13 32/16 34/1 34/7 37/1 39/14 42/15
 42/19 43/15 43/23 56/7 59/24 65/18 72/12
 73/10 75/23 78/5 79/18 80/7 80/10 91/14
 102/19 103/9 107/6 107/17 108/4 109/7
 113/2 113/21 114/1 115/6 118/2 118/19
 122/19 128/6 129/11
altering [2] 70/22 124/9
alternative [1] 11/13
although [5] 3/21 57/21 68/16 108/14
 122/10
altogether [1] 114/2
always [5] 28/15 54/12 60/1 88/19 93/20
am [2] 55/22 87/5
ambit [1] 92/8
ameliorate [1] 38/19
amended [2] 5/25 129/17
amendment [7] 6/20 93/18 106/2 106/3
 106/4 109/20 110/10
America [3] 2/11 101/1 117/23
American [1] 19/12
Americans [1] 102/4
among [5] 98/10 102/23 103/12 111/9
 122/2
amount [10] 19/24 24/24 24/25 35/4 39/11
 43/14 55/16 81/6 110/24 116/10
amounting [1] 128/1
analogy [4] 30/24 32/4 32/5 32/7
analysis [3] 18/12 76/5 112/16
analysts [1] 85/12
analyze [1] 83/1
analyzes [1] 82/23
ANDREW [2] 1/15 2/15
animal [1] 28/17
animals [1] 32/5
another [17] 4/22 6/11 25/19 25/19 27/8
 31/21 35/14 38/18 46/17 53/24 55/13
 65/10 74/24 81/25 94/6 107/12 127/1
answer [11] 9/3 9/15 10/11 11/17 11/18
 22/14 28/1 63/7 73/12 89/22 90/18
answered [3] 10/10 10/10 10/11
answering [1] 61/6
ANTHONY [1] 1/6
anti [4] 63/7 125/3 125/18 125/24
anti-diversion [1] 63/7
anti-price [3] 125/3 125/18 125/24
anticipate [1] 25/13
anticipated [1] 111/16
anticompetitive [1] 127/22
any [62] 12/22 25/1 25/10 26/16 28/15
 28/19 30/15 34/8 34/15 37/1 37/23 38/21
 40/17 47/7 47/23 48/13 49/19 55/22 56/12
 56/17 56/18 56/23 58/15 60/3 62/8 64/18
 64/19 66/8 67/10 67/11 67/19 70/5 70/14
 71/15 71/16 73/12 75/13 75/18 76/19
 76/24 80/4 83/15 91/20 95/1 98/9 98/9
 112/2 112/5 112/6 113/10 117/3 117/25
 118/5 118/25 119/7 125/5 125/12 126/25
 127/25 128/7 129/3 129/5
anymore [3] 20/18 62/21 87/24
anyone [8] 52/8 53/14 54/2 57/16 69/16
 82/19 93/17 121/12
anything [14] 47/10 55/25 56/1 56/13
 70/17 76/23 92/1 94/12 95/20 116/22
 130/9 131/23 132/1 132/15
anyway [1] 20/18
apart [2] 14/21 78/16
apparent [1] 128/21
apparently [1] 91/16
appeal [2] 4/12 34/20
appeals [4] 43/10 63/8 112/25 116/11
appear [3] 116/17 129/3 129/5
appears [1] 108/14
applicable [1] 68/4
application [4] 49/15 66/2 83/13 122/20
applied [9] 56/19 80/11 80/19 80/24 83/6
 83/6 83/12 93/12 123/15
applies [21] 19/12 19/15 21/7 25/21
 36/15 37/1 37/3 39/8 43/2 43/4 45/1
 48/18 49/25 54/7 75/8 78/12 84/2 88/16
 106/3 108/11 124/14

apply [15] 16/16 39/23 45/5 45/7 59/8
 68/23 74/24 80/20 80/24 80/25 83/7 83/17
 83/24 122/1
applying [1] 49/22
appreciate [5] 72/2 72/4 100/16 100/17
 132/13
approach [1] 28/21
appropriate [3] 11/13 47/17 130/23
appropriates [1] 106/8
are [147]
area [3] 70/6 76/20 113/10
aren't [4] 12/13 75/24 86/10 86/11
argue [7] 14/15 21/1 27/18 108/14 112/21
 113/13 116/17
argued [7] 5/24 16/19 16/20 17/9 17/9
 77/19 79/18
argues [3] 18/5 19/9 88/5
arguing [1] 41/2
argument [35] 3/13 3/15 3/19 20/9 27/3
 27/5 28/19 33/17 36/19 37/6 43/1 50/8
 65/13 68/19 70/22 74/23 75/4 75/5 75/17
 77/18 80/14 83/8 88/19 88/22 89/1 89/4
 89/7 101/10 101/13 107/21 108/18 110/9
 116/23 119/13 129/12
arguments [17] 14/14 19/23 20/7 25/3
 32/15 35/13 36/9 36/10 36/11 39/11 41/23
 47/13 69/23 121/22 127/14 131/17 131/19
arise [1] 114/3
arises [3] 43/9 109/11 121/25
Arizona [7] 18/15 18/24 19/11 19/13
 80/21 81/5 113/12
Arizona v. United [1] 113/12
Arkansas [4] 34/19 61/10 61/12 118/7
arose [1] 16/10
around [10] 25/15 40/14 49/1 49/2 49/3
 57/14 57/14 69/6 78/13 123/10
arrangement [3] 59/15 60/3 65/18
arrangements [8] 52/10 59/25 60/2 64/15
 103/5 103/7 103/9 118/12
article [3] 104/22 112/3 122/2
articulate [1] 127/25
as [179]
as-applied [7] 80/11 80/19 80/24 83/6
 83/6 83/12 93/12
aside [2] 31/14 59/1
ask [7] 39/25 42/11 56/12 58/11 62/12
 129/24 130/16
asked [9] 26/2 34/2 46/3 56/21 59/11
 85/21 89/16 97/7 97/24
asking [2] 16/17 61/12
aspects [1] 21/3
assert [2] 42/4 111/25
asserts [1] 107/21
assets [1] 123/1
assists [1] 118/10
associate [2] 35/9 132/9
association [2] 102/21 124/18
assume [2] 26/18 75/6
assumed [1] 115/1
Astra [14] 5/21 6/18 11/11 17/19 40/5
 48/20 86/3 86/18 87/6 87/7 115/13 115/13
 115/25 116/4
AstraZeneca [11] 1/18 2/19 2/22 4/19
 20/5 26/21 26/23 28/11 88/14 101/2
 130/12
AstraZeneca's [5] 21/15 24/18 28/14 66/6
 132/9
attach [1] 32/11
attached [2] 81/13 98/1
attaches [2] 32/6 37/12
attachments [2] 37/12 69/6
attempt [2] 26/10 49/1
attempted [1] 32/12
attempting [3] 42/4 49/4 99/22
attention [2] 92/7 93/24
Attorney [20] 3/6 3/11 25/13 36/25 39/17
 41/6 42/18 48/24 49/1 55/17 55/23 58/8
 62/6 72/14 95/11 95/15 100/21 104/24
 107/4 126/2
audit [21] 13/12 56/17 56/23 56/24 57/2
 57/3 57/10 57/12 57/13 57/15 57/18 57/20
 57/22 59/10 59/13 59/20 79/21 79/24 80/3
 102/13 113/24
audited [1] 102/14
auditing [1] 57/16
audits [4] 57/4 57/25 58/6 79/22
authority [11] 15/6 15/6 48/21 64/1 79/2
 79/4 79/11 79/14 83/18 113/17 115/21
authorization [2] 68/25 113/23
authorized [4] 69/11 97/15 97/20 110/25

**A**

Automated [1] 115/19
avail [1] 80/2
availability [1] 64/4
available [17] 17/4 24/25 26/20 28/14
 30/19 31/3 46/16 68/9 71/18 72/10 72/25
 74/12 89/9 89/25 93/13 125/23 125/25
Aventis [2] 104/8 116/6
avenues [1] 102/13
avoid [2] 47/5 99/22
awarded [1] 105/8
aware [4] 16/11 34/8 55/22 75/11
away [2] 32/10 99/22

**B**

back [24] 12/2 24/10 24/12 27/11 33/13
 33/15 33/23 33/24 34/8 35/12 46/2 48/1
 52/17 53/8 53/13 63/1 63/5 63/16 64/10
 69/13 70/9 77/18 81/9 95/11
backed [3] 44/13 106/18 109/3
backend [1] 94/22
background [1] 121/23
Backing [1] 10/8
bail [1] 110/11
Baker [1] 107/4
balance [5] 77/3 105/13 121/10 128/15
 128/15
balancing [1] 121/6
Baltimore [2] 1/6 1/25
bank [4] 47/23 47/24 47/25 48/3
banks [2] 48/1 48/2
bar [1] 94/24
bare [2] 8/16 88/23
bargain [9] 40/1 40/4 40/6 40/10 84/25
 85/1 85/19 121/10 121/12
based [12] 20/10 73/24 82/10 98/6 115/19
 122/25 123/2 124/14 124/14 127/21 128/8
 131/19
basic [2] 49/2 63/9
basically [11] 9/20 17/19 36/16 60/9
 60/15 63/1 63/4 63/18 86/3 97/2 131/4
basics [1] 64/10
basis [1] 88/21
be [170]
became [2] 16/11 21/14
because [98] 4/10 6/3 6/12 12/11 13/10
 16/14 21/15 22/20 23/4 23/21 24/18 24/24
 24/25 25/14 25/24 25/25 26/3 26/12 26/17
 28/24 32/10 32/16 33/14 34/23 35/13
 36/14 37/7 37/9 38/5 39/10 39/13 39/24
 41/12 42/1 42/8 42/16 43/10 44/1 44/4
 44/14 45/5 45/8 46/9 46/22 48/1 49/23
 52/9 53/2 54/5 54/10 55/4 56/7 56/22
 57/25 58/4 59/25 60/8 61/12 61/23 62/8
 63/18 63/19 63/19 65/11 65/19 68/7 69/24
 71/25 73/2 74/1 74/3 75/6 76/1 76/18
 81/1 81/20 83/17 84/3 85/21 86/10 86/11
 86/12 87/17 88/9 90/9 91/1 91/19 91/20
 92/5 93/6 93/14 98/15 99/5 103/7 119/6
 127/16 127/19 129/17
become [4] 10/6 47/2 54/10 106/11
been [38] 12/24 16/24 21/12 21/21 22/4
 22/5 22/6 34/15 34/18 34/19 36/15 37/3
 39/18 52/24 56/19 70/20 70/21 71/3 74/23
 79/10 89/13 89/24 90/7 90/20 92/10 92/16
 98/2 98/3 99/16 99/20 101/11 103/13
 113/2 113/4 115/5 125/11 126/21 132/6
Beer [1] 127/15
before [19] 1/11 2/4 2/6 9/22 18/4 19/5
 35/13 56/4 60/8 60/10 67/15 70/24 72/18
 74/15 101/11 114/10 126/12 127/9 128/8
began [1] 104/3
begin [2] 4/9 91/14
beginning [2] 7/10 35/11
behalf [19] 1/14 1/16 1/18 1/20 2/19
 2/22 2/24 3/2 3/6 20/5 22/23 35/8 58/9
 69/12 78/3 95/11 97/16 97/21 103/18
behind [1] 69/21
being [11] 3/17 12/13 17/6 21/17 22/2
 22/14 22/19 68/19 72/13 85/21 119/20
belabor [1] 55/19
believe [14] 13/4 46/3 52/3 52/18 67/10
 68/16 89/11 94/24 97/7 129/13 129/16
 129/18 129/23 130/14
believed [1] 92/5
believes [3] 33/23 40/20 79/9
Bell [1] 31/2
below [3] 40/8 68/4 79/13
bend [1] 4/13
beneficial [1] 106/13

beneficiaries [1] 115/17
benefit [13] 29/15 30/17 38/21 38/24
 39/22 80/18 80/19 106/18 106/24 107/4
 107/9 108/16
benefits [7] 26/13 30/16 30/17 31/21
 94/18 94/19 109/12
Bennett [3] 110/15 111/4 111/5
best [5] 5/20 30/24 32/5 46/8 62/17
better [4] 4/16 72/5 98/21 128/23
between [30] 3/22 5/22 6/23 7/6 14/10
 20/15 25/16 27/22 40/1 41/12 52/12 55/1
 60/6 61/13 62/2 62/8 76/12 78/10 80/19
 82/14 82/15 83/5 102/20 103/22 111/2
 117/25 118/11 118/19 119/7 121/10
beyond [14] 26/21 26/25 27/16 29/4 30/7
 38/23 65/21 66/15 71/8 82/12 84/24 85/4
 90/18 94/12
big [1] 59/1
bigger [2] 85/15 85/16
Bill [2] 100/24 104/16
billion [2] 85/13 85/15
billion-dollar [1] 85/15
bind [1] 8/16
binding [1] 66/12
Bio [2] 119/14 121/3
biopharmaceutical [1] 102/22
bit [10] 4/14 20/1 34/22 60/20 73/15
 76/8 77/15 89/3 100/17 121/22
black [2] 53/2 56/15
Black's [1] 15/22
black-boxed [1] 53/2
blight [2] 38/20 94/3
Blinken [1] 105/21
blue [2] 51/8 53/25
board [6] 3/11 72/15 74/18 100/22 100/22
 104/25
bolts [1] 131/5
bona [2] 11/5 14/1
borders [3] 82/12 122/9 122/21
both [20] 8/6 8/14 8/19 16/2 32/16 33/12
 38/1 39/19 41/19 41/21 50/7 56/5 63/18
 66/18 66/19 82/1 110/17 112/21 117/19
 118/2
bottle [1] 63/23
bottom [2] 69/8 121/14
box [4] 51/14 53/11 53/13 56/15
boxed [1] 53/2
breach [1] 102/7
break [2] 77/12 78/2
brief [23] 13/2 13/2 33/16 34/1 36/8
 36/12 37/6 39/17 40/19 40/23 41/7 43/2
 49/17 62/5 77/2 77/19 78/5 81/7 81/14
 84/3 84/4 94/23 129/23
briefed [5] 3/17 16/12 80/22 101/11
 101/12
briefing [19] 3/18 16/10 17/8 18/5 22/18
 22/19 36/23 67/16 77/4 80/12 81/6 92/5
 97/25 98/1 100/4 129/13 129/15 130/6
 131/13
briefly [7] 14/13 56/10 65/11 78/4 88/4
 127/13 132/4
briefs [8] 10/17 13/10 13/13 15/1 20/17
 25/4 57/7 86/23
bring [3] 41/1 63/22 86/24
brings [2] 45/9 92/8
broad [1] 95/10
broader [1] 89/9
broadly [1] 109/25
brought [4] 35/12 41/18 72/13 74/13
BROWN [2] 1/6 2/6
Buchmann [2] 33/8 88/7
Bull [1] 38/12
burden [6] 30/18 48/13 106/10 120/16
 125/9 126/22
burdens [4] 30/17 109/12 122/17 127/3
burdensome [1] 106/11
buy [4] 12/19 22/20 55/6 96/13

**C**

calculate [1] 53/3
calculated [1] 53/23
calculates [1] 52/18
calculation [1] 53/2
Calder [1] 38/12
California [1] 117/23
call [4] 90/15 93/24 100/11 106/15
called [18] 5/8 7/5 8/1 9/19 17/3 22/23
 24/5 30/10 31/13 31/18 40/4 41/15 51/20
 59/3 73/20 92/7 101/24 103/5
came [4] 1/10 18/24 31/7 82/24

can [83] 5/17 5/21 9/3 10/2 10/11 10/13
 11/8 13/20 13/22 16/4 16/6 17/14 17/16
 18/8 19/20 23/23 24/4 25/8 25/13 28/1 28/16
 28/24 33/12 37/11 39/12 39/13 39/14
 39/24 42/3 42/10 42/21 43/14 47/3 47/13
 51/5 52/21 53/24 54/2 56/10 57/3 57/17
 63/5 63/14 63/22 64/16 65/16 65/24 66/20
 69/9 71/21 72/4 73/24 74/13 78/4 78/24
 79/6 79/8 79/21 80/14 80/21 82/5 83/15
 83/22 84/19 86/7 86/8 87/2 87/15 90/5
 90/19 91/23 92/18 93/1 93/2 96/11 98/9
 98/21 98/21 99/11 106/11 106/12 113/25
 131/16 131/20
can't [19] 9/9 28/13 32/24 41/1 57/10
 57/24 63/18 72/19 72/20 75/10 78/16
 83/21 83/22 83/24 87/16 88/20 89/11
 89/25 93/5
cannot [18] 12/11 15/5 26/14 42/11 45/16
 49/1 49/2 67/6 67/24 73/7 74/23 76/20
 79/15 80/17 82/12 115/15 118/16 119/7
capping [1] 20/12
car [2] 14/24 14/24
care [1] 41/9
carefully [1] 86/23
cares [1] 28/3
carry [1] 48/14
cart [1] 74/15
case [133] 3/9 3/16 5/18 5/19 5/24 6/18
 7/5 7/9 8/5 8/6 9/16 9/19 10/10 10/11
 11/11 11/17 14/10 15/10 15/10 15/25 17/9
 17/10 18/9 18/15 18/16 18/17 19/10 19/12
 19/13 21/4 30/15 36/3 36/12 36/22 36/24
 38/18 39/5 39/7 39/9 39/11 39/23 40/1
 40/3 40/5 40/11 41/6 41/8 41/9 41/14
 42/3 42/3 42/6 42/19 43/14 44/1 47/13
 47/19 55/8 61/10 61/11 61/19 62/6 64/24
 65/12 66/12 67/11 70/25 71/13 75/18 76/6
 76/18 76/19 78/19 79/19 80/9 80/12 80/20 80/21
 80/25 81/5 81/6 81/24 81/25 81/25 82/1
 82/23 82/24 83/15 83/17 83/25 84/3 84/5
 88/11 92/6 93/19 97/9 105/20 105/21
 106/7 107/5 107/7 107/8 107/19 109/10
 110/3 110/16 110/19 111/4 111/6 111/11
 111/17 111/21 111/22 111/25 112/17
 112/17 112/19 115/10 117/24 119/15
 119/16 120/13 122/14 123/14 123/21 126/9
 126/10 127/24 128/11 128/14 129/13
 129/16 129/17 130/18
cases [32] 3/7 8/7 15/1 15/11 18/11
 19/19 24/2 33/8 38/1 43/9 66/3 66/11
 66/13 66/15 67/10 74/18 75/22 75/24
 80/13 80/23 81/3 81/23 92/6 93/23 99/6
 101/11 104/8 108/19 113/6 116/12 117/5
 128/4
cast [1] 116/14
catch [2] 57/13 129/24
Catch-22 [1] 57/13
categorical [1] 59/24
categories [1] 102/2
caught [2] 35/15 72/16
cause [2] 61/21 79/25
caused [2] 60/24 111/3
cease [1] 32/9
ceased [1] 32/2
ceases [1] 88/14
ceiling [5] 8/3 8/12 68/4 70/16 79/13
ceilings [3] 113/16 118/22 121/7
centers [1] 102/3
central [5] 106/22 106/23 108/23 109/9
 120/4
cents [1] 73/8
Century [1] 38/13
certain [13] 22/11 30/17 40/9 54/21 71/7
 84/9 102/2 104/4 120/16 122/25 123/1
 124/24 124/25
certainly [6] 47/5 50/17 60/2 70/1 98/24
 99/12
CERTIFICATE [1] 132/23
Certified [1] 133/4
certify [1] 133/6
cetera [1] 47/16
chain [1] 82/22
challenge [13] 64/8 65/2 74/16 76/6
 80/15 83/5 83/13 83/14 88/17 88/21 93/21
 100/23 119/16
challenged [15] 111/20 118/8 118/9 120/5
 120/20 121/7 123/8 123/15 123/18 124/20
 125/20 126/6 126/16 127/18 128/4
challenges [7] 80/10 80/11 80/20 83/6
 83/6 93/13 111/18

**136**

**C**

Chamber [1] 68/1
change [7] 11/20 14/6 15/7 24/23 25/1
  72/7 85/8
changed [4] 16/19 17/10 60/7 85/18
character [7] 44/17 50/16 88/9 106/19
  109/7 109/13 109/15
charge [4] 24/12 29/1 71/22 92/2
charge-back [1] 24/12
chargeable [1] 55/5
charged [3] 111/2 111/3 121/6
charges [2] 22/12 87/18
charging [2] 28/8 55/2
chartered [3] 47/23 47/25 48/2
chattels [1] 39/9
CHAZEN [18] 1/20 3/5 77/8 78/18 89/21
  89/22 91/17 91/25 92/22 94/21 95/11 97/6
  100/9 129/14 129/22 129/24 130/10 132/15
Chazen's [1] 83/8
Cheffer [1] 111/21
Chief [1] 39/7
choice [1] 124/10
choose [4] 31/15 31/22 32/12 33/6
chooses [1] 29/8
chosen [2] 18/11 121/12
Cippollone [1] 112/17
circle [1] 35/12
circling [1] 69/13
circuit [72] 5/8 5/18 5/19 8/5 8/6 8/14
  8/19 8/20 8/23 9/16 9/19 10/10 10/11
  10/20 10/24 10/25 13/21 14/10 19/11
  19/12 19/14 19/17 19/18 26/22 26/24
  37/18 37/18 38/1 38/1 43/19 49/4 49/5
  61/9 61/11 63/4 63/5 65/4 66/9 66/9
  75/18 75/20 75/23 76/7 79/19 80/9 81/24
  85/1 85/23 99/6 99/6 105/21 107/5 107/7
  107/8 110/16 110/19 111/5 111/22 112/24
  113/16 114/9 114/18 115/12 116/7 116/7
  116/21 116/22 119/15 119/21 121/3 122/4
  125/2
Circuit's [2] 10/3 119/14
circuits [1] 96/25
circumstance [1] 111/9
circumstances [1] 83/16
citation [1] 57/8
citations [1] 51/2
cite [5] 7/16 43/14 107/6 118/19 119/13
cited [11] 15/1 15/11 19/12 30/15 57/7
  67/11 76/7 76/19 81/23 90/11 120/1
cites [3] 40/11 41/6 108/19
citing [3] 51/24 51/25 105/19
City [3] 38/14 106/23 107/13
civil [12] 1/4 2/5 3/9 86/9 90/7 100/20
  101/3 102/17 105/1 105/1 105/2 110/17
claim [33] 4/25 35/11 36/2 36/5 36/7
  39/11 41/1 41/7 41/24 43/25 44/5 44/25
  45/11 46/1 48/11 50/13 67/24 70/7 73/5
  73/24 79/9 86/13 86/20 93/14 94/25 110/8
  111/14 111/23 111/24 119/10 125/16
  126/19 128/7
claimant [1] 106/17
claiming [2] 85/25 131/8
claims [34] 7/6 9/19 10/16 11/25 12/12
  12/17 12/20 12/25 13/3 13/4 13/8 13/10
  13/14 13/15 41/18 41/20 48/23 57/23 58/6
  59/21 73/15 79/9 79/11 79/20 79/25 80/7
  86/1 93/8 105/11 105/23 112/1 112/3
  117/17 119/8
Clara [3] 5/22 48/20 115/13
clarified [1] 127/17
clarify [1] 13/7
clarity [2] 92/14 93/5
class [2] 38/21 94/11
classic [2] 106/7 109/19
clause [29] 36/14 37/7 39/8 42/10 73/15
  73/24 75/7 82/9 82/9 83/19 106/1 106/2
  106/4 110/13 110/18 111/18 112/3 115/8
  121/21 121/24 121/25 122/6 122/12 122/15
  122/19 123/4 125/4 126/19 128/7
clauses [2] 67/5 69/9
clear [37] 13/6 16/3 21/4 21/14 23/20
  33/22 37/9 37/14 40/19 46/19 46/24 58/21
  64/2 65/17 65/18 70/23 72/18 72/23 73/11
  74/17 78/14 81/15 83/25 84/18 84/19
  88/24 95/23 99/7 105/18 109/18 114/6
  117/10 119/6 125/11 126/20 127/5 128/22
clearly [2] 39/4 85/1
client [1] 44/16
clients [2] 10/22 56/24
clinics [1] 102/3

close [2] 5/17 63/2
closely [1] 60/17
closer [1] 67/14
Code [2] 101/25 104/23
codified [1] 101/25
cognizable [1] 110/6
colleague [3] 23/19 52/23 72/2
colleagues [10] 18/4 19/25 35/10 50/1
  64/24 78/4 78/24 83/2 97/8 129/19
Columbia [2] 119/14 119/20
combination [1] 125/3
come [19] 3/25 11/1 15/23 17/16 24/10
  30/20 30/24 30/25 32/4 32/6 42/11 52/5
  55/1 73/7 73/13 77/18 83/15 85/6 87/21
comes [12] 2/6 29/17 30/6 54/17 55/5
  58/22 66/2 76/5 81/9 97/12 99/24 114/18
coming [1] 46/2
command [2] 45/23 50/3
commerce [25] 68/2 75/7 82/8 121/21
  121/24 121/25 122/2 122/6 122/8 122/11
  122/12 122/15 122/17 122/19 122/20
  122/21 123/3 123/19 125/4 125/9 126/19
  126/23 127/2 127/19 128/7
commercial [15] 51/6 52/13 53/16 54/6
  54/6 54/9 54/11 54/19 78/20 78/22 81/10
  91/19 92/2 92/2 104/22
commonly [3] 7/11 106/21 123/7
communicated [1] 123/7
communities [1] 101/17
community [1] 102/3
companies [13] 3/10 44/22 49/8 51/14
  54/17 54/18 55/24 60/9 60/16 85/18
  100/21 102/22 126/13
company [5] 12/6 50/4 55/13 106/23
  107/22
comparable [1] 120/16
compel [6] 9/6 9/9 11/2 11/19 93/15
  108/9
compelled [4] 35/25 38/8 45/18 108/13
compels [1] 68/20
compensation [8] 74/13 94/7 94/22 94/25
  95/1 106/6 106/15 107/13
competition [1] 127/21
competitive [1] 128/1
complaining [1] 7/3
complains [1] 111/11
complaint [4] 66/5 66/5 66/6 129/17
complaints [1] 74/25
complement [1] 65/9
complementary [2] 65/6 114/20
complements [2] 65/8 114/23
complete [2] 15/21 65/12
completed [2] 3/19 130/6
completely [2] 60/6 86/8
complexity [2] 81/15 114/6
compliance [6] 66/18 102/12 113/21
  115/21 117/19 118/1
complicated [2] 51/4 59/4
complied [1] 12/13
comply [8] 15/8 27/13 49/5 49/13 65/22
  94/17 118/6 121/13
complying [1] 30/23
component [3] 7/14 19/22 57/5
components [3] 7/12 71/7 79/5
comprised [1] 3/9
Computer [1] 1/22
Computer-aided [1] 1/22
concede [1] 74/8
concedes [1] 71/10
conceived [1] 109/25
concepts [2] 78/16 83/21
concern [1] 99/24
concerning [4] 35/9 36/4 56/17 56/18
concerns [1] 127/8
conclude [1] 115/22
concluded [1] 123/18
concludes [1] 33/19
conclusions [1] 113/7
conclusively [1] 55/8
condition [10] 10/12 10/14 10/17 10/19
  11/25 12/1 12/25 79/19 101/19 107/23
conditioned [1] 84/17
conditions [18] 10/15 10/16 10/21 10/23
  11/24 13/25 14/1 41/3 46/13 47/1 49/12
  63/20 84/1 91/21 92/10 92/11 93/15 97/2
conduct [12] 22/11 22/12 57/25 59/10
  79/23 80/3 97/12 100/7 116/16 125/5
  125/15 126/4
confer [1] 130/1
conference [2] 132/5 133/10

conferred [2] 40/17 118/17
conferring [2] 94/9 132/6
conference [1] 78/11
confirm [1] 25/9
confirmed [2] 67/17 96/25
confirming [1] 68/25
confiscation [1] 108/21
confiscatory [1] 40/9
conflict [25] 4/12 13/9 14/11 19/22
  27/22 67/7 67/24 81/2 83/23 83/25 84/1
  84/6 112/12 112/22 117/18 117/18 117/25
  118/11 118/14 118/19 118/21 119/7 119/9
  119/22 121/15
conflict-preempted [1] 119/22
conflicting [1] 6/17
conflicts [1] 63/19
conformance [1] 133/10
conforming [1] 96/15
confronted [1] 86/19
confused [1] 89/3
confusing [2] 43/16 43/25
confusion [4] 43/9 89/13 95/24 99/22
Congress [38] 5/20 5/25 6/20 6/21 6/23
  8/20 9/13 10/6 10/25 11/12 11/22 18/11
  18/19 19/4 19/6 19/20 40/1 44/22 48/7
  48/14 49/7 49/9 50/5 64/2 67/20 86/4
  112/7 112/10 112/15 112/19 113/9 115/22
  117/8 117/22 121/6 121/8 121/10 121/13
Congress' [2] 116/17 117/12
Congress's [6] 4/11 15/8 118/11 118/15
  120/10 122/1
congressional [4] 6/4 6/5 116/14 116/15
conjunction [1] 52/16
conjunctive [1] 71/4
connection [1] 126/13
consent [1] 130/13
consequence [1] 84/21
consider [1] 29/14
considerable [1] 81/6
consideration [2] 107/15 108/23
considered [1] 52/25
considering [3] 34/21 106/16 111/7
consist [1] 102/2
consistent [2] 34/7 113/11
consistently [1] 94/8
consists [1] 28/7
consolidated [4] 3/9 3/16 67/11 105/2
consolidates [1] 100/20
constituents [1] 48/11
constitute [7] 42/1 59/25 76/24 104/21
  107/2 108/24 109/20
constitutes [1] 45/18
Constitution [3] 83/19 112/4 122/3
constitutional [6] 47/5 48/14 74/19
  105/23 129/4 129/6
constitutionality [2] 64/22 100/23
constitutionally [2] 110/20 126/10
consultant [1] 24/5
consumables [1] 95/2
consumer [5] 65/8 67/22 72/14 114/22
  126/5
consumers [1] 121/5
contain [4] 8/13 8/14 8/15 11/10
container [1] 31/25
contains [2] 7/24 8/12
contend [3] 103/25 115/11 123/21
contends [1] 94/18
content [1] 17/14
contention [1] 112/19
context [5] 15/3 72/8 81/1 83/7 83/25
contingent [1] 111/15
continue [2] 47/3 80/8
continued [2] 104/12 110/5
continues [1] 32/8
contract [106] 7/15 7/23 7/24 9/23 10/18
  11/2 12/1 12/12 13/17 13/20 18/7 20/12
  21/17 21/18 23/2 26/20 26/21 26/25 27/1
  35/24 37/16 37/24 38/4 38/7 40/4 42/10
  46/25 52/9 52/15 53/5 55/24 58/20 59/8
  59/15 59/25 60/1 60/3 60/12 60/20 60/23
  61/3 62/2 62/9 63/6 63/10 63/11 64/15
  65/14 65/18 66/25 67/19 68/24 69/11
  75/15 80/7 82/16 84/4 84/12 85/3 85/5
  85/20 91/18 91/18 92/3 94/14 96/1 96/3
  96/6 96/12 96/13 96/20 96/22 96/23 97/15
  97/19 98/5 98/14 103/5 103/14 103/21
  104/1 104/4 104/11 104/14 104/19 104/20
  107/23 109/6 114/12 114/14 116/9 116/13
  116/18 116/20 117/1 117/2 117/3 117/7
  117/13 118/12 118/14 118/15 119/4 124/1

137

**C**

contract... [2] 124/11 125/04
contracting [1] 8/17
contractor [1] 31/5
contractors [2] 31/1 66/23
contracts [3] 62/2 62/8 62/13
contradicts [2] 27/2 34/1
contrary [4] 112/6 118/7 120/9 127/2
contrast [3] 14/10 109/14 111/11
control [7] 6/12 6/15 48/11 48/13 120/19 125/17 128/5
controlled [2] 49/20 125/6
controls [3] 60/21 60/23 63/7
convenience [1] 51/24
conveniently [1] 64/16
convince [2] 35/16 35/18
cooperate [1] 12/20
core [1] 20/14
CORP [1] 1/3
corporation [6] 2/6 100/25 112/17 117/23 122/13 123/11
corporations [3] 122/24 123/7 123/9
correct [13] 17/22 20/23 34/3 39/19 57/19 70/11 70/12 70/19 92/1 129/14 129/22 131/15 133/7
cost [13] 29/10 29/13 29/14 29/16 29/21 30/5 32/21 32/24 33/1 44/12 54/16 54/19 91/4
Costello [2] 16/3 78/23
costly [4] 10/6 30/22 31/16 91/2
costs [7] 20/9 31/22 33/19 34/24 34/25 73/7 124/25
could [27] 4/13 7/16 14/11 14/13 19/5 20/18 30/25 32/5 34/8 38/20 49/17 49/19 52/21 57/8 57/22 58/11 59/21 60/11 69/18 71/17 80/22 89/4 91/7 108/2 120/14 123/15 131/2
couldn't [3] 23/5 70/17 80/25
Council [1] 105/20
counsel [11] 2/8 2/8 5/12 13/7 14/19 25/13 68/17 77/1 77/2 97/8 98/21
counsel --at [1] 77/1
count [1] 110/5
counter [1] 14/14
counter-arguments [1] 14/14
counterpart [1] 69/18
countries [1] 120/16
country [3] 67/17 123/8 123/10
counts [1] 43/16
County [4] 5/22 107/4 115/9 115/13
couple [5] 47/11 53/15 63/4 70/21 93/11
course [15] 18/9 22/14 34/5 34/9 53/10 62/11 71/10 75/6 78/13 78/21 79/4 80/8 80/11 80/25 91/6
court [145]
Court's [13] 5/21 19/10 20/8 21/2 51/24 82/4 92/7 93/24 106/22 108/4 110/1 115/13 127/15
courts [17] 26/17 31/4 31/8 34/15 43/10 49/13 63/8 67/17 69/24 70/2 80/16 104/9 107/15 107/16 110/23 114/9 116/11
cover [2] 4/19 4/24
coverage [1] 107/24
covered [130] 5/23 6/23 7/3 7/7 8/3 10/14 14/2 16/4 16/15 21/9 22/16 24/8 29/1 29/15 29/17 30/1 30/4 35/23 37/14 37/15 37/21 37/24 38/3 51/9 54/19 54/21 56/10 56/20 57/11 57/15 57/17 57/23 58/15 58/17 59/7 59/20 60/4 61/8 61/13 61/14 61/19 62/2 62/9 62/16 62/22 63/11 64/15 64/16 64/20 65/16 65/20 65/21 65/22 65/23 67/1 67/2 67/20 68/9 68/13 68/22 68/23 68/25 69/12 69/12 69/16 70/15 71/2 71/5 71/11 71/18 72/10 72/25 73/10 73/11 73/17 73/21 73/22 75/8 76/12 76/17 79/8 79/10 79/12 79/13 81/11 86/11 88/12 88/18 89/7 91/5 94/15 95/25 96/9 96/21 96/24 97/16 97/17 97/20 97/21 98/15 98/16 99/15 99/18 101/19 101/24 102/2 102/5 102/10 102/14 102/20 103/1 103/4 103/6 103/8 103/10 103/17 103/18 103/21 104/5 108/21 110/5 113/18 113/24 113/25 114/1 114/13 124/4 124/14 125/16 128/20
covers [6] 69/24 72/16 73/3 73/4 99/21 100/7
crazy [1] 87/17
create [5] 10/12 10/13 14/5 19/21 41/4
created [2] 48/6 48/10
creates [2] 18/7 42/10

creating [2] 9/10 87/14
credibility [1] 73/4
crime [1] 42/11
criminal [6] 18/20 86/8 87/18 90/8 110/17 111/6
criminally [1] 18/21
critical [2] 6/5 61/10
Criticism [1] 67/23
critique [1] 93/13
cross [2] 22/18 82/8
cross-referenced [1] 22/18
CRR [2] 1/23 133/16
crucially [1] 20/24
cruel [1] 110/12
currently [3] 105/6 126/11 130/12
customers [1] 52/4
cv [2] 1/5 2/5
CVS [5] 35/24 39/1 52/13 52/16 73/20
cycle [1] 53/21

**D**

D.C [35] 5/7 5/18 8/5 8/13 8/19 8/23 9/16 9/18 10/3 10/10 10/20 10/24 13/20 14/10 26/24 37/18 38/1 49/4 63/4 66/9 79/10 80/9 85/1 85/23 99/6 116/7 116/22 120/5 120/6 120/11 120/13 120/20 126/6 126/9 126/17
D.C.'s [1] 119/16
data [16] 9/19 10/16 11/25 12/12 12/17 12/21 12/25 13/4 13/4 13/8 13/10 13/15 79/20 79/25 80/7 86/1
Dated [1] 133/12
day [4] 11/19 74/16 132/18 133/12
days [2] 34/21 85/13
dealing [1] 12/6
deals [1] 72/11
decades [1] 86/15
deceptive [1] 104/21
decide [3] 28/23 32/19 59/2
decided [5] 18/21 19/7 32/7 47/20 60/19
decides [2] 19/20 66/16
deciding [2] 28/16 64/22
decision [14] 5/21 19/1 19/10 20/22 24/6 40/20 40/22 82/4 94/1 106/22 108/4 115/13 119/14 127/15
decisions [5] 84/12 87/22 113/3 126/13 126/14
deck [2] 50/21 55/19
declarant [2] 51/16 62/7
declarants [5] 23/10 52/20 55/17 80/15 90/22
declaration [11] 10/18 12/19 16/3 16/3 22/23 29/24 44/9 44/9 52/1 52/2 61/24
declarations [14] 11/24 16/2 16/8 22/16 22/17 25/6 27/11 29/19 32/23 54/21 54/24 55/21 78/23 91/4
declaratory [2] 101/4 105/4
deemed [2] 68/22 110/20
defeats [1] 15/25
defend [3] 21/10 31/10 49/2
defendant [3] 2/9 89/3 120/17
Defendant's [1] 130/14
defendants [13] 1/7 1/20 3/7 20/24 21/10 21/23 32/22 68/1 71/15 74/8 75/20 76/7 130/17
defense [13] 15/25 30/15 36/2 36/7 37/7 40/11 42/5 45/5 48/25 86/13 86/14 96/6 105/20
defenses [5] 44/25 71/16 86/21 86/24 87/18
deference [1] 110/1
defines [1] 68/21
definite [1] 8/16
definition [4] 52/21 59/6 68/6 73/17
definitional [1] 16/23
definitions [1] 68/8
degree [1] 3/22
Delaware [1] 26/23
delegated [1] 102/15
deliver [18] 11/2 14/24 37/23 38/4 38/6 39/14 39/15 66/24 67/19 78/19 78/21 91/17 96/12 96/13 98/16 104/10 118/13 119/1
delivered [8] 16/6 28/13 37/16 56/1 89/17 92/3 96/21 100/3
deliveries [1] 124/16
delivering [1] 10/12
delivery [86] 8/18 8/21 8/25 9/17 10/1 11/5 14/9 14/16 14/18 14/21 15/13 15/16 15/18 15/24 16/13 21/11 21/12 22/1 25/1

27/7 27/21 28/11 28/23 31/11 31/13 39/13 45/12 46/25 47/16 49/16 49/18 49/24 50/2 54/24 54/25 54/25 55/9 55/9 55/18 55/25 65/23 67/15 67/16 68/13 69/13 69/25 70/15 71/11 71/14 72/12 73/3 73/3 76/8 78/15 90/15 95/12 95/12 96/1 97/18 98/22 99/1 104/13 104/20 109/5 109/6 114/11 114/14 114/17 115/24 116/2 116/6 116/13 116/18 116/19 116/25 117/2 117/3 117/6 117/13 118/15 119/3 119/4 123/25 123/25 125/14
democracy [1] 65/9
demonstrate [2] 105/10 129/8
demonstrates [1] 55/8
demonstrating [1] 110/7
demonstrative [1] 50/21
denial [2] 97/12 98/16
denied [2] 69/19 129/10
denies [2] 97/17 106/13
deny [4] 15/15 45/16 93/16 101/14
denying [2] 90/15 104/18
Department [6] 17/7 39/6 40/2 101/22 106/9 107/18
depends [2] 59/23 88/20
depict [1] 51/4
derive [1] 120/7
derived [2] 86/2 122/7
describe [6] 41/20 45/12 47/18 50/10 58/3 95/16
described [4] 6/20 40/5 87/5 126/19
describes [4] 10/4 13/21 50/15 50/17
describing [2] 42/4 52/2
description [1] 70/4
designated [3] 21/2 23/2 67/20
designed [1] 63/1
despite [1] 67/7
destroyed [1] 95/3
detail [3] 5/1 6/3 82/24
detailed [2] 7/1 17/19
details [3] 47/14 60/1 62/25
deter [1] 64/13
deterioration [1] 49/21
determine [3] 57/4 86/1 110/23
determined [3] 102/6 103/16 111/5
Detrick [1] 34/6
developed [3] 103/13 119/23 121/25
developer [1] 94/2
development [3] 19/19 44/15 119/25
dialectic [1] 121/5
dictate [1] 11/9
Dictionary [1] 15/22
did [21] 10/25 20/19 37/25 41/15 41/25 42/16 43/2 43/5 48/7 49/15 56/14 68/5 75/3 75/18 83/18 104/9 115/12 115/22 116/9 125/19 127/18
didn't [12] 32/7 41/4 48/4 60/13 62/8 75/21 77/19 83/18 89/22 92/9 92/20 92/22
difference [7] 5/17 14/25 25/16 39/2 43/20 52/12 53/18
differences [1] 69/21
different [31] 5/16 11/18 11/19 14/7 14/8 15/18 15/20 16/10 16/20 16/21 17/11 17/25 27/6 27/8 27/25 35/19 43/11 44/21 47/15 69/6 69/17 70/21 72/3 79/5 85/20 85/22 87/14 89/17 89/22 91/16 97/24
difficult [1] 59/13
diminishes [1] 43/15
direct [7] 45/22 45/23 68/20 95/25 122/12 123/19 127/7
directing [2] 98/15 98/16
direction [2] 20/8 21/3
directly [13] 12/6 15/14 48/19 69/1 104/17 106/8 117/10 122/16 122/24 123/4 124/3 125/17 130/24
directs [1] 37/25
disadvantaged [1] 128/19
disagrees [1] 123/24
discerning [1] 107/16
discharges [1] 37/19
discount [12] 9/22 12/23 24/7 24/13 24/25 24/25 25/7 29/2 51/10 55/3 67/4 74/10
discounted [8] 5/7 20/20 52/10 64/18 64/20 101/24 103/1 103/22
discounting [1] 104/2
discounts [23] 5/8 20/12 22/20 23/15 26/20 26/24 30/19 33/13 34/4 34/8 34/9 52/12 56/19 76/15 80/1 84/24 86/20 89/8 90/16 102/11 113/20 118/23 118/24
discovered [1] 12/7

**D**

discovery [6]  62/13 120/12 131/25 131/9
131/10 132/7
discriminate [1]  69/20
discriminates [1]  97/18
discriminating [1]  104/18
discrimination [2]  97/13 128/7
discriminatory [2]  127/22 128/1
discuss [1]  42/3
discussion [5]  6/4 6/6 23/14 39/6 42/6
disease [1]  49/21
dismiss [8]  36/23 92/6 129/12 129/16
129/18 130/6 130/17 131/11
dispensation [2]  68/14 74/2
dispense [1]  103/6
dispensed [5]  24/1 28/10 52/18 53/14
61/18
dispensing [3]  53/4 59/2 59/3
disproportional [2]  110/21 110/24
dispute [14]  5/22 11/10 11/14 20/14
36/17 71/22 71/22 79/3 87/12 91/22 92/25
114/4 114/4 118/25
disputed [1]  20/24
disputes [6]  6/23 11/13 76/11 76/12
102/20 114/3
distinct [2]  106/18 109/3
distinction [7]  65/19 72/9 80/19 80/24
81/3 83/5 83/7
distinctions [1]  70/23
distinguish [1]  61/3
distributed [2]  23/23 74/2
distributers [1]  125/22
distribution [12]  20/16 24/17 25/1 27/21
64/1 66/14 69/1 76/11 103/12 114/11
116/8 125/1
distributors [10]  12/4 12/8 81/19 82/14
82/15 82/16 123/24 124/8 124/10 124/22
district [18]  1/1 1/1 26/23 34/19 81/25
82/24 107/19 107/20 107/20 108/4 108/5
113/2 113/3 118/9 119/14 119/20 133/5
133/6
diversion [29]  53/12 56/18 57/24 58/14
58/15 58/24 59/1 59/15 59/17 59/19 59/25
60/5 60/22 60/23 61/4 61/15 61/20 61/21
62/10 62/15 62/23 63/7 65/19 76/14 86/12
89/5 94/17 114/3 118/24
diversions [1]  80/1
diverting [2]  102/11 113/19
divide [1]  103/22
DIVISION [2]  1/2 72/14
do [82]  9/2 9/16 9/17 10/1 11/7 11/20
14/5 15/24 17/6 17/21 18/17 18/22 19/5
19/6 19/7 19/7 19/21 26/25 27/17 28/9
28/10 28/12 28/16 29/5 31/8 35/12 36/4
39/13 41/3 49/4 50/5 52/20 55/25 56/10
56/25 57/11 57/12 57/19 57/24 60/2 60/22
61/2 63/9 63/11 63/15 63/18 65/17 66/16
70/17 72/1 72/2 74/8 76/14 78/4 78/21
79/15 79/16 83/18 85/21 88/23 89/12 90/1
90/20 91/7 93/6 93/18 93/23 95/24 96/10
96/18 97/3 97/7 102/13 108/19 112/8
117/5 117/9 129/18 131/7 131/8 131/9
133/6
doctrine [11]  19/15 19/16 39/21 39/23
39/24 40/12 42/20 45/4 45/7 56/8 94/20
doctrines [1]  19/2
documentation [1]  79/24
does [83]  9/4 9/25 12/14 13/1 16/1 19/14
19/21 21/5 26/19 27/23 27/24 32/10 33/2
33/3 36/14 37/10 39/10 45/4 55/11 57/1
62/16 64/17 64/19 67/5 67/14 67/18 67/20
68/3 68/6 68/8 68/12 68/23 72/24 72/24
74/22 75/19 76/10 76/22 76/24 83/14
83/17 85/2 89/12 90/17 90/20 90/21 91/15
94/20 107/1 108/9 109/20 112/1 112/10
114/10 115/20 116/9 116/25 117/1 117/16
118/25 119/3 120/24 120/24 121/1 121/2
124/1 124/2 124/6 124/11 124/12 125/17
126/15 126/18 126/25 127/9 128/14 129/3
129/5 130/4 131/1 131/1 131/6 131/8
doesn't [23]  15/13 19/11 21/1 22/13
27/21 32/9 33/21 35/25 39/23 42/3 45/7
50/2 50/5 59/16 59/18 62/1 70/10 72/7
80/20 81/3 83/7 83/16 96/6
doing [6]  27/13 27/19 59/9 86/17 97/9
98/2
dollar [12]  5/10 9/12 14/24 14/25 29/15
29/16 51/10 85/13 85/15 91/3 91/3 91/3
dollars [13]  23/11 27/12 29/20 29/21
29/25 34/23 44/12 53/18 54/22 55/1 55/11

dominant [1]  114/25
don't [66]  9/24 14/3 14/16 16/8 16/11
16/13 20/18 20/20 22/7 26/4 26/16 27/18
28/18 28/22 37/22 38/6 38/8 39/15 41/4
45/5 46/7 46/9 47/10 49/13 50/5 50/18
52/20 53/1 55/10 56/12 57/18 59/9 59/24
60/1 61/22 61/23 62/11 63/10 63/20 67/10
77/1 77/5 82/19 84/2 84/23 88/19 90/4
91/14 91/22 92/1 93/1 93/16 93/20 94/23
95/4 95/15 95/17 95/18 95/20 96/3 96/9
96/17 96/20 97/1 99/13 100/6
done [3]  9/13 9/14 18/13
door [1]  58/23
Dormant [8]  75/7 82/9 121/21 121/24
121/25 122/6 125/4 128/7
doubt [3]  66/20 80/6 89/8
doubts [1]  17/23
down [5]  35/13 73/20 74/22 74/22 93/4
dozen [1]  80/23
dramatically [1]  11/18
drive [1]  4/11
driven [2]  67/22 71/14
drops [1]  33/22
drug [100]  5/4 5/24 6/24 7/6 7/14 7/21
7/22 8/8 9/2 9/10 9/20 9/21 11/24 12/6
12/10 12/11 13/5 13/11 13/22 13/25 15/16
15/16 16/24 16/24 26/13 37/1 49/8 49/19
50/4 51/7 51/10 51/14 53/24 54/4 54/13
58/16 58/18 60/3 61/4 61/16 62/16 62/20
65/6 66/14 68/21 69/10 69/14 71/1 71/2
73/7 73/18 73/21 78/19 79/8 81/19 82/1
85/16 85/18 97/14 97/19 99/15 99/16
99/19 99/19 101/5 101/17 101/20 102/22
102/24 104/2 104/6 104/10 107/22 108/9
108/11 114/17 114/21 115/24 116/8 117/6
118/6 118/17 118/24 119/2 119/16 119/17
119/19 119/19 120/7 120/15 120/18 123/23
124/6 124/8 124/21 124/23 125/13 126/12
127/11 128/2
drugs [146]
duck [4]  28/4 28/5 28/5 28/17
due [3]  129/23 130/15 131/14
duly [1]  129/2
duly-enacted [1]  129/2
duplicate [3]  80/1 102/11 104/2
duplicative [2]  113/20 118/24
duration [2]  13/19 57/4
during [5]  5/12 7/5 16/10 34/5 34/9

**E**

each [7]  8/2 51/2 78/6 101/2 101/8
105/16 106/3
earlier [6]  8/5 8/6 45/14 79/18 112/25
124/20
early [3]  21/14 34/20 85/13
easiest [2]  36/4 83/20
economic [8]  30/13 43/23 44/8 44/20 94/3
106/16 109/1 109/12
economics [1]  50/16
economize [1]  4/6
Edgar [3]  122/13 122/23 123/12
effect [16]  18/12 19/8 32/3 44/19 45/15
55/25 64/12 66/15 85/9 98/3 98/4 104/16
112/14 123/20 123/22 128/1
effecting [1]  94/3
effectively [1]  20/12
effectiveness [1]  67/23
effects [6]  65/3 122/22 127/6 127/14
127/20 127/23
effectuate [3]  11/6 13/6 56/7
efficiency [3]  100/19 130/5 132/10
effort [1]  21/10
efforts [2]  82/1 85/24
eight [1]  85/10
eight-fold [1]  85/10
Eighth [11]  19/18 61/9 61/11 65/4 106/2
110/10 112/24 113/16 114/9 114/18 115/11
either [21]  14/3 26/5 35/23 50/6 61/6
61/6 61/21 79/7 81/4 92/23 93/7 95/5
95/25 96/10 97/14 99/11 108/10 112/11
112/13 122/25 128/4
elaborated [1]  23/19
elementary [1]  64/10
elements [1]  44/7
Eleventh [2]  107/5 111/21
Eli [1]  107/18
eligible [1]  24/6
eliminated [1]  82/3
Ellis [3]  2/24 3/2 35/8

Ellison [3]  81/25 82/6 82/23
else [14]  11/8 43/7 45/17 48/2 57/16
59/9 89/9 94/22 121/23 131/4 131/5 131/7
131/23 132/1 132/15
embodied [1]  122/5
emissions [1]  19/17
emphasize [2]  32/19 45/10
emphasized [3]  38/19 109/24 128/3
emphasizes [1]  107/10
employ [1]  11/25
employers [1]  18/22
employment [1]  18/21
enact [1]  67/8
enacted [10]  34/12 41/14 48/14 60/16
104/15 113/4 122/18 125/8 126/24 129/2
enacting [2]  64/3 67/21
enactment [1]  126/21
enactments [1]  127/2
enacts [1]  37/9
encompassed [1]  123/9
encourages [1]  65/13
end [35]  6/19 48/25 50/9 74/15 76/18
106/6 106/8 106/11 106/13 106/15 106/20
107/3 107/13 107/17 108/3 110/2 110/12
110/15 111/16 111/20 112/5 112/15 115/8
117/20 117/22 121/5 122/1 122/9 122/13
122/18 122/22 123/17 123/20 124/23 126/5
ended [1]  91/14
enforce [10]  18/3 26/10 26/12 26/14
46/19 46/21 48/21 58/8 113/18 131/6
enforceable [1]  90/5
enforced [2]  25/23 66/8
enforcement [26]  6/22 59/23 70/16 71/14
72/12 72/13 79/2 79/4 87/2 93/3 101/3
101/9 102/15 104/24 104/25 105/3 105/25
111/12 115/1 118/20 118/22 118/23 119/4
127/10 128/24 129/1
enforces [1]  26/6
enforcing [2]  25/18 27/19
engage [1]  116/15
engaged [4]  57/24 86/12 98/8 104/7
engaging [2]  124/22 125/23
Engine [3]  15/2 15/9 18/9
enhanced [1]  120/3
enjoin [2]  74/12 101/3
enjoining [1]  50/17
enjoy [1]  132/18
enough [4]  8/16 53/22 61/2 121/14
ensued [1]  104/8
ensure [2]  102/12 113/21
ensures [1]  64/15
entangled [1]  35/17
enter [3]  7/14 56/4 101/21
entered [2]  85/19 103/5
entertain [1]  131/20
entice [1]  30/12
entire [4]  9/25 27/2 27/5 85/17
entirely [7]  17/17 32/9 81/1 81/22 82/7
82/16 85/16
entities [66]  5/23 6/24 7/3 7/7 10/14
16/4 22/16 30/5 37/15 37/21 40/10 54/19
54/22 57/24 59/7 59/20 61/8 62/2 62/9
63/11 64/16 64/20 65/22 67/1 68/13 69/17
73/17 75/9 76/12 76/17 79/8 81/11 86/11
88/12 88/18 89/7 91/5 91/18 91/19 94/15
95/25 96/10 96/21 96/24 101/24 102/2
102/5 102/10 102/14 102/20 103/1 103/4
103/7 103/8 103/17 104/5 108/21 110/6
113/18 113/24 113/25 114/1 114/13 124/4
124/14 128/20
entities' [4]  64/15 65/23 79/12 103/10
entitle [1]  64/19
entitled [5]  1/10 71/16 73/22 73/23
133/9
entitlement [2]  118/17 129/9
entity [61]  12/7 14/2 16/15 21/9 22/23
24/8 29/1 29/16 29/17 30/1 35/23 37/24
38/3 38/25 48/5 51/9 56/20 57/11 57/16
57/17 58/7 58/17 58/19 58/20 59/6 60/5
61/14 61/14 61/19 62/17 62/22 65/16
65/20 67/2 67/20 68/9 68/22 68/23 68/25
69/12 69/13 70/15 71/5 71/18 72/10 72/25
73/21 73/22 79/10 97/16 97/17 97/20
97/21 98/15 98/16 99/18 102/17 103/19
103/21 106/24 125/16
entity's [1]  103/20
enumerated [3]  40/5 40/10 94/15
equally [2]  39/8 110/9
equitable [1]  74/11
equities [3]  77/3 105/13 128/16

**E**

**equity [1]**  44/15
**escape [2]**  35/16 50/7
**Especially [1]**  82/19
**ESQUIRE [7]**  1/14 1/15 1/16 1/17 1/18 1/19 1/20
**essential [1]**  124/23
**essentially [10]**  5/4 14/23 20/11 20/22 22/6 24/15 35/15 37/19 86/17 91/3
**establish [1]**  121/15
**established [4]**  103/3 105/7 115/3 120/14
**establishing [1]**  121/19
**et [3]**  1/6 2/6 47/16
**evaluate [1]**  44/7
**even [34]**  17/15 25/22 27/20 28/22 31/13 32/8 32/19 36/21 37/2 38/6 38/7 38/14 38/18 44/3 58/10 58/23 59/13 59/22 74/7 75/21 81/16 86/16 87/4 92/25 94/7 94/12 96/5 106/10 107/12 109/20 112/9 120/25 126/10 126/12
**event [2]**  59/3 95/1
**events [4]**  53/4 59/2 82/22 111/15
**eventually [3]**  62/19 80/3 93/7
**ever [5]**  10/6 12/5 46/13 88/14 92/9
**every [12]**  11/2 29/15 29/16 40/11 43/12 57/20 58/7 85/3 93/16 93/19 95/16 126/24
**everybody [1]**  73/18
**everyone [1]**  2/2
**everything [2]**  23/21 48/2
**evidence [6]**  50/20 51/25 55/21 55/22 57/13 116/19
**evidentiary [3]**  126/11 128/8 129/7
**exact [3]**  22/10 48/23 66/9
**exactly [19]**  20/22 22/9 23/23 24/2 24/10 28/6 35/20 37/25 38/24 48/2 60/9 61/11 63/3 79/15 86/17 86/18 89/12 90/11 131/1
**examine [1]**  55/20
**example [8]**  18/15 49/16 49/19 75/11 83/20 86/5 98/13 111/5
**except [1]**  96/15
**excerpts [1]**  55/20
**excessive [17]**  75/5 75/17 75/24 76/5 106/2 110/10 110/11 110/13 110/18 110/20 111/7 111/18 111/23 119/17 119/20 120/14 120/18
**exchange [5]**  39/25 40/1 40/6 40/14 40/18
**excluded [2]**  44/22 114/1
**excluding [1]**  48/22
**exclusion [1]**  115/24
**exclusionary [1]**  120/6
**exclusive [6]**  7/6 7/7 7/8 7/9 48/21 87/1
**exclusivity [5]**  118/22 119/11 119/24 120/23 121/17
**excuse [2]**  11/14 16/22
**executed [1]**  52/2
**executing [1]**  118/4
**execution [2]**  48/14 117/21
**exercise [7]**  13/12 13/13 24/16 49/18 117/9 117/14 120/6
**Exhibit [8]**  22/22 23/11 23/12 29/24 30/2 37/11 44/10 52/3
**Exhibit 1 [2]**  37/11 44/10
**exhibits [4]**  37/12 51/2 98/1 125/11
**Exhibits 1B [1]**  37/12
**exist [4]**  32/2 32/8 32/9 74/18
**existence [1]**  60/18
**existing [1]**  26/11
**exists [3]**  33/18 37/7 65/9
**expand [5]**  5/15 68/6 68/8 72/24 85/10
**expansion [1]**  103/25
**expansive [1]**  52/22
**expect [1]**  131/18
**expectations [3]**  44/14 106/19 109/3
**expected [1]**  117/9
**expects [1]**  130/7
**expediency [1]**  100/19
**expedited [2]**  130/12 132/7
**expensive [2]**  29/25 33/6
**explain [5]**  13/10 50/19 52/20 98/21 101/14
**explained [8]**  13/12 18/9 39/7 39/22 43/17 45/13 56/3 85/2
**explains [7]**  13/21 13/22 44/5 51/16 52/15 53/7 85/23
**explanation [1]**  98/11
**explicitly [3]**  15/7 48/17 67/14
**explored [1]**  36/18
**explosive [1]**  60/24
**express [1]**  26/22
**expressed [2]**  68/1 112/9

**expressly [2]**  112/10 112/20
**expulsion [1]**  102/8
**extend [2]**  26/24
**extended [2]**  26/25 34/9
**extensive [1]**  11/21
**extent [6]**  4/8 25/11 50/14 106/17 111/1 124/13
**extra [1]**  129/25
**extract [2]**  31/20 110/14
**extraneous [3]**  30/11 31/18 33/7
**extraordinary [4]**  105/8 128/25 129/6 129/9
**extraterritorial [5]**  122/5 123/20 123/22 124/11 127/20
**extraterritoriality [9]**  75/3 77/18 78/9 81/8 82/3 121/22 122/7 127/7 127/14
**extremely [2]**  5/7 46/19
**eye [3]**  6/11 18/13 19/24

**F**

**F.3d [1]**  75/21
**F.4th [2]**  105/21 112/25
**face [9]**  38/24 45/15 45/17 45/22 48/5 58/23 83/9 90/11 94/13
**facial [17]**  64/8 65/2 74/16 76/6 80/10 80/15 80/18 80/19 80/24 83/5 83/14 84/2 88/17 88/21 93/12 93/14 93/21
**facie [1]**  120/13
**facilitate [2]**  44/18 45/23
**facilitates [1]**  74/9
**facilities [4]**  5/6 5/23 115/14 115/17
**facility [1]**  113/19
**fact [28]**  4/5 5/15 7/24 17/3 19/18 20/25 21/4 21/5 23/16 23/22 24/20 25/4 25/8 32/17 34/12 45/2 57/2 62/5 64/7 65/20 67/16 88/25 115/4 115/19 116/24 121/13 131/6 131/8
**factor [2]**  105/16 111/10
**factors [9]**  105/16 106/21 106/22 108/23 110/23 125/2 125/12 128/11 128/13
**fail [6]**  69/23 75/2 117/25 118/5 121/9 128/22
**failed [7]**  109/18 114/15 114/24 118/2 119/6 127/5 127/24
**fails [2]**  70/8 116/23
**fall [2]**  110/18 120/25
**fallen [1]**  110/7
**falling [1]**  121/19
**falls [2]**  66/10 66/21
**familiar [1]**  20/14
**far [13]**  10/6 11/8 11/21 11/22 31/14 34/17 42/3 74/22 74/22 76/2 82/13 85/3 93/12
**Farina [1]**  111/20
**fashion [1]**  38/4
**fast [1]**  66/22
**favor [3]**  34/15 61/11 105/13
**favors [1]**  128/16
**fear [2]**  91/9 92/1
**feasible [1]**  58/9
**features [1]**  25/4
**federal [212]**
**Federally [1]**  48/1
**feel [1]**  100/6
**feet [1]**  48/16
**Feldman [4]**  14/19 78/13 89/16 89/20
**few [7]**  5/12 6/6 9/20 14/17 50/24 78/11 91/13
**fiction [1]**  14/22
**fide [2]**  11/5 14/1
**field [14]**  19/22 20/6 80/25 81/2 83/20 83/21 110/2 112/11 112/21 113/9 114/7 115/23 117/17 120/3
**Fifth [4]**  19/14 93/18 106/1 109/19
**figure [2]**  86/15 91/3
**file [4]**  81/7 129/18 129/25 131/18
**filed [7]**  3/9 3/16 16/10 100/20 101/2 101/8 129/17
**files [1]**  131/14
**filing [2]**  132/11 132/13
**fill [2]**  18/8 19/22
**Filling [1]**  27/9
**fills [1]**  27/9
**final [3]**  86/2 89/11 90/14
**finally [3]**  53/21 90/14 95/22
**financial [7]**  23/9 24/15 24/20 25/8 27/15 32/21 120/22
**find [20]**  7/1 15/6 50/11 78/24 79/17 79/21 80/21 82/5 82/6 82/18 85/24 86/23 112/2 117/16 119/7 124/6 126/18 127/16

128/14 130/4
**finding [1]**  127/20
**finds [12]**  79/23 80/8 110/4 111/23 113/6 116/23 117/12 121/18 128/6 128/9 129/7
**fine [7]**  29/23 63/10 76/1 78/7 96/18 110/24 111/20
**fined [1]**  114/1
**fines [12]**  75/5 75/17 75/24 76/5 90/7 105/1 106/2 110/9 110/11 110/13 110/18 111/18
**finger [1]**  84/7
**first [43]**  4/1 6/7 7/14 7/20 7/22 14/15 17/9 17/9 21/7 21/16 22/3 23/23 31/12 33/16 36/9 36/11 36/20 37/5 39/16 39/18 42/24 43/3 44/7 50/2 50/14 54/25 59/5 70/24 77/5 78/10 80/14 88/4 89/25 93/8 93/12 95/9 99/14 100/6 105/10 106/16 107/7 125/5 125/13
**fiscal [2]**  17/3 18/1
**fish [2]**  32/6 32/8
**Fitch [4]**  108/5 113/5 113/5 113/6
**five [4]**  51/1 56/14 78/6 94/1
**Floor [1]**  1/24
**flow [2]**  24/23 24/23
**focus [14]**  11/23 20/7 35/10 64/24 65/1 65/11 68/16 69/9 72/6 75/24 76/8 76/23 89/12 105/22
**focused [2]**  32/17 70/25
**focuses [1]**  76/23
**focusing [1]**  98/25
**fold [3]**  85/10 85/11 85/11
**folks [2]**  81/10 100/16
**follow [1]**  41/9
**followed [1]**  2/8
**following [2]**  14/23 30/25
**food [6]**  31/1 31/3 31/4 31/8 31/11 66/22
**footnote [2]**  33/22 82/5
**forbidden [3]**  94/8 107/9 122/12
**forbidding [2]**  95/8 109/6
**forbids [3]**  102/10 104/16 122/15
**force [6]**  39/14 54/23 63/17 95/9 111/18 111/23
**forced [2]**  22/19 38/11
**forcefully [1]**  93/6
**forces [1]**  43/6
**forcing [1]**  20/11
**foreclose [2]**  77/1 113/9
**foreclosed [1]**  108/1
**foregoing [2]**  113/6 133/7
**foreseeable [2]**  74/3 109/7
**Forest [1]**  19/18
**forfeiture [2]**  110/25 111/6
**form [6]**  4/22 5/3 56/6 65/6 114/20 129/1
**formalize [1]**  6/22
**format [1]**  133/9
**former [1]**  109/16
**forms [1]**  121/16
**formula [1]**  102/6
**forth [4]**  11/12 12/18 15/13 87/3
**forum [1]**  79/7
**forward [7]**  10/18 11/24 73/13 84/1 85/12 90/8 90/12
**found [5]**  36/11 108/7 109/10 119/11 119/21
**four [10]**  3/9 23/4 67/10 94/1 100/20 105/6 105/13 105/16 111/3 117/21
**four-year [1]**  23/4
**Fourteenth [1]**  106/4
**fourth [13]**  19/11 19/11 43/19 75/20 76/6 81/24 105/21 110/15 110/19 111/5 122/4 125/2 128/13
**FR [2]**  79/17 79/21
**framework [6]**  6/25 7/1 7/1 58/1 113/15 120/9
**Franklin [1]**  107/6
**frankly [1]**  26/4
**fraud [1]**  18/22
**free [2]**  45/20 47/3
**frequency [1]**  57/4
**Frequently [1]**  18/5
**friend [4]**  79/15 80/10 88/4 88/18
**friends [3]**  29/19 36/22 90/2
**Frosh [4]**  81/24 82/6 124/19 124/21
**fuels [1]**  19/13
**fulfilling [1]**  118/10
**full [18]**  22/20 23/8 24/4 29/1 30/5 39/2 52/6 52/13 53/6 54/2 54/12 55/2 55/15 58/23 69/7 92/2 96/14 120/6
**fully [1]**  101/11

**F**

**fundamental [1]** 12/21
**fundamentally [2]** 85/8 85/22
**funds [2]** 5/4 5/6
**furnish [1]** 57/8
**further [7]** 11/22 49/11 58/25 61/18 73/12 81/6 84/3
**future [1]** 111/15

**G**

**gap [4]** 18/7 19/21 27/9 27/10
**Garelick [1]** 107/8
**gave [1]** 48/8
**general [27]** 3/6 3/11 15/9 25/13 41/6 42/18 48/15 48/24 49/15 49/23 49/24 51/20 54/1 55/17 55/23 58/8 58/22 61/25 62/6 72/15 76/21 88/6 95/11 100/21 104/24 107/5 126/2
**General's [4]** 36/25 39/17 49/1 95/15
**generally [5]** 3/21 85/25 107/9 111/19 120/2
**generate [2]** 23/15 55/12
**generic [1]** 124/23
**generous [2]** 5/8 60/15
**get [39]** 16/6 23/25 27/13 30/17 33/13 33/15 33/24 34/8 38/17 38/24 39/1 47/14 49/1 49/2 49/6 51/10 51/11 53/11 53/25 57/12 57/13 57/19 57/22 58/21 59/1 61/2 62/13 66/8 69/9 74/21 74/22 77/4 78/8 80/3 83/12 84/20 93/5 95/3 100/3
**gets [10]** 24/8 25/23 27/25 28/21 28/25 29/2 39/1 42/9 62/20 74/20
**getting [4]** 57/13 65/20 83/8 100/16
**Gilead [2]** 12/18 12/22
**gist [2]** 38/1 57/6
**give [19]** 39/24 39/25 40/7 42/11 42/22 43/3 43/7 43/20 43/21 44/1 44/2 46/14 56/16 58/22 59/16 59/19 67/24 77/15 130/1
**given [3]** 9/15 72/21 84/1
**gives [1]** 84/8
**giving [2]** 40/14 46/5
**glad [2]** 26/2 56/21
**go [34]** 4/1 11/7 12/14 15/5 24/10 32/15 33/2 49/11 50/18 51/17 51/21 53/13 58/25 62/16 63/1 63/5 63/16 70/17 71/21 74/6 80/4 84/15 84/24 86/14 87/12 90/12 90/19 94/14 95/2 95/5 95/11 98/9 114/4 130/20
**goals [2]** 120/10 121/6
**goes [11]** 25/12 29/1 29/16 33/1 33/4 38/23 39/17 39/21 52/17 57/13 60/4
**going [25]** 18/2 20/7 20/16 21/14 23/19 25/14 41/10 46/21 46/21 47/1 48/16 50/22 55/3 60/15 63/11 64/10 66/17 69/6 70/9 75/6 83/4 90/8 90/10 95/25 96/12
**good [17]** 2/2 2/10 2/13 2/14 2/15 2/17 2/18 2/20 2/21 2/23 2/25 3/5 3/8 4/3 32/4 35/7 82/25
**got [5]** 7/12 26/23 63/3 72/16 89/21
**gouging [5]** 124/22 125/3 125/18 125/23 125/24
**governed [1]** 88/10
**governing [1]** 79/3
**government [52]** 9/13 11/9 17/18 19/3 29/12 30/12 31/1 40/11 41/2 41/14 41/19 41/19 41/22 42/9 44/17 45/12 46/18 48/9 48/15 48/19 50/8 50/16 50/22 55/11 65/5 70/1 73/6 76/20 78/21 79/2 79/4 79/9 79/14 85/1 87/4 87/12 93/22 95/8 95/19 96/2 106/7 106/19 107/1 107/10 107/22 108/10 108/22 109/14 114/19 115/23 128/12 132/7
**government's [7]** 31/17 35/3 36/24 39/11 39/17 92/25 110/14
**governmental [1]** 109/10
**governments [1]** 41/12
**governs [2]** 42/20 67/7
**grant [1]** 116/10
**granted [2]** 113/17 130/13
**graph [1]** 53/3
**graphic [1]** 56/14
**gravity [1]** 110/22
**great [6]** 4/17 50/18 90/6 90/19 107/15 121/12
**greater [2]** 24/25 31/14
**greatly [1]** 130/22
**grossly [2]** 110/21 110/24
**grounds [4]** 57/11 57/12 59/10 106/1
**group [4]** 5/23 94/16 107/2 112/17
**grown [2]** 10/5 103/4

**growth [1]** 60/24
**guess [9]** 25/21 28/8 77/12 77/15 77/20 98/4 106/17 123/1 123/23
**guidance [2]** 57/6 57/6
**guidelines [1]** 82/25

**H**

**had [21]** 6/20 22/6 37/19 48/1 52/24 60/12 77/2 84/4 92/4 92/10 92/21 92/22 94/8 101/11 122/25 123/1 127/19 131/4 132/5 132/5 132/6
**half [3]** 13/19 31/11 80/23
**hall [1]** 129/24
**hand [3]** 5/22 63/12 114/13
**handful [1]** 91/5
**handle [1]** 21/6
**hands [3]** 38/17 62/20 90/19
**happen [1]** 82/18
**happened [2]** 10/4 19/4
**happening [2]** 24/20 85/24
**happens [7]** 12/5 23/22 24/16 51/13 51/16 52/4 85/7
**happy [5]** 25/10 33/3 73/12 81/7 84/3
**hard [1]** 41/9
**Hardees [1]** 31/2
**harm [8]** 33/2 33/4 33/11 33/13 49/21 77/3 105/12 111/3
**harms [1]** 90/11
**Harvey [1]** 107/7
**has [109]** 6/12 9/13 9/13 9/14 9/15 10/4 10/5 11/4 11/5 11/10 14/3 16/20 17/6 18/11 18/12 18/12 18/17 19/8 23/8 24/17 26/5 26/8 26/12 26/15 26/21 28/9 28/10 28/12 28/19 30/10 31/18 33/23 35/12 35/18 35/20 36/6 36/17 38/13 40/17 43/23 44/22 45/25 46/18 47/7 48/20 48/21 49/9 49/19 50/5 50/8 57/11 57/17 57/25 59/11 62/19 63/25 65/5 65/6 67/13 69/22 71/7 71/17 71/23 71/25 71/25 72/21 75/12 76/1 76/12 76/20 79/4 79/5 79/10 79/11 79/12 79/14 79/15 79/24 82/11 85/1 86/6 86/18 91/21 96/2 98/3 98/4 99/16 102/15 103/4 103/13 104/1 108/25 109/2 109/18 109/21 110/6 112/19 113/4 113/6 114/8 114/19 114/21 115/5 119/23 121/12 122/10 122/22 125/11 126/20
**hasn't [3]** 61/4 70/1 76/3
**Hatch [1]** 120/1
**Hatch-Waxman [1]** 120/1
**have [173]**
**haven't [2]** 80/22 84/4
**having [3]** 3/18 39/18 101/19
**HB [1]** 100/24
**HB1056 [102]** 5/14 17/5 20/9 20/22 21/7 28/6 28/18 33/14 33/19 64/8 64/12 64/22 65/13 65/21 65/25 66/8 66/24 68/3 68/7 68/20 68/21 68/23 69/6 69/24 70/10 70/16 70/17 71/1 71/7 71/14 71/24 71/25 72/11 72/12 72/23 72/24 73/3 73/11 73/16 73/25 74/1 74/23 75/8 75/12 75/13 76/5 76/22 81/12 97/10 97/12 98/11 99/12 101/3 101/9 104/16 105/4 105/25 108/8 108/9 108/24 109/1 109/2 109/7 109/19 109/20 110/4 111/13 112/1 112/20 112/21 113/4 114/8 114/13 116/2 118/1 118/3 118/5 118/19 119/3 119/7 119/10 120/24 121/1 121/8 121/19 123/21 124/1 124/6 124/9 124/11 125/11 125/17 126/10 126/11 126/12 126/15 126/21 126/24 127/6 127/10 127/25 128/18
**HB1056's [3]** 118/13 125/13 127/14
**he [5]** 4/25 14/20 62/8 78/18 88/5
**he's [1]** 83/11
**health [12]** 17/7 40/2 64/4 66/20 67/22 88/6 101/22 102/16 107/18 107/24 115/2 115/7
**healthcare [7]** 5/6 5/23 22/23 68/6 74/5 101/15 115/14
**Healy [3]** 127/15 127/18 128/4
**hear [13]** 3/13 3/15 3/19 4/3 46/5 56/9 56/13 75/3 77/19 86/13 89/22 92/22 97/6
**heard [19]** 33/16 47/10 69/18 73/14 74/24 88/4 91/17 93/22 94/21 96/8 97/25 98/6 98/7 98/10 98/18 99/6 101/9 101/12 129/12
**hearing [17]** 1/10 2/7 3/15 3/19 4/7 5/11 5/13 14/17 16/18 20/19 22/10 34/2 36/18 77/13 78/10 97/7 132/8
**held [10]** 3/14 48/20 65/4 104/9 115/14 116/7 120/5 123/3 123/7 133/8

**help [2]** 51/4 58/12
**helpful [3]** 50/19 50/23 57/9
**helps [1]** 110/22
**here [59]** 4/12 4/23 5/2 5/13 7/13 10/8 11/19 11/25 13/24 14/5 18/5 19/23 20/7 22/1 25/14 25/21 28/6 30/17 30/21 32/4 32/9 33/13 40/16 41/10 44/8 44/17 44/19 48/16 51/24 51/25 54/15 60/15 61/21 63/15 72/3 72/8 76/9 80/14 88/11 91/22 92/23 94/20 96/2 99/13 100/5 103/12 105/22 107/21 109/15 112/9 113/13 114/24 115/11 116/14 117/25 121/7 125/11 127/13 128/18
**here's [7]** 8/13 12/17 17/8 17/12 19/1 29/6 68/3
**hereby [1]** 133/6
**herring [1]** 65/12
**HHS [21]** 30/9 52/1 57/3 57/5 57/15 57/16 57/25 59/23 60/7 60/19 76/10 102/15 102/17 102/25 104/5 104/9 113/17 113/24 114/5 115/22 116/6
**HHS's [1]** 59/11
**high [9]** 38/15 47/18 50/6 55/21 62/25 93/25 120/8 120/16 120/19
**high-income [1]** 120/16
**high-level [1]** 55/21
**higher [3]** 47/11 92/21 120/15
**highlight [3]** 6/5 21/3 22/15
**highlighted [1]** 42/8
**highlights [3]** 23/16 24/22 26/3
**highly [1]** 57/2
**Hillsborough [1]** 115/9
**him [1]** 89/22
**hinder [1]** 127/1
**his [2]** 4/25 20/6
**history [4]** 61/1 109/4 115/3 120/1
**hold [5]** 6/15 65/24 66/11 66/13 89/1
**holding [4]** 26/22 66/15 115/19 116/9
**holds [1]** 73/2
**home [1]** 94/2
**Homeless [1]** 22/24
**honest [1]** 76/9
**honestly [1]** 90/1
**honor [75]** 2/10 2/14 2/15 2/18 2/21 2/23 3/1 3/5 4/2 4/5 5/11 11/23 14/19 16/17 17/23 18/5 19/24 20/4 20/20 22/9 27/24 28/22 32/15 33/3 34/17 35/6 35/7 37/5 46/23 52/23 56/21 61/5 63/22 63/25 65/12 65/20 66/18 67/13 69/5 70/8 70/13 70/16 70/19 70/25 71/17 72/1 72/18 73/2 73/9 73/14 75/2 76/9 77/10 77/21 78/3 78/8 83/3 83/12 84/13 87/25 88/3 91/12 95/10 97/23 99/14 129/22 130/11 130/13 130/19 130/21 131/22 131/25 132/2 132/4 132/16
**Honor's [1]** 71/6
**HONORABLE [4]** 1/11 77/25 100/12 132/19
**hope [3]** 13/7 84/19 87/25
**hopeful [1]** 92/24
**hopefully [2]** 28/1 59/11
**horizontal [1]** 82/10
**Horne [2]** 39/5 106/9
**horse [1]** 74/15
**hospital [2]** 52/24 107/7
**hospitals [2]** 84/22 102/3
**hour [1]** 100/16
**hours [1]** 77/12
**house [3]** 60/14 100/24 104/15
**housing [1]** 19/19
**how [34]** 6/12 8/13 8/24 12/3 12/15 16/12 25/11 42/18 46/2 47/14 50/11 51/4 51/5 51/16 52/2 52/18 52/20 57/12 60/8 60/17 60/20 60/22 61/2 67/14 72/7 74/3 82/19 83/6 87/17 89/20 98/11 98/22 131/1 131/5
**however [3]** 44/3 128/12 130/23
**HRSA [4]** 57/5 76/10 76/12 102/16
**Human [4]** 17/7 40/2 101/22 107/19
**hunt [1]** 15/5
**hurdles [1]** 59/12
**hypothesize [1]** 53/3
**hypothetical [2]** 111/12 111/13

**I**

**I'd [13]** 4/9 14/13 19/25 20/1 21/2 35/10 45/25 51/1 77/17 79/1 83/2 91/13 130/16
**I'll [9]** 4/3 9/20 16/2 43/18 54/3 77/6 100/11 105/24 128/12
**I'm [38]** 3/13 3/25 5/13 7/16 8/24 15/19 20/7 20/16 25/10 25/11 26/2 33/3 33/17 42/4 43/18 46/2 46/10 50/22 56/7 56/21 61/2 66/17 69/7 70/9 72/24 73/12 75/6

**I**

**I'm... [11]** 75/11 77/21 78/23 87/13 87/17 89/18 90/1 99/22 105/19 108/4 118/19
**I've [2]** 67/15 98/18
**Idaho [2]** 75/12 75/14
**idea [1]** 33/9
**identical [2]** 34/13 112/24
**identifiable [3]** 38/21 94/11 94/17
**identified [7]** 5/5 21/20 30/19 79/20 81/9 94/14 125/2
**identifies [1]** 38/23
**identify [4]** 80/1 117/25 118/5 127/24
**identifying [1]** 98/10
**ignore [4]** 19/10 19/11 96/5 96/5
**ignores [1]** 65/14
**ii [5]** 21/20 89/23 92/15 92/16 99/25
**Illinois [8]** 122/23 122/25 123/1 123/2 123/5 123/13 123/14 123/16
**Illinois-based [1]** 123/2
**illustrating [2]** 86/17 87/17
**imagine [5]** 30/25 49/17 53/15 53/19 92/18
**immigration [6]** 18/18 19/2 19/3 19/10 19/16 66/22
**immunity [3]** 33/24 94/24 116/10
**impact [5]** 18/13 44/8 85/18 106/16 109/1
**impacts [1]** 126/12
**impede [1]** 48/13
**impedes [1]** 106/14
**impending [1]** 111/19
**impermissible [1]** 123/22
**implement [2]** 41/16 75/15
**implementation [1]** 128/18
**implementing [1]** 98/3
**implication [1]** 122/11
**implications [1]** 6/11
**implicitly [3]** 67/18 112/11 113/9
**import [1]** 17/19
**important [18]** 6/11 6/18 7/13 10/2 10/3 16/14 19/8 19/22 39/10 58/13 61/9 64/11 65/7 71/1 78/12 81/24 105/16 114/22
**impose [14]** 13/22 26/15 31/22 32/11 32/21 32/24 34/24 63/14 86/8 91/2 91/8 102/17 125/8 126/22
**imposed [12]** 21/21 29/5 29/7 31/25 34/25 92/10 108/2 110/11 111/6 111/12 113/17 113/23
**imposes [8]** 20/9 26/7 27/4 27/7 27/15 30/6 31/14 35/18
**imposing [4]** 27/10 29/13 47/22 119/18
**imposition [1]** 111/19
**impossible [3]** 66/19 117/20 118/2
**improve [1]** 5/14
**inadequate [1]** 129/8
**Inc [1]** 1/16
**incentive [1]** 120/4
**incentives [3]** 119/23 120/9 120/22
**incidental [1]** 122/10
**inclined [1]** 50/14
**include [6]** 5/25 8/17 26/19 31/24 71/17 85/2
**included [1]** 10/16
**includes [4]** 16/24 99/19 102/22 113/21
**including [15]** 11/1 11/13 15/1 15/24 38/14 44/21 64/3 76/25 79/11 104/8 110/24 113/5 113/22 119/12 123/5
**income [1]** 120/16
**inconsistent [3]** 42/25 67/25 113/11
**Incorporated [1]** 101/2
**incorrect [3]** 73/24 75/19 129/20
**increase [1]** 128/18
**increases [1]** 124/24
**incurred [1]** 33/19
**indeed [6]** 8/15 93/14 93/19 111/16 114/9 116/5
**independent [1]** 51/22
**Indiana [1]** 107/20
**indicate [1]** 67/5
**indicated [1]** 71/17
**indicates [3]** 67/7 72/6 79/24
**indirectly [2]** 15/15 104/17
**indisputably [1]** 36/1
**indistinguishable [1]** 51/15
**individuals [2]** 94/11 94/17
**indivisible [1]** 94/3
**indulgence [1]** 97/4
**industry [3]** 31/23 107/3 121/11
**industry-wide [1]** 31/23
**inflicted [1]** 110/12

**information [2]** 57/23 85/12
**informed [1]** 62/7
**informs [1]** 122/22
**inherent [1]** 74/7
**inherently [1]** 88/9
**initial [2]** 51/5 81/14
**initially [1]** 21/10
**initiate [1]** 79/8
**injunction [38]** 1/10 2/7 3/14 3/16 3/20 17/25 18/3 22/19 26/23 36/9 37/12 44/11 56/4 58/2 64/23 72/19 75/2 75/4 75/25 90/9 90/12 93/6 95/8 95/19 96/19 101/9 101/10 101/15 105/7 105/8 105/9 105/14 105/25 128/14 128/16 128/18 129/1 129/10
**injunctive [2]** 105/3 105/17
**injury [2]** 56/5 56/9
**innovation [2]** 120/22 121/4
**innovators [2]** 120/3 121/10
**insist [2]** 9/21 63/1
**insisted [2]** 47/1 63/2
**Insofar [1]** 123/25
**instances [1]** 66/4
**instant [3]** 111/11 126/9 127/24
**instantly [1]** 54/11
**instead [12]** 11/4 12/7 21/19 29/1 45/19 53/17 60/20 69/19 109/22 112/20 115/21 131/7
**Institute [1]** 127/16
**institutions [1]** 48/10
**instructions [1]** 65/23
**instrumentality [1]** 48/6
**insurance [5]** 24/4 54/17 54/18 99/10 107/24
**insured [1]** 103/24
**insurer [1]** 103/23
**intend [2]** 10/25 46/19
**intended [11]** 5/20 6/16 7/8 8/21 10/7 11/22 67/21 69/15 110/17 115/23 126/3
**intending [1]** 100/1
**intends [5]** 97/12 97/22 99/3 100/8 117/8
**intent [8]** 4/11 6/4 6/5 15/9 64/2 69/21 116/15 116/19
**interacting [1]** 65/10
**interdependent [1]** 6/7
**interest [10]** 50/17 64/14 77/3 100/18 105/13 113/15 115/2 128/15 128/23 130/4
**interests [1]** 114/25
**interfere [5]** 41/22 44/13 45/16 93/17 127/1
**interfered [2]** 106/18 109/3
**interference [3]** 47/3 109/11 119/2
**interferes [1]** 122/16
**interfering [2]** 64/14 68/12
**interim [1]** 34/5
**interplay [1]** 41/11
**interpret [1]** 46/17
**interpretation [12]** 17/12 17/13 46/4 46/11 46/20 46/22 47/4 63/17 83/9 92/18 92/19 129/3
**interpreted [7]** 8/4 17/10 46/9 48/25 62/19 83/8 118/16
**interpreting [1]** 8/20
**interstate [6]** 122/11 122/17 123/19 125/9 126/22 127/2
**intervention [1]** 116/11
**intrinsic [1]** 82/11
**introduce [1]** 2/9
**introducing [1]** 31/17
**invaded [1]** 114/8
**invading [1]** 81/2
**invalid [1]** 81/1
**invalidate [2]** 36/14 112/7
**invalidated [3]** 48/8 115/8 122/23
**invasion [1]** 109/14
**invent [1]** 83/23
**inventories [1]** 103/15
**inventory [12]** 24/1 24/11 51/17 51/20 51/21 51/22 54/1 58/22 60/13 61/7 61/25 103/19
**invest [1]** 119/24
**investigated [1]** 25/15
**investigation [3]** 76/2 76/4 104/23
**investment [4]** 44/13 44/15 106/18 109/3
**investment-backed [3]** 44/13 106/18 109/3
**invite [1]** 41/13
**involved [7]** 12/5 47/22 81/10 119/16 123/23 125/17 127/11
**involves [1]** 40/12
**involving [3]** 75/8 125/9 126/23
**irreparable [8]** 33/1 33/4 33/11 33/12

56/5 56/9 77/2 105/12
**irrespective [1]** 113/10
**is [540]**
**isn't [4]** 32/20 61/17 62/21 100/2
**issue [30]** 9/18 11/11 16/6 16/7 16/10 20/11 21/6 25/12 25/15 34/16 43/17 63/4 64/23 65/19 80/11 83/22 83/22 83/23 84/2 87/11 87/13 96/19 96/20 107/14 108/20 109/15 111/8 130/7 130/24 131/2
**issued [5]** 34/4 57/6 79/4 104/6 108/6
**issues [11]** 3/21 3/23 4/7 4/12 4/20 4/24 19/19 34/22 112/23 113/2 130/22
**it [328]**
**it's [118]** 4/14 5/3 5/3 5/9 7/11 7/12 7/18 7/20 8/1 8/12 9/7 9/8 9/9 9/12 10/2 10/3 10/9 10/10 10/10 12/5 12/7 12/21 12/23 13/6 14/22 15/24 16/3 16/21 16/22 19/2 19/15 21/12 22/7 23/6 23/12 24/24 25/1 25/21 25/23 25/24 26/10 26/12 28/5 28/24 29/3 29/5 29/6 29/12 32/24 34/20 34/20 36/20 36/21 37/7 38/8 40/25 41/8 41/9 42/15 44/10 45/14 45/18 46/12 52/3 53/2 55/17 55/20 56/10 56/15 60/6 63/18 63/19 64/7 66/21 66/22 67/16 69/10 71/1 71/3 73/8 74/17 75/6 75/6 75/13 76/3 76/4 76/22 78/16 81/2 81/15 82/8 83/20 83/25 84/16 85/6 85/6 85/14 85/17 85/18 85/20 86/16 86/16 87/7 89/24 90/16 93/20 94/1 95/18 95/20 96/7 98/15 98/16 98/19 99/15 99/23 99/25 105/7 117/23
**its [61]** 4/11 28/12 30/13 33/16 34/1 35/25 40/18 42/21 42/22 45/14 45/17 48/5 49/18 56/6 56/6 57/5 58/23 60/7 60/17 64/12 65/17 65/24 66/1 67/23 69/18 70/22 73/17 75/4 75/5 75/17 75/19 77/4 79/2 82/12 83/9 85/13 92/8 97/4 97/25 102/23 105/11 105/13 106/8 107/23 107/24 110/7 110/25 116/19 117/9 119/3 121/14 122/8 123/1 123/2 123/12 124/2 124/9 125/20 127/10 127/21 131/14
**itself [27]** 20/19 27/14 32/6 32/11 33/22 40/17 45/9 50/8 59/15 60/3 65/13 65/15 68/21 68/24 70/3 72/19 75/1 76/10 76/16 89/10 90/18 115/25 117/1 120/20 121/8 121/13 124/12

**J**

**job [1]** 17/17
**Johnson [2]** 104/9 116/6
**join [1]** 31/5
**JOSHUA [2]** 1/20 3/5
**judge [3]** 13/20 43/17 83/9
**judgment [1]** 105/4
**judgments [1]** 110/2
**judicial [2]** 130/4 133/10
**July [3]** 101/10 104/16 108/6
**July 1st [2]** 101/10 104/16
**July 22nd [1]** 108/6
**juncture [1]** 74/20
**jurisdiction [2]** 76/11 76/12
**jurisprudence [1]** 121/24
**just [74]** 4/14 12/2 12/21 15/4 15/13 16/23 18/9 19/9 21/1 21/7 21/8 21/16 23/21 24/15 24/22 27/7 27/18 28/16 29/11 29/25 31/23 33/11 33/17 34/23 36/5 42/2 45/2 45/9 45/19 51/25 53/23 54/4 55/1 55/20 57/10 58/11 58/13 63/16 74/7 76/8 77/20 78/5 78/18 83/4 83/21 84/19 85/6 87/6 88/6 89/1 89/3 90/7 90/14 91/5 92/13 94/7 94/22 94/25 95/10 95/17 95/22 96/4 96/20 97/2 106/6 107/12 127/13 127/16 130/25 131/4 132/4 132/8 132/9
**Justice [3]** 15/2 18/10 39/7
**justified [2]** 59/3 124/25
**justify [1]** 108/16

**K**

**Katsas [1]** 13/20
**KEDEM [10]** 1/18 2/18 4/19 20/5 35/20 42/14 45/13 91/14 130/20 132/1
**keep [3]** 39/2 43/22 53/18
**keeping [1]** 121/4
**Kelo [10]** 38/14 93/23 93/25 94/5 94/12 107/13 107/17 109/21 109/24 110/2
**Kelo's [1]** 93/24
**key [6]** 4/9 7/10 22/1 29/6 65/19 72/9
**kind [10]** 35/25 41/22 41/23 43/12 50/8 53/12 53/25 59/22 91/13 93/3
**kinds [3]** 41/2 48/23 55/10
**Kirkland [3]** 2/24 3/2 35/8

**K**

**knew [2]**  6/23 82/24
**know [30]**  30/5 34/17 35/3 38/10 49/10
 49/20 52/20 53/1 59/5 59/9 60/1 60/5
 60/13 61/5 61/23 63/16 68/3 69/5 76/3
 77/1 81/20 82/13 82/19 82/19 91/14 95/15
 95/16 95/18 98/23 129/19
**knowing [1]**  63/13
**known [3]**  7/11 52/8 101/18
**Korangy [1]**  110/19

**L**

**label [1]**  43/16
**labels [2]**  28/4 43/25
**Laboratories [1]**  115/9
**lack [5]**  3/22 103/8 128/6 128/9 128/20
**lacking [1]**  128/10
**laid [1]**  9/24
**land [2]**  39/10 112/5
**language [5]**  34/14 47/15 69/17 93/24
 112/9
**large [2]**  41/18 94/3
**largely [2]**  3/21 34/13
**last [11]**  10/5 25/15 42/18 58/11 58/14
 65/4 70/24 72/3 95/10 97/7 127/17
**Lastly [1]**  76/8
**late [1]**  100/16
**later [5]**  19/6 23/6 33/19 94/8 103/15
**latter [1]**  109/16
**law [145]**
**lawfully [1]**  80/17
**laws [14]**  18/18 27/5 34/18 48/14 64/4
 75/10 115/1 119/12 119/12 120/21 121/15
 121/16 126/16 126/24
**lawsuits [2]**  3/9 48/22
**lay [1]**  58/25
**layer [2]**  65/7 114/22
**layers [1]**  81/10
**lays [1]**  88/23
**Learjet [1]**  117/24
**learn [2]**  62/3 62/9
**least [10]**  26/20 68/17 77/1 82/21 84/7
 109/17 126/11 129/13 130/24 131/2
**leave [3]**  51/16 92/23 95/2
**leaves [4]**  30/11 62/20 114/16 117/13
**leaving [1]**  10/22
**legal [5]**  61/15 61/22 62/1 115/6 121/22
**legislation [6]**  34/12 34/13 112/8 112/20
 113/4 117/15
**legislative [4]**  85/7 110/2 116/11 120/1
**legislature [7]**  17/3 17/5 47/24 47/25
 69/17 69/22 81/15
**legislature's [1]**  18/1
**legislatures [1]**  107/16
**length [1]**  50/18
**lengthy [1]**  39/6
**less [3]**  30/12 35/2 109/10
**lesson [1]**  15/9
**let [7]**  5/2 6/5 12/2 60/22 81/8 86/2
 129/19
**let's [3]**  51/6 51/7 51/10
**letter [1]**  76/3
**letters [1]**  104/6
**level [14]**  47/12 47/19 49/10 50/6 55/21
 62/25 70/18 71/21 71/23 78/21 87/19
 98/19 99/24 115/5
**leverage [3]**  30/14 31/17 31/20
**liability [2]**  99/10 105/1
**liberty [2]**  10/22 41/22
**licensees [1]**  119/18
**life [1]**  109/12
**Liggett [1]**  112/17
**light [2]**  130/15 130/21
**like [49]**  4/9 13/3 13/4 13/18 14/13
 19/25 21/2 21/15 23/7 28/4 28/5 28/6
 31/2 31/3 31/7 31/23 32/6 34/12 35/8
 35/10 35/24 37/22 38/25 39/9 41/20 42/12
 44/11 45/25 51/1 52/16 56/9 57/20 59/14
 60/9 64/13 69/18 77/17 78/5 79/1 81/5
 83/2 91/13 97/6 112/20 118/7 123/14
 126/9 126/24 131/9
**likelihood [8]**  64/5 70/7 105/15 105/22
 110/7 127/25 128/6 128/9
**likely [12]**  54/22 65/25 93/7 105/10
 105/11 111/24 112/2 117/17 119/8 121/20
 126/18 127/7
**Likewise [1]**  6/14
**Lilly [1]**  107/18
**Lilly v. United [1]**  107/18
**limit [3]**  15/15 16/22 69/20

**limitation [9]**  16/25 17/1 21/21 22/5
 37/4 76/16 92/17 97/14 99/20
**limitations [2]**  98/10 99/9
**limited [7]**  57/25 62/13 79/12 120/6
 126/11 128/8 129/7
**limiting [2]**  104/19 116/8
**limits [4]**  63/14 97/18 110/13 117/2
**Lindamood [1]**  22/22
**line [6]**  75/14 82/8 82/9 82/9 121/14
 128/4
**lines [3]**  33/9 62/14 123/4
**linking [1]**  8/25
**list [1]**  5/5
**literally [2]**  54/5 54/9
**litigated [1]**  63/3
**litigation [7]**  34/5 34/10 91/24 93/4
 104/7 109/4 109/17
**little [12]**  4/14 4/14 20/1 41/9 60/14
 60/20 73/14 76/8 77/15 89/3 100/17
 121/22
**lived [1]**  123/12
**lives [1]**  98/22
**local [3]**  107/16 115/7 126/8
**located [1]**  124/4
**locations [2]**  23/1 31/9
**Lochner [1]**  41/20
**Lochner-like [1]**  41/20
**logic [1]**  116/24
**logical [1]**  12/21
**logistic [1]**  81/19
**Lombard [1]**  1/24
**London [2]**  38/15 107/13
**long [9]**  5/25 12/24 43/6 60/24 65/6 90/4
 91/22 114/21 115/3
**longer [3]**  36/16 36/21 37/7
**longstanding [1]**  110/1
**look [13]**  5/17 15/3 15/4 15/22 22/16
 27/25 28/3 51/19 61/15 65/2 81/12 81/13
 82/5
**looking [3]**  15/3 69/7 83/13
**looks [1]**  28/6
**loosen [1]**  60/19
**lose [2]**  45/8 54/22
**loss [4]**  23/11 25/6 55/5 55/5
**losses [2]**  23/9 23/10
**lost [5]**  22/21 23/3 25/7 29/20 43/19
**lot [10]**  41/11 47/15 64/9 74/15 75/24
 88/4 88/23 89/13 95/21 97/25
**loud [1]**  95/17
**love [1]**  20/1
**low [1]**  5/7
**lower [1]**  54/13
**LP [2]**  1/18 101/2
**Lucas [1]**  43/14
**lump [1]**  66/17
**lunch [2]**  100/17 132/18

**M**

**MAC [3]**  41/15 41/25 42/2
**MADDOX [1]**  1/11
**made [20]**  6/21 6/24 21/17 25/3 46/18
 68/19 70/15 70/21 70/23 75/5 89/8 100/5
 108/25 109/21 114/6 125/11 125/23 125/25
 126/21 127/20
**magically [1]**  53/25
**maintain [3]**  61/22 62/1 70/2
**maintained [5]**  12/8 60/12 61/7 65/7
 114/21
**maintains [1]**  61/14
**maintenance [1]**  51/22
**make [42]**  4/15 6/16 8/9 8/10 9/3 9/3 9/7
 9/14 11/4 11/21 19/19 21/4 26/19 30/18
 31/3 33/5 33/17 37/13 39/18 42/8 47/11
 51/7 71/16 78/9 84/12 85/9 85/19 86/2
 86/3 89/24 93/9 95/10 95/22 96/10 97/1
 103/9 109/18 119/6 126/15 127/5 128/22
 131/16
**makes [12]**  23/20 24/6 24/13 29/24 31/16
 35/1 37/8 46/24 83/10 86/6 88/24 130/5
**making [4]**  33/22 64/10 78/14 123/13
**mall [2]**  31/4 31/8
**Malone [1]**  112/16
**mandate [3]**  64/17 67/14 67/19
**mandated [1]**  33/14
**mandates [2]**  73/5 74/1
**manner [4]**  8/18 48/13 54/4 55/25
**manufacturer [34]**  8/2 9/2 13/25 15/14
 16/22 21/22 22/12 24/13 28/25 29/8 29/11
 29/16 29/18 53/24 57/10 64/14 65/22 68/4
 68/9 71/4 71/16 71/19 72/10 72/25 75/13

 79/10 79/12 79/20 79/23 97/17 99/17
 101/23 102/8 104/23
**manufacturer's [4]**  114/24 115/18 119/1
 126/3
**manufacturers [72]**  2/11 5/5 5/24 6/24
 7/7 7/14 7/23 8/9 9/11 9/21 11/25 13/5
 13/11 13/22 15/2 20/10 22/25 24/19 26/6
 26/18 27/16 29/4 30/1 30/6 30/12 32/23
 57/22 62/24 64/13 64/17 67/3 67/19 68/12
 69/16 74/10 76/13 78/19 79/8 81/18 82/14
 82/20 101/1 101/6 101/20 102/13 102/18
 102/20 102/23 102/24 104/3 104/7 104/10
 104/17 108/9 108/11 113/23 113/24 113/25
 115/15 115/16 117/6 118/6 118/13 118/18
 119/17 119/24 120/7 124/8 124/21 125/13
 125/22 128/2
**manufacturers' [6]**  15/10 18/9 116/8
 123/23 124/7 127/12
**manufactures [2]**  66/24 82/15
**many [11]**  18/10 18/10 19/18 19/18 52/18
 52/25 60/2 81/10 81/21 81/21 101/15
**marked [1]**  81/17
**market [8]**  40/9 49/8 49/9 74/4 119/11
 119/24 120/2 121/16
**markups [1]**  81/14
**MARYLAND [90]**  1/1 1/6 1/25 3/6 3/11 3/11
 5/14 11/18 11/20 12/25 13/7 14/5 14/11
 17/22 18/5 25/23 27/3 28/19 29/7 29/13
 31/7 31/24 34/24 36/14 36/20 37/1 37/7
 40/17 40/20 41/4 41/5 42/11 42/17 44/11
 47/2 47/21 47/22 47/22 47/24 47/25 48/17
 48/23 49/10 49/11 54/17 58/7 62/14 63/15
 64/3 65/22 66/19 69/15 72/15 75/9 82/19
 82/23 82/24 85/6 86/7 91/6 91/15 97/2
 98/12 99/4 99/12 100/21 100/22 100/23
 101/17 104/15 104/23 104/24 104/25
 118/10 121/9 121/14 124/5 124/14 124/14
 124/17 124/19 125/6 125/16 125/21 125/24
 126/1 126/2 129/2 129/4 133/6
**Maryland's [6]**  5/12 26/5 28/12 29/24
 30/6 34/11
**Maryland-based [2]**  124/14 124/14
**Marylanders [1]**  74/9
**materially [1]**  5/16
**materials [1]**  78/25
**matter [22]**  1/10 2/4 2/6 26/14 31/13
 50/15 51/3 51/5 52/6 76/2 83/22 100/20
 114/17 116/2 116/5 116/13 116/24 116/24
 117/10 117/13 124/4 133/9
**matters [2]**  34/22 115/7
**MATTHEW [5]**  1/11 1/16 2/23 35/7 91/12
**maximize [1]**  67/1
**maximizing [1]**  64/4
**maximum [2]**  102/5 111/7
**may [40]**  2/2 4/25 8/14 15/14 16/22 20/4
 25/19 41/1 45/20 62/12 63/24 73/22 77/11
 93/3 94/5 95/23 99/1 100/15 102/7 102/14
 102/17 104/15 104/23 104/25 107/10
 110/18 111/15 111/16 112/7 112/8 112/10
 113/9 114/1 117/19 122/8 124/8 127/3
 128/20 131/21 132/8
**maybe [10]**  53/4 57/19 58/11 58/12 59/21
 72/16 78/6 85/11 85/13 85/14
**McClain [7]**  61/9 65/4 112/25 113/16
 114/18 115/12 118/8
**McCulloch [2]**  47/21 47/22
**me [15]**  5/2 6/5 7/17 11/14 12/2 14/24
 14/24 16/22 36/4 45/9 56/15 57/19 81/8
 86/2 129/19
**mean [9]**  15/23 17/11 22/5 27/21 41/1
 43/11 46/10 98/8 117/1
**meaning [4]**  17/20 22/10 34/5 36/17
**meanings [1]**  15/20
**means [15]**  6/9 6/12 17/1 17/3 17/8 17/13
 42/16 53/10 54/3 62/19 68/20 71/2 90/3
 95/20 99/15
**meant [1]**  46/15
**measure [1]**  32/22
**mechanism [3]**  33/15 33/18 33/21
**mechanisms [3]**  113/21 118/20 127/11
**mediations [1]**  103/10
**Medicaid [19]**  6/9 9/8 9/8 30/18 40/7
 40/22 40/24 40/24 41/11 41/13 49/6 84/18
 84/21 85/16 101/19 102/9 102/12 102/24
 108/12
**medical [4]**  101/24 102/4 107/4 115/9
**Medicare [15]**  6/9 9/9 30/18 40/6 40/22
 41/11 41/13 49/6 84/17 84/21 85/15
 101/20 102/9 102/24 108/12
**medication [1]**  64/17

**M**

medications [1]  74/3
Medicines [1]  124/19
meet [3]  2/13 2/14 3/3
meeting [1]  132/6
member [1]  12/22
members [2]  100/22 102/23
membership [1]  102/21
Memorial [1]  107/7
memory [1]  57/18
mention [1]  77/2
mentioned [5]  49/16 68/18 80/10 86/16
 132/5
MEREDITH [2]  1/17 3/1
merely [4]  21/11 26/6 26/10 32/20
merge [1]  128/13
Merit [1]  133/4
merits [8]  65/25 93/7 105/11 105/15
 105/23 111/24 119/8 128/10
methods [1]  66/4
MICHAEL [2]  1/19 2/21
microphone [1]  4/14
Midkiff [1]  38/14
might [22]  11/23 36/2 38/17 50/19 50/24
 51/2 51/4 52/25 57/21 58/7 58/8 60/14
 65/3 74/1 78/9 82/9 82/9 83/2 83/12
 83/23 84/14 129/25
military [1]  31/2
million [4]  23/11 23/12 29/25 30/2
millions [13]  27/12 29/20 29/21 34/23
 44/12 44/12 54/22 55/1 55/10 55/10 55/12
 55/12 90/23
mind [2]  4/13 60/7
minimum [1]  119/18
Minnesota [1]  82/1
minute [1]  100/11
minutes [4]  9/20 77/23 77/24 78/6
misdemeanor [1]  105/1
misplaced [3]  116/4 124/19 127/16
missing [1]  87/5
Mississippi [6]  34/19 108/6 108/7 113/3
 118/8 118/9
MITE [1]  122/13
MJM [2]  1/5 2/5
model [20]  5/1 23/20 23/22 24/15 24/22
 25/8 44/4 50/12 65/11 66/4 74/24 74/24
 88/19 88/20 88/23 89/2 89/5 98/2 103/12
 103/13
models [4]  74/18 74/20 74/25 98/6
moment [8]  5/11 44/4 45/25 47/9 70/9
 78/4 93/11 99/25
monetary [2]  102/17 111/8
money [10]  24/23 24/24 27/15 28/24 28/25
 33/12 33/23 33/24 55/16 90/21
Monsanto [1]  74/11
months [3]  23/13 30/2 70/20
more [22]  10/6 11/8 11/21 14/11 23/4
 29/25 31/16 33/5 34/12 53/23 54/3 55/14
 56/13 57/8 60/14 77/16 86/20 92/18 93/5
 100/17 103/10 122/15
Moreover [2]  108/23 117/8
morning [18]  2/2 2/10 2/15 2/17 2/18
 2/20 2/21 2/23 2/25 3/5 3/8 35/7 35/10
 36/5 36/18 36/23 92/4 92/23
most [5]  6/18 24/2 52/11 74/6 105/16
motion [23]  3/15 26/4 36/8 36/23 37/12
 44/11 58/2 62/5 75/4 75/5 75/25 90/10
 90/12 101/8 101/10 105/9 129/18 130/7
 130/12 130/13 131/10 132/7 132/13
motions [20]  3/14 3/17 3/18 3/20 3/22
 3/23 75/1 92/6 101/11 101/12 101/14
 105/6 112/23 129/10 129/11 129/12 129/15
 130/5 130/7 130/17
Motor [1]  112/16
move [1]  73/14
moving [1]  73/13
Mr [13]  20/6 23/19 35/20 77/8 77/11
 79/20 84/18 86/16 90/2 97/5 129/21 130/3
 132/3
Mr. [41]  4/4 4/19 4/24 9/10 14/19 21/7
 21/19 34/6 42/14 42/14 44/9 45/13 46/3
 46/20 78/13 78/18 78/23 78/23 79/22 83/8
 89/16 89/20 89/21 89/22 90/2 91/14 91/17
 91/25 92/22 94/21 95/11 97/6 100/9
 129/14 129/22 129/24 130/10 130/20
 131/24 132/1 132/15
Mr. Chazen [15]  78/18 89/21 89/22 91/17
 91/25 92/22 94/21 95/11 97/6 100/9
 129/14 129/22 129/24 130/10 132/15
Mr. Chazen's [1]  83/8

Mr. Costello [1]  78/23
Mr. Detrick [1]  34/6
Mr. Feldman [13]  9 78/13 80/10/10/24
Mr. Kedem [6]  4/19 42/14 45/13 91/14
 130/20 132/1
Mr. Owen [3]  4/24 9/10 79/22
Mr. Perry [8]  4/4 21/7 21/19 42/14 46/3
 46/20 90/2 131/24
Mr. Scheidler's [1]  44/9
Mr. Scheulen [1]  78/23
Ms. [1]  52/24
Ms. Pohl [1]  52/24
MTA [1]  111/20
much [11]  4/18 25/11 31/16 33/5 35/2
 63/21 69/17 77/19 89/1 130/3 131/9
multiple [4]  4/23 60/25 67/17 79/5
multitiered [1]  79/5
Murr [1]  106/12
must [15]  6/10 8/13 8/15 17/16 25/18
 42/22 45/19 65/22 73/6 75/2 105/10
 105/16 105/18 110/23 112/13
my [27]  18/4 19/25 21/2 23/19 29/19 32/4
 34/6 35/9 35/11 36/22 44/15 50/1 52/23
 64/24 77/6 78/3 78/23 79/15 80/10 80/14
 83/2 86/13 88/4 88/18 90/2 129/19 129/24
myself [1]  35/9
mystery [3]  26/16 56/15 56/16

**N**

name [1]  48/18
named [1]  101/5
narrow [2]  76/22 130/22
narrower [1]  72/6
National [2]  127/17 128/3
nationwide [1]  127/3
Natural [1]  105/19
nature [10]  5/2 6/8 11/20 14/6 25/8
 35/21 41/21 44/18 111/1 111/9
necessary [5]  13/5 13/10 80/4 103/7
 131/21
need [22]  12/21 17/25 18/3 28/22 46/22
 49/9 52/11 53/15 56/12 60/21 70/23 74/21
 79/25 86/1 90/10 92/13 93/6 96/19 128/10
 130/9 131/12 131/19
needs [3]  64/24 77/4 107/17
negative [2]  45/19 122/1
negotiated [1]  99/11
negotiating [1]  126/13
neither [4]  68/14 115/25 116/21 116/22
net [1]  55/4
neutral [3]  24/1 24/11 51/21
never [4]  20/24 30/15 47/2 105/8
new [23]  5/25 6/24 17/11 26/7 26/15 27/4
 27/10 27/20 29/3 29/5 32/20 35/18 35/21
 37/23 38/15 90/24 91/2 91/7 106/23
 107/13 119/25 120/9 131/19
next [16]  51/6 51/13 51/19 52/4 52/15
 53/7 53/15 53/15 53/19 54/4 54/13 85/8
 93/22 119/10 129/23 130/15
Night [1]  11/19
Ninth [1]  19/17
no [76]  1/4 2/5 9/6 10/15 12/14 12/14
 12/15 14/4 14/21 14/25 16/14 17/16 18/21
 18/24 18/24 21/15 24/25 26/12 27/4 31/13
 32/3 33/13 33/14 33/24 34/3 34/17 36/16
 36/21 37/7 42/2 42/6 43/23 47/8 48/11
 48/12 51/22 51/22 52/6 53/13 54/8 56/12
 59/11 60/23 61/20 62/1 64/2 66/15 66/20
 70/4 73/4 73/8 73/15 73/24 74/23 76/2
 76/19 80/6 83/22 86/7 88/7 88/15 89/1
 89/8 90/18 91/1 94/18 99/4 106/24 112/19
 114/16 118/14 118/21 125/11 126/20 132/2
 132/16
non [3]  8/15 8/17 21/18
non-designated [1]  21/18
non-price [2]  8/15 8/17
noncompliance [1]  113/22
noncompliant [2]  113/25 114/1
nonpatients [1]  113/19
nonprofit [1]  102/3
noon [1]  78/2
normal [1]  24/17
normally [2]  24/17 52/7
NORTHERN [1]  1/2
not [279]
Notably [1]  128/3
note [6]  16/2 17/4 18/2 43/19 101/5
 128/12
noted [2]  114/18 123/6
notes [1]  1/22

nothing [14]  15/24 28/9 28/10 28/12
 71/25 73/10 75/12 75/22 88/25 91/21
 120/11 120/23 121/25
notice [3]  42/24 54/23 55/7
notion [3]  83/11 84/7 122/7
notwithstanding [3]  96/4 112/5 114/5
NOVARTIS [25]  1/3 2/5 3/16 5/11 8/5
 14/17 16/18 17/9 20/19 22/10 34/2 36/18
 37/18 70/25 70/25 72/6 78/10 97/8 100/25
 104/9 113/5 116/6 116/22 123/21 127/13
Novartis' [1]  101/10
now [52]  2/4 2/6 8/4 11/23 13/2 13/23
 14/13 15/12 15/22 16/10 17/10 19/9 20/14
 21/23 22/25 28/8 29/10 30/5 33/17 34/11
 34/20 34/25 37/5 43/3 45/1 46/14 47/24
 48/24 53/10 54/3 58/20 59/22 60/10 60/15
 61/12 73/8 77/25 79/18 80/21 80/23 81/23
 82/3 82/18 83/2 86/7 87/6 87/11 100/12
 101/12 121/21 128/9 132/19
number [13]  12/4 15/1 34/21 37/6 37/16
 38/10 41/18 60/22 79/22 87/3 104/3
 104/11 110/23
nuts [1]  131/5

**O**

object [2]  13/1 13/3
objective [1]  121/3
objectives [2]  117/22 118/4
obligate [1]  102/25
obligated [2]  27/17 86/10
obligates [1]  101/23
obligation [30]  7/21 8/8 8/11 26/16
 26/17 26/19 27/7 27/10 27/15 27/19 27/20
 27/22 29/3 29/3 29/4 29/5 29/6 31/15
 32/21 35/22 37/20 85/2 85/9 90/15 90/24
 91/5 91/8 95/24 96/21 96/23
obligations [15]  8/21 26/6 26/7 26/11
 26/15 26/18 27/4 27/8 30/22 30/22 32/11
 49/18 88/12 91/2 102/7
obsessed [1]  32/5
obstacle [9]  20/8 25/12 112/12 112/22
 117/21 118/3 118/5 119/9 120/20
obtain [3]  56/24 93/2 105/17
obtaining [1]  107/24
obvious [1]  99/23
obviously [4]  26/11 26/15 31/14 57/8
occupy [2]  114/7 115/23
occur [8]  67/15 81/21 106/12 111/15
 111/16 117/19 124/17 126/4
occurred [5]  24/18 53/23 125/7 125/21
 126/1
occurring [2]  82/7 122/8
occurs [4]  98/19 106/7 106/24 107/22
off [5]  31/4 31/11 32/14 81/17 124/23
off-patent [1]  124/23
offending [1]  111/1
offense [6]  110/15 110/22 111/2 111/3
 111/8 111/9
offenses [1]  111/3
offer [75]  7/12 8/1 8/3 8/8 8/9 8/10
 8/11 8/12 8/14 8/15 8/20 8/25 9/3 9/3
 9/5 9/7 9/7 9/14 9/15 9/17 9/17 10/1
 10/8 11/4 11/5 11/10 11/17 14/1 14/6
 14/7 14/8 16/14 17/15 17/17 22/7 30/12
 31/6 31/8 31/9 35/3 37/10 37/14 37/17
 37/19 37/22 37/23 38/2 38/5 38/6 46/5
 47/16 49/12 49/13 50/4 68/4 69/19 71/3
 85/9 86/5 91/16 96/10 96/23 98/19 98/20
 98/22 98/25 99/1 99/9 99/16 100/1 103/1
 118/25 123/12 123/13 123/16
offered [10]  21/16 22/3 22/6 25/5 25/18
 29/11 37/1 43/4 46/13 92/9
offering [3]  27/7 28/8 49/7
offers [5]  65/7 79/19 114/21 122/24
 123/6
Office [2]  3/6 72/14
official [4]  1/24 52/1 133/1 133/16
often [3]  5/9 5/9 103/8
oh [2]  73/7 87/20
OIG [1]  60/6
okay [14]  3/3 4/18 4/21 7/19 17/12 47/4
 49/21 60/20 77/14 77/22 96/7 98/18
 129/21 130/3
old [1]  38/12
omission [2]  118/12 118/15
once [5]  3/18 51/16 53/22 130/6 130/6
one [79]  5/22 6/10 7/22 9/19 9/23 10/18
 11/25 12/1 12/12 13/17 13/19 14/24 14/25
 18/4 18/15 26/5 26/8 26/21 27/1 27/6
 28/3 29/25 31/25 34/18 35/14 37/6 39/18

**O**

one... [52]  32/20 40/23 41/9 45/17 46/20
 48/2 50/7 54/3 54/4 55/13 57/17 57/20
 59/11 60/11 60/20 60/21 61/4 61/21 61/22
 62/1 62/6 64/24 65/9 65/10 68/17 68/22
 71/17 74/8 74/24 75/15 77/1 77/17 80/7
 81/24 83/4 86/2 86/6 89/1 91/16 92/18
 93/14 94/18 96/11 98/9 98/13 98/18
 110/24 127/1 129/13 129/16 130/24 131/2
Oneok [1]  117/24
onerous [1]  108/24
ones [1]  56/3
ongoing [2]  129/13 129/16
only [54]  7/9 8/10 13/19 14/16 16/5 16/6
 16/8 27/14 29/7 31/8 34/11 34/18 36/6
 36/14 37/7 38/3 41/5 41/6 43/2 47/24
 48/7 48/18 49/24 50/2 54/7 54/25 55/15
 57/17 57/20 60/13 64/7 64/25 65/16 65/24
 66/12 66/25 67/21 71/6 71/21 73/16 74/20
 74/24 79/24 87/15 91/13 94/2 94/2 95/7
 96/22 108/11 110/21 111/11 123/12 124/15
operate [2]  13/11 103/8
operates [2]  6/13 6/16
operating [1]  66/22
operation [4]  52/14 110/5 122/16 124/2
operational [1]  127/3
operations [2]  48/9 48/13
opinion [10]  10/4 13/21 15/2 18/10 41/25
 43/18 75/20 90/5 93/2 108/6
opinions [1]  49/4
opportunistic [1]  85/24
opportunity [7]  11/1 78/5 80/2 84/4 99/4
 131/18 131/20
oppose [1]  13/8
opposed [1]  27/13
opposite [2]  67/12 87/6
opposition [9]  36/8 36/12 37/6 39/22
 62/5 129/19 129/23 129/25 131/14
opted [1]  6/21
oral [6]  3/13 3/15 3/19 101/9 101/12
 129/12
orally [1]  100/18
order [26]  4/6 12/10 12/11 12/11 12/13
 12/14 14/2 16/4 35/15 35/16 50/7 53/7
 53/16 53/23 58/6 58/25 59/4 61/5 70/15
 73/21 91/23 93/2 94/17 98/9 121/23
 125/15
ordered [1]  54/10
ordering [3]  12/7 16/12 68/13
orders [7]  10/13 12/3 12/8 51/6 51/11
 54/6 124/16
organization [3]  23/3 23/7 64/13
original [1]  47/19
originally [2]  81/17 89/16
originate [1]  88/12
originates [1]  88/10
other [75]  3/17 7/3 8/12 8/13 10/22
 12/22 15/10 16/12 18/4 18/10 20/7 23/1
 23/10 24/18 25/3 26/9 27/7 28/21 32/20
 33/8 34/13 34/15 34/19 35/1 35/16 37/12
 39/5 39/18 40/3 40/18 42/5 47/7 50/9
 51/14 52/23 56/1 57/7 57/16 64/20 66/4
 68/17 68/17 69/16 71/16 74/18 74/19
 74/25 75/10 75/11 77/2 79/14 80/2 80/4
 80/13 85/7 86/5 89/14 90/2 91/6 91/20
 92/7 98/20 101/5 101/11 105/1 111/2
 111/10 114/9 114/13 121/16 125/8 126/22
 127/22 128/2 128/11
others [2]  3/24 84/10
otherwise [18]  15/21 26/8 27/16 46/23
 48/12 58/18 59/22 69/11 69/20 71/8 77/6
 96/14 97/13 97/15 97/18 97/20 104/19
 128/20
ought [1]  87/1
our [74]  11/24 13/10 13/13 15/1 16/2
 16/8 20/9 20/16 22/18 23/1 25/3 26/3
 31/5 34/7 36/7 36/8 37/11 37/19 38/5
 38/25 39/1 39/22 40/25 41/22 43/25 44/1
 44/2 44/8 44/10 44/25 46/18 47/2 47/3
 49/16 50/13 51/5 51/25 52/20 54/22
 55/20 56/11 56/23 57/25 62/7 65/9 72/18
 74/6 80/12 82/11 84/3 86/21 87/18 88/12
 88/19 88/21 88/21 89/1 89/4 89/11 89/14
 90/4 90/12 90/12 90/19 91/19 92/6 92/25
 93/7 93/17 95/2 95/7 96/8 96/15 96/23
ours [1]  23/7
ourselves [1]  132/9
out [33]  9/24 11/7 15/5 27/2 29/17 36/23
 42/14 44/24 50/1 62/13 63/13 67/13 67/14
 79/1 82/7 82/14 82/16 82/17 82/24 86/15

95/17 123/23 124/2 124/3 124/7 124/8
 124/13 125/7 125/15 125/18 126/13 127/6
 127
outcome [1]  4/11
outlined [1]  68/10
outlining [1]  62/25
outpatient [4]  58/16 71/2 79/13 99/15
outset [1]  81/16
outside [8]  66/10 75/23 81/22 122/8
 122/21 123/5 123/14 125/21
outsider [1]  11/1
over [15]  10/4 19/3 23/4 23/12 28/14
 30/2 48/11 71/22 71/23 72/17 76/11 76/12
 86/15 103/13 120/15
over-spreading [1]  72/17
overcharged [1]  79/10
overcharges [11]  7/3 68/10 71/19 72/10
 73/1 76/13 86/4 102/18 115/16 115/21
 118/24
overcharging [1]  70/10
overcome [1]  59/14
overlap [1]  3/23
overlapping [1]  3/21
overread [1]  72/20
oversee [2]  17/18 115/21
oversight [1]  102/15
owe [2]  86/20 107/16
OWEN [16]  1/16 2/23 4/24 9/10 23/19 35/7
 79/20 79/22 84/18 86/16 90/2 91/12 97/5
 129/21 130/3 132/3
own [22]  15/25 22/15 25/6 37/10 42/21
 43/6 43/7 43/15 45/17 46/13 48/10 51/25
 58/22 61/17 64/3 67/24 91/4 93/17 103/8
 106/8 118/18 125/20
owner [2]  42/21 42/22
ownership [1]  15/23

**P**

p.m [4]  78/2 100/14 100/14 132/21
PAC [1]  41/8
pace [1]  85/14
package [1]  51/18
packaged [1]  23/24
page [15]  6/3 13/2 13/16 36/11 39/21
 39/21 40/23 41/8 41/24 43/1 69/7 75/20
 78/13 80/22 133/9
Page 119 [1]  6/3
Page 1243 [1]  41/24
Page 14 [3]  36/11 39/21 43/1
Page 15 [1]  40/23
Page 17 [2]  39/21 41/8
Page 21 [1]  75/20
Page 29 [2]  13/2 13/16
Page 3 [1]  69/7
Page 37 [1]  78/13
Page 410 [1]  80/22
pages [10]  5/18 6/19 9/16 9/24 10/3
 18/16 51/3 80/8 85/2 85/23
Pages 121 [1]  6/19
Pages 403 [1]  18/16
Pages 456 [1]  10/3
Pages 460 [4]  5/18 9/16 9/24 85/2
paid [5]  22/25 53/5 54/13 94/7 107/12
panels [1]  63/8
paper [2]  23/24 91/23
papers [3]  56/11 75/7 132/11
paragraph [5]  22/24 23/3 23/6 66/6 69/7
Paragraph 40 [1]  66/6
paragraphs [3]  44/10 66/5 66/6
parallel [4]  36/24 86/8 87/14 87/16
Park [1]  19/18
part [21]  6/18 9/8 19/1 29/6 40/22 40/24
 72/11 79/22 81/9 84/7 85/15 88/18 96/2
 98/19 99/19 101/20 102/25 105/25 116/21
 119/3 127/15
participants [1]  32/25
participate [22]  29/8 30/1 30/13 30/21
 31/15 31/22 32/1 32/12 32/23 33/6 40/21
 40/22 41/3 41/14 42/17 45/5 63/9 88/14
 102/24 107/3 108/12 108/13
participated [1]  101/17
participates [2]  106/25 108/15
participating [10]  29/10 29/22 30/6
 44/23 84/17 90/24 102/13 104/10 113/23
 115/15
participation [15]  9/12 20/10 31/20 35/1
 35/4 39/20 39/23 40/12 40/25 42/1 42/5
 42/12 45/4 91/1 108/1
particular [20]  7/25 8/23 9/18 12/9
 12/18 17/5 19/1 22/3 22/22 39/15 51/7

59/20 79/1 79/18 79/20 81/13 83/16 94/10
 94/10 113/10
particularly [5]  29/6 73/13 75/25
parties [9]  4/23 5/4 8/17 20/15 60/7
 68/17 95/4 100/24 114/4
partly [1]  92/5
parts [3]  6/6 50/13 81/21
party [17]  24/5 24/5 35/23 52/17 59/7
 64/18 64/20 81/19 94/7 94/10 103/16
 103/21 107/12 108/10 115/17 123/13
 128/12
passed [2]  19/4 48/17
past [1]  77/5
patent [9]  4/22 32/16 32/17 119/12
 119/22 120/7 120/21 121/15 124/23
patented [6]  119/19 120/11 120/15 120/18
 120/25 120/25
path [2]  74/22 74/23
patience [1]  132/17
patient [19]  24/3 52/8 52/19 52/21 53/1
 58/18 58/20 59/5 59/6 60/4 60/4 61/17
 61/19 62/16 62/18 62/21 62/22 63/13
 103/24
patient's [1]  103/23
patients [25]  24/2 49/7 52/5 52/11 52/11
 53/4 54/12 54/17 55/4 56/20 64/16 65/17
 67/2 75/9 85/25 86/11 94/16 95/3 101/16
 103/6 103/11 103/17 103/20 114/11 128/19
pause [1]  25/10
pay [15]  23/8 33/23 49/9 52/6 52/7 52/7
 53/18 53/20 54/12 54/18 54/20 55/2 58/23
 90/21 96/14
paying [4]  39/1 53/17 56/2 90/22
payment [2]  99/9 114/3
payments [1]  110/14
pays [1]  24/4
Pedley [1]  52/1
Pedley's [1]  61/24
penalizing [2]  120/7 120/19
penalties [9]  66/8 86/9 86/9 102/18
 105/1 110/17 110/20 111/12 113/22
penalty [2]  111/1 111/8
pending [7]  2/4 3/13 34/20 75/11 105/6
 129/19 130/5
Penn [4]  106/21 106/22 108/23 109/9
pennies [3]  5/9 5/9 9/11
penny [8]  40/9 45/21 46/14 50/4 52/13
 55/6 55/14 73/8
people [8]  18/20 38/21 48/11 53/5 63/13
 81/20 95/3 95/6
per [9]  5/9 23/12 43/11 43/12 43/14
 43/16 43/21 43/23 44/2
perceives [2]  118/14 118/21
percent [9]  10/6 31/4 51/10 53/16 53/16
 60/25 60/25 120/15 123/12
percentage [2]  122/25 123/1
perfectly [2]  13/6 37/9
perhaps [7]  6/18 72/16 80/12 85/15 85/16
 99/9 100/5
period [2]  23/4 120/22
permanent [1]  105/3
permissible [1]  126/10
permission [4]  59/11 59/20 63/22 80/3
permit [1]  125/14
permits [1]  73/16
permitting [1]  5/1
PERRY [12]  1/14 2/10 4/4 20/6 21/7 21/19
 42/14 46/3 46/20 77/11 90/2 131/24
person [12]  12/11 35/23 38/18 38/21
 40/13 44/21 45/24 52/25 58/18 60/4 61/18
 106/24
person's [2]  44/21 94/2
personal [1]  39/9
personally [1]  100/6
persons [1]  56/19
perspective [3]  46/18 131/24 132/15
persuade [1]  114/15
persuaded [2]  108/4 108/18
persuasive [1]  113/7
pervasive [2]  113/14 114/7
Petroleum [1]  19/12
Pharm [1]  41/8
pharmaceutical [11]  2/11 3/10 55/24 60/9
 60/16 62/24 100/21 101/1 101/21 120/3
 121/11
pharmaceuticals [9]  1/3 1/18 2/5 2/19
 2/22 20/5 100/25 101/2 114/19
pharmacies [62]  16/4 37/16 38/4 54/6
 54/19 59/8 60/23 61/25 62/3 62/9 63/11
 66/25 68/13 68/21 68/24 69/2 73/16 73/25

**P**

**pharmacies [44]** 7/13 81/15 82/7 84/9
84/13 89/6 91/18 94/14 96/1 96/3 96/7
96/13 96/14 96/20 98/5 103/5 103/6 103/9
103/15 104/1 104/4 104/11 104/14 104/20
104/20 107/23 109/6 114/12 114/14 116/9
116/13 116/18 116/20 117/1 117/2 117/4
117/7 117/13 118/14 118/16 119/5 124/1
124/15 125/14
**pharmacy [73]** 3/12 9/23 10/19 11/2 12/1
12/6 12/13 13/17 13/20 14/2 15/17 20/12
21/18 21/18 23/1 23/2 23/23 23/25 26/20
26/21 26/25 27/1 28/15 35/24 37/24 38/7
38/25 47/1 51/6 51/15 51/18 51/21 52/5
52/9 52/16 53/5 54/1 55/24 58/20 59/15
59/25 60/1 60/3 60/12 60/14 60/21 61/3
61/14 62/20 63/6 64/15 65/14 65/18 67/19
69/11 69/14 72/15 74/4 74/6 75/15 80/8
85/3 92/3 95/14 96/22 97/15 97/19 98/14
100/22 103/21 104/25 115/4 118/12
**Phil [1]** 2/10
**PHILIP [1]** 1/14
**phone [1]** 19/14
**phrase [1]** 43/11
**phrased [2]** 14/17 45/19
**PhRMA [16]** 1/14 2/11 2/16 3/10 12/22
22/18 65/4 75/4 92/6 102/21 112/25 113/5
123/21 126/6 126/9 126/16
**PhRMA's [2]** 66/5 127/13
**physical [4]** 43/8 43/12 45/8 109/14
**PI [2]** 26/3 62/5
**PICHINI [2]** 1/19 2/22
**pick [1]** 74/6
**picked [1]** 4/15
**picks [1]** 24/3
**piece [3]** 91/23 98/25 99/25
**Pike [1]** 128/7
**pills [2]** 31/24 73/21
**place [18]** 8/18 12/10 12/11 13/18 21/16
22/3 36/24 39/16 43/3 50/2 53/22 54/25
62/25 89/25 95/9 118/18 122/20 125/6
**placed [4]** 12/3 12/9 53/8 125/16
**placing [2]** 14/2 104/3
**plain [2]** 17/2 64/1
**Plainly [1]** 108/20
**plaintiff [15]** 1/4 1/14 1/16 1/18 2/16
3/10 44/8 67/10 76/19 104/2 105/10
118/11 123/14 126/12 128/25
**plaintiff's [1]** 107/25
**Plaintiffs [62]** 2/8 3/25 33/18 40/3
40/18 41/18 55/8 64/5 64/13 65/3 65/25
66/3 66/11 67/13 68/16 68/20 70/14 74/17
76/25 89/14 92/24 96/9 97/9 98/8 100/25
101/6 101/7 101/8 102/23 103/12 103/14
103/25 104/12 105/2 111/25 112/2 112/21
112/23 113/13 114/6 114/15 114/24 115/11
116/14 116/17 117/25 118/2 118/5 118/19
119/6 119/10 119/13 121/9 121/13 121/7
126/14 126/16 126/18 127/4 127/5 127/24
128/22
**Plaintiffs' [12]** 36/22 40/20 64/7 95/7
98/20 105/23 116/4 116/23 117/17 121/21
124/18 128/16
**planning [1]** 3/13
**plays [1]** 72/7
**please [2]** 2/9 20/4
**pleased [2]** 3/3 4/3
**pocket [2]** 29/17 29/17
**podium [1]** 63/23
**POHL [3]** 1/17 3/1 52/24
**point [43]** 12/17 13/24 13/24 18/4 19/20
22/1 22/22 24/8 27/2 27/11 28/18 29/23
32/13 39/5 42/9 48/22 49/2 52/9 52/9
52/12 52/13 53/21 54/14 55/22 61/2 62/8
67/14 77/5 77/12 79/1 86/2 89/4 89/11
90/14 93/8 93/10 93/11 93/25 95/10 95/22
96/8 96/8 126/20
**pointed [5]** 36/23 42/14 50/1 64/25 67/13
**points [7]** 39/18 47/11 70/21 78/9 88/3
91/13 100/5
**police [4]** 39/14 49/18 117/9 117/14
**policies [25]** 12/12 12/12 12/13 23/7
24/18 24/19 37/13 37/13 44/11 54/22
60/6 62/24 75/14 76/4 80/16 80/17 90/4
90/8 90/13 91/20 93/1 96/15 96/17 98/2
104/12
**policy [16]** 13/17 13/17 17/4 18/1 21/15
24/18 26/21 27/1 46/24 47/3 79/21 79/21
80/8 89/14 89/14 110/1
**poor [1]** 102/4

**Pork [4]** 82/4 82/25 127/17 128/3
**portion [2]** 19/13 103/19
**portions [1]** 124/23
**poses [1]** 118/5
**position [10]** 21/11 36/21 36/25 36/25
37/25 38/5 59/14 94/23 95/15 104/5
**possession [1]** 95/2
**possibility [1]** 108/1
**possible [4]** 20/1 64/8 86/16 111/7
**potentially [1]** 35/1
**power [10]** 19/3 39/14 48/12 49/18 67/8
110/14 117/14 120/7 122/1 127/19
**powers [4]** 48/15 66/21 82/10 117/9
**PPA [5]** 40/4 41/4 58/17 101/22 102/8
**PPAs [2]** 102/25 115/18
**practical [4]** 12/2 16/4 16/8 124/3
**practically [2]** 112/23 126/7
**practice [3]** 98/11 98/13 104/22
**practices [7]** 98/7 98/10 104/5 104/7
104/13 116/8 116/10
**pre [1]** 26/11
**pre-existing [1]** 26/11
**precise [1]** 57/8
**preclude [3]** 64/2 67/21 115/1
**precludes [3]** 68/15 75/13 122/19
**precluding [1]** 75/22
**predominating [1]** 113/15
**preempt [6]** 99/4 112/7 112/11 116/15
116/19 117/8
**preempted [16]** 13/9 20/25 26/12 28/20
49/23 63/18 71/9 71/13 80/7 90/25 112/1
112/20 116/1 119/10 119/22 121/20
**preemption [70]** 4/12 4/22 4/23 6/4 14/12
15/3 19/23 20/6 20/8 25/12 27/3 28/3
32/14 32/16 32/16 32/17 33/2 33/4 33/9
34/16 35/9 35/12 35/16 42/15 45/11 47/10
47/13 47/19 50/7 50/7 56/7 56/8 66/17
66/18 67/24 68/5 69/23 70/7 73/13 78/12
80/20 80/25 81/1 81/3 83/7 83/17 83/20
83/21 83/25 88/5 88/8 88/15 91/9 93/8
111/25 112/10 112/11 112/12 112/14
112/16 112/22 112/22 112/22 113/8 113/9
117/17 117/18 117/18 119/9 121/15
**preemptive [2]** 18/12 19/8
**preempts [1]** 117/3
**preexisting [2]** 26/14 67/6
**preferable [1]** 132/13
**preliminary [34]** 1/10 2/7 3/14 3/15 3/20
22/19 36/8 37/11 44/10 58/2 64/23 72/19
75/1 75/4 75/25 90/9 90/12 93/6 101/8
101/10 101/15 105/3 105/6 105/7 105/9
105/12 105/17 105/24 128/14 128/16 129/1
129/10 130/25 131/3
**premise [2]** 27/3 27/5
**premiums [1]** 54/18
**prepare [1]** 77/16
**prerequisite [1]** 13/11
**prescribed [5]** 25/19 103/10 118/23
120/13 121/7
**prescribes [1]** 22/11
**prescribing [2]** 25/17 120/19
**prescription [6]** 52/6 74/4 119/16 119/19
125/10 126/23
**prescriptions [3]** 9/22 12/23 86/10
**present [1]** 52/5
**presentation [2]** 35/11 129/8
**presented [4]** 35/10 36/3 74/23 112/23
**preserved [1]** 49/21
**presuming [2]** 75/13 87/21
**presumption [4]** 88/5 88/7 88/15 115/6
**pretty [3]** 38/10 64/11 84/18
**prevail [3]** 37/25 105/9 112/13
**prevent [3]** 56/5 60/21 60/23
**preventing [1]** 98/15
**prevents [1]** 43/22
**preview [1]** 62/12
**previous [1]** 43/1
**previously [2]** 3/14 46/3
**price [93]** 8/3 8/12 8/14 8/15 8/16 8/17
12/20 14/18 14/21 14/22 14/23 16/7 20/13
20/20 21/17 22/6 22/6 22/8 22/12 22/14
22/20 23/5 23/8 24/4 24/9 25/16 25/17
25/18 25/18 25/22 25/24 25/25 25/25 28/9
29/1 32/18 32/20 37/2 37/15 38/3 38/7
39/2 39/15 42/12 45/14 49/10 49/12 50/3
51/7 51/11 52/6 52/7 52/13 53/6 53/9
54/2 54/12 54/13 55/2 55/5 55/13 55/15
56/1 58/23 70/16 71/23 73/5 79/13 84/13
89/17 92/21 96/12 96/14 96/22 96/24
101/24 103/18 103/23 107/1 118/22 119/17

119/20 120/15 120/16 120/18 120/19 121/7
124/22 125/3 125/18 125/23 125/24 128/5
**priced [2]** 73/6 84/9 98/5 102/11
104/13 116/2 119/2
**prices [35]** 5/7 5/7 9/11 21/9 22/25 25/5
28/15 40/9 45/21 46/25 50/4 54/10 64/18
68/5 71/3 73/18 76/17 78/20 78/22 91/19
92/2 92/2 99/17 102/5 103/2 120/8 120/12
120/20 121/1 121/4 123/22 124/24 125/7
125/17 127/11
**pricing [33]** 7/22 14/16 20/15 20/21
20/25 21/5 23/16 23/21 25/7 25/9 27/6
28/6 28/18 28/19 28/24 29/2 29/3 31/12
72/1 73/4 73/22 76/13 78/17 82/2 87/21
88/25 90/6 101/18 101/21 113/16 114/3
120/14 128/5
**prima [1]** 120/13
**primarily [1]** 22/17
**principal [3]** 18/15 19/20 46/8
**principle [4]** 80/22 82/3 83/17 122/6
**PRINS [2]** 1/15 2/15
**prior [1]** 24/6
**private [30]** 5/4 35/23 36/1 38/16 38/18
38/21 39/8 44/20 44/21 45/23 48/22 73/16
73/25 74/6 74/12 76/24 94/2 94/7 94/9
94/10 106/4 106/8 106/10 107/9 107/12
107/21 108/2 108/10 109/22 115/20
**probably [10]** 13/19 38/15 49/23 57/18
58/9 66/17 86/16 98/20 100/17 131/12
**probe [1]** 77/20
**probed [1]** 25/15
**problem [13]** 13/14 35/21 36/19 37/21
42/4 42/15 42/16 50/9 57/1 58/24 59/1
62/14 93/21
**problems [2]** 47/5 95/21
**proceed [3]** 6/10 91/25 128/10
**proceeding [9]** 86/25 87/1 87/1 87/8
87/14 87/15 87/15 87/16 124/21
**proceedings [1]** 133/8
**process [9]** 12/5 82/11 86/4 86/6 86/8
86/15 102/19 114/5 119/1
**Producers [4]** 82/4 82/25 127/18 128/3
**product [2]** 25/18 44/15
**production [1]** 124/25
**productive [1]** 106/13
**products [3]** 10/12 108/10 108/20
**profit [4]** 38/25 44/22 55/13 95/4
**profits [1]** 120/3
**program [111]** 5/2 5/3 5/15 5/16 6/10
6/15 6/16 9/2 9/8 9/9 9/12 9/25 10/5
11/7 11/12 11/21 12/24 13/5 13/18 13/19
15/7 20/11 26/7 26/13 26/13 26/18 26/19
27/14 29/9 29/10 29/12 29/22 30/2 30/7
30/8 30/11 30/13 30/16 30/21 31/5 31/20
32/1 32/2 32/9 32/10 32/11 32/12 32/25
33/7 34/25 35/2 40/21 40/24 40/24 41/13
42/6 42/13 44/23 45/6 47/15 48/18 48/22
49/3 49/6 54/16 56/16 59/16 59/18 59/19
60/8 60/17 60/25 61/24 64/19 64/21 66/10
76/10 84/8 84/16 84/17 84/20 84/25 85/5
85/10 85/13 85/14 85/15 85/17 85/20
86/19 86/23 88/15 89/9 90/25 91/2 101/18
101/18 101/21 102/8 102/12 102/15 102/19
103/3 103/4 103/14 106/25 109/4 109/11
113/19 114/2 114/16
**program's [2]** 15/5 114/6
**programming [1]** 8/22
**programs [15]** 6/8 11/19 40/23 40/23
40/25 41/1 41/4 59/18 67/6 84/22 107/25
108/1 108/12 108/13 108/15
**prohibit [6]** 15/15 45/16 45/21 68/12
69/20 93/16
**prohibited [6]** 17/6 119/17 122/13 124/21
124/24 125/22
**prohibiting [1]** 104/18
**prohibition [3]** 97/13 118/16 122/5
**prohibitions [1]** 113/18
**prohibits [5]** 53/13 66/24 70/5 75/13
97/18
**proliferation [1]** 65/14
**promise [1]** 56/23
**promote [1]** 109/12
**promotes [1]** 65/13
**promptly [1]** 130/8
**prong [2]** 71/1 77/5
**pronounced [1]** 115/3
**proper [3]** 6/25 7/2 46/11
**properly [2]** 59/3 62/22
**property [50]** 35/22 35/25 36/1 36/16
37/10 38/12 38/17 38/25 39/1 39/8 39/9

**P**

**property...** [39] 19/24 40/7 41/25 42/11 42/22 42/23 43/3 43/6 43/12 43/15 43/20 43/21 43/22 44/1 44/2 44/21 45/8 45/17 45/24 46/13 56/6 56/6 74/12 76/24 93/15 93/17 94/6 95/6 95/8 106/5 106/8 106/10 106/13 106/14 107/2 107/11 108/3 109/11 109/14
**proposed** [2] 16/11 81/17
**proposition** [9] 38/11 68/2 76/21 81/23 107/6 108/20 116/1 117/5 120/2
**propositions** [3] 57/7 84/5 105/19
**protect** [2] 91/24 110/4
**protected** [1] 53/12
**protection** [5] 46/22 65/8 67/22 72/14 114/22
**protection-driven** [1] 67/22
**prove** [1] 120/17
**proven** [1] 103/7
**provide** [18] 7/21 9/22 10/21 12/20 52/10 52/12 55/3 57/1 67/3 70/10 74/10 76/10 84/4 102/4 115/20 119/24 120/21 121/16
**provided** [6] 11/17 37/15 78/25 86/20 114/5 124/4
**provider** [1] 68/7
**providers** [4] 81/19 101/16 101/24 110/5
**provides** [8] 12/19 82/25 102/19 106/4 110/10 112/4 118/21 119/3
**provision** [19] 7/10 7/12 7/20 7/25 8/2 8/4 8/8 10/2 9/12 12/17 17/5 17/11 18/16 21/19 86/5 89/23 92/7 129/4 129/6
**provisions** [6] 4/9 6/1 6/2 8/18 48/21 119/11
**proximate** [1] 60/17
**public** [30] 38/17 38/22 39/3 44/18 44/19 50/17 64/3 67/21 74/8 74/13 77/3 93/23 94/3 94/12 94/18 94/19 94/19 102/2 105/14 106/5 107/14 107/17 109/11 109/13 109/22 109/24 110/6 115/2 128/15 128/22
**publicly** [1] 123/7
**publicly-held** [1] 123/7
**pull** [4] 14/21 30/11 31/18 33/7
**punish** [6] 18/19 18/20 18/21 18/23 18/25 110/18
**punishment** [2] 110/12 110/14
**purchase** [11] 12/15 15/24 16/15 17/6 17/16 21/16 21/17 37/2 64/20 79/13 103/17
**purchased** [24] 16/24 21/8 21/9 21/12 21/13 21/21 21/24 21/24 21/25 22/2 22/4 22/5 23/1 68/22 68/23 71/5 76/17 89/24 89/25 92/16 98/17 99/18 99/20 115/15
**purchaser** [1] 67/1
**purchasers** [1] 103/17
**purchases** [1] 49/22
**purely** [4] 9/7 72/5 80/15 80/18
**purport** [1] 118/25
**purports** [1] 65/1
**purpose** [25] 2/7 5/13 6/20 11/6 38/19 42/15 48/4 48/5 50/21 58/1 69/21 74/8 77/17 94/6 94/9 107/11 107/15 109/22 109/25 110/4 110/6 112/14 118/10 122/18 128/21
**purposes** [7] 4/6 64/22 67/24 89/6 117/22 118/4 120/21
**pursuant** [2] 130/13 133/6
**pursue** [4] 48/24 57/23 58/6 59/21
**purview** [1] 66/10
**put** [21] 10/18 11/12 11/24 20/18 22/9 23/24 23/25 29/23 51/14 53/13 54/1 61/25 62/24 63/12 84/1 84/14 85/12 86/20 87/18 90/5 91/3
**puts** [1] 13/25
**putting** [3] 31/13 58/1 84/6

**Q**

**quacking** [1] 28/17
**quacks** [1] 28/5
**qualified** [1] 86/11
**qualifies** [1] 61/19
**qualify** [1] 76/14
**question** [32] 8/6 8/10 9/1 9/4 9/14 9/25 10/2 10/8 11/16 16/5 16/8 18/19 26/2 28/2 28/22 34/3 46/2 56/14 56/18 61/6 71/6 74/19 78/19 81/8 83/1 83/4 83/14 86/3 88/17 90/17 97/7 97/24
**questioning** [1] 14/19
**questions** [9] 16/17 21/3 25/10 46/1 47/7 56/13 56/17 61/12 73/12
**quick** [1] 78/9

**quickly** [1] 33/11
**quite** [1] 34/22
**quote** [43] 4/19 7/4 7/6 7/24 17/23 22/24 23/3 23/7 33/17 34/3 34/6 88/8 94/9 94/10 95/13 106/5 106/6 106/9 106/10 106/11 106/12 106/14 106/14 106/15 106/16 106/20 107/1 107/4 107/10 107/13 107/17 108/3 110/1 110/2 110/10 110/12 110/13 110/15 110/21 111/15 111/16 111/19 111/20 112/4 112/5 112/14 112/15 114/19 115/6 115/8 117/19 117/20 117/20 117/22 121/5 121/5 122/1 122/1 122/7 122/9 122/12 122/13 122/16 122/18 122/19 122/22 123/15 123/17 123/19 123/20 124/22 124/24 126/3 126/5
**quotes** [1] 111/21
**quoting** [2] 5/13 33/17

**R**

**rabbit** [1] 28/5
**raise** [2] 42/12 127/7
**raised** [2] 3/23 4/23
**raises** [1] 39/9
**raising** [1] 131/19
**ramifications** [1] 65/2
**ran** [1] 60/17
**range** [2] 84/24 89/9
**rare** [1] 12/5
**rather** [2] 38/22 83/9
**reach** [1] 126/3
**read** [13] 10/20 16/23 17/6 41/9 54/21 64/12 70/12 80/23 86/23 89/18 89/20 129/5 131/7
**readily** [1] 109/10
**reading** [9] 17/21 17/24 17/24 17/25 18/1 18/2 46/8 62/17 97/11
**reaffirmed** [1] 38/13
**real** [3] 13/24 17/23 86/10
**reality** [2] 5/9 12/3
**realized** [1] 81/15
**really** [24] 6/5 14/15 29/20 29/23 42/9 47/18 49/17 49/24 50/2 50/3 54/15 57/24 58/10 59/9 61/18 62/21 62/25 80/20 84/2 89/11 90/3 91/22 95/5 99/25
**Realtime** [1] 133/5
**Rear** [1] 52/1
**reason** [11] 28/11 33/4 36/22 46/9 46/11 48/8 56/22 58/12 64/6 77/20 96/17
**reasonable** [14] 10/15 10/16 11/4 11/5 13/21 13/25 57/11 57/12 59/10 79/25 96/11 96/24 97/1 121/4
**reasoned** [1] 107/25
**reasoning** [1] 108/3
**reasons** [8] 44/24 45/13 56/3 63/3 65/9 101/14 117/16 129/10
**reassurance** [1] 90/10
**rebalancing** [1] 120/8
**rebates** [1] 23/4
**rebut** [1] 78/5
**rebuttal** [2] 20/2 77/16
**receive** [3] 69/12 97/16 97/20
**received** [3] 51/12 61/3 76/3
**recent** [8] 5/18 6/20 34/12 53/3 82/4 103/13 104/2 113/2
**recently** [4] 5/8 59/12 108/5 118/8
**recess** [5] 78/1 100/11 100/13 100/14 132/20
**recognition** [1] 115/4
**recognize** [2] 31/12 104/4
**recognized** [9] 39/3 109/9 113/16 114/9 114/10 116/12 119/22 121/3 122/4
**record** [16] 2/9 37/11 46/24 50/20 52/3 55/21 55/23 58/21 60/5 78/22 80/23 96/16 126/11 127/9 128/8 129/7
**recourses** [1] 115/16
**recover** [2] 33/18 34/4
**red** [1] 65/12
**reduced** [3] 40/4 71/3 99/17
**reduces** [1] 30/13
**refer** [3] 48/5 100/24 112/10
**reference** [4] 66/3 67/6 67/9 75/18
**referenced** [5] 22/18 71/11 71/12 74/25 99/13
**references** [3] 68/7 73/4 99/12
**referred** [5] 5/11 101/6 103/12 106/21 124/20
**referring** [2] 69/4 92/12
**refers** [1] 48/17
**reflect** [1] 109/25
**reflected** [3] 114/25 115/4 115/6

**reflecting** [1] 113/14
**refunds** [1] 76/13
**refusal** [1] 79/19
**refuse** [1] 46/12
**refused** [2] 45/3 70/15
**refusing** [1] 66/24
**regard** [1] 126/7
**regarded** [2] 65/5 114/20
**regarding** [4] 65/19 75/15 76/11 76/13
**regardless** [4] 28/24 31/14 122/17 126/1
**regime** [2] 18/6 95/23
**Registered** [1] 133/4
**regular** [2] 44/19 103/15
**regulate** [24] 15/13 17/14 21/5 22/14 39/12 48/6 50/2 64/1 65/1 67/6 76/20 81/18 82/1 82/7 82/12 97/12 97/22 99/3 100/1 100/8 114/10 122/2 122/8 123/15
**regulated** [13] 20/22 31/12 35/19 48/19 58/5 88/13 99/2 99/11 100/2 106/25 107/2 107/3 115/5
**regulates** [14] 20/15 20/25 21/11 25/9 28/18 50/3 66/20 71/7 71/8 88/8 88/25 95/12 114/13 123/25
**regulating** [13] 14/15 14/16 14/18 14/22 14/22 25/16 25/25 31/11 70/5 78/15 116/1 122/24 123/4
**regulation** [43] 22/11 25/20 25/24 28/7 28/19 31/23 32/18 32/20 42/2 42/2 42/10 43/22 44/19 44/20 45/1 45/13 45/14 45/22 54/7 65/6 65/8 71/13 75/25 82/22 88/6 106/12 106/14 106/17 106/18 106/20 107/1 107/14 109/13 113/10 114/21 114/23 115/7 115/24 116/19 122/5 122/11 122/12 124/12
**regulations** [10] 41/15 41/16 41/16 41/25 55/13 67/8 67/22 109/5 109/15 133/10
**regulatory** [16] 15/6 42/19 42/20 42/25 43/8 43/13 44/3 44/6 44/7 45/7 50/15 106/10 108/25 109/19 113/14 113/15
**rehash** [2] 47/10 77/6
**reimbursed** [1] 84/20
**reimbursement** [1] 103/23
**rein** [1] 6/15
**reins** [1] 60/19
**reinstitute** [1] 44/12
**reject** [1] 37/22
**rejected** [2] 41/23 107/20
**relate** [1] 35/13
**related** [2] 6/9 101/4
**relates** [1] 120/9
**relating** [1] 115/7
**relationship** [7] 61/13 61/22 62/4 62/10 88/9 110/25 111/2
**relationships** [1] 61/8
**relevant** [6] 16/21 16/23 23/21 50/12 51/2 66/12
**reliance** [6] 39/20 40/12 42/24 116/4 124/18 127/16
**relief** [9] 70/18 74/11 101/4 105/3 105/12 105/17 118/25 129/7 129/9
**relies** [1] 22/17
**rely** [8] 21/19 68/1 77/4 80/8 91/24 93/2 127/14 131/4
**relying** [1] 75/22
**remain** [1] 54/23
**remainder** [1] 55/19
**remaining** [5] 3/20 77/6 101/12 102/23 117/11
**remarks** [1] 35/9
**remedies** [7] 68/9 68/10 71/18 72/9 72/23 72/25 80/5
**remedy** [18] 6/25 7/2 7/6 7/8 7/8 7/9 13/14 58/3 58/4 59/16 59/19 70/10 78/20 94/2 94/22 95/5 105/8 128/25
**remember** [3] 8/10 9/6 60/8
**remora** [2] 32/6 32/8
**render** [3] 100/18 109/1 124/11
**renewable** [1] 19/13
**Reno** [1] 111/21
**repeat** [1] 20/16
**repeatedly** [3] 14/20 19/9 38/14
**replace** [1] 37/22
**replenish** [2] 53/8 103/19
**replenishment** [20] 5/1 23/20 23/22 24/9 24/15 24/22 25/8 44/4 50/12 53/22 59/4 63/12 65/11 66/4 88/19 88/20 88/23 89/2 89/5 103/13
**reply** [6] 13/2 39/22 75/17 75/19 131/13 131/17
**reported** [2] 1/23 133/8
**Reporter** [5] 1/24 133/1 133/4 133/5

**R**

**Reporter...** [1] 113/24
**reporting** [1] 113/22
**reports** [1] 60/6
**represented** [1] 123/1
**represents** [2] 64/14 102/21
**Republic** [1] 38/12
**repudiated** [2] 36/10 39/19
**request** [5] 24/9 105/24 128/17 131/20 132/10
**requests** [1] 24/12
**require** [15] 8/2 9/4 10/1 22/25 68/3 69/15 72/24 74/2 90/17 91/20 96/6 104/10 116/25 117/3 131/1
**required** [11] 9/2 11/7 11/16 23/7 29/4 92/20 101/20 107/3 110/11 114/4 128/11
**requirement** [9] 9/19 9/23 13/22 35/22 40/18 73/15 101/25 118/13 125/13
**requirements** [15] 6/8 7/25 66/14 99/10 102/12 108/17 113/22 118/1 118/7 119/18 124/9 124/12 124/16 126/25 127/10
**requires** [18] 7/14 7/22 10/9 14/8 14/9 16/15 27/14 68/15 73/25 89/6 89/8 89/10 90/18 90/21 93/15 93/19 107/22 108/16
**requiring** [3] 55/14 96/3 109/5
**resale** [1] 119/18
**research** [5] 2/11 44/15 101/1 102/22 119/25
**resell** [1] 58/17
**reselling** [1] 102/10
**reserve** [1] 20/1
**resolution** [4] 11/14 79/3 114/5 119/1
**resolve** [1] 102/19
**resolved** [2] 11/12 71/23
**resolving** [2] 11/13 87/1
**resourced** [1] 103/11
**resources** [5] 102/16 103/8 105/20 107/19 119/25
**respect** [5] 27/21 29/25 46/5 58/15 107/15
**respectfully** [1] 21/5
**respectively** [2] 89/4 116/7
**respond** [3] 98/23 124/8 131/20
**response** [6] 26/3 33/16 34/1 78/18 130/14 130/16
**rest** [2] 91/24 132/18
**restate** [1] 72/23
**restaurants** [1] 66/22
**restoring** [1] 23/14
**restrain** [1] 124/3
**restraint** [1] 123/19
**restrict** [6] 15/15 55/24 69/20 84/8 104/13 117/6
**restricted** [1] 84/9
**restricting** [3] 98/4 98/4 104/18
**restriction** [6] 23/17 97/13 98/14 98/19 98/21 118/17
**restrictions** [6] 7/24 104/3 109/6 118/18 119/2 119/4
**restrictive** [1] 57/2
**restricts** [3] 25/5 97/17 117/2
**rests** [1] 111/14
**result** [6] 22/21 30/10 97/22 102/7 104/25 108/2
**resulted** [3] 23/8 104/1 119/19
**retail** [2] 31/9 126/5
**retard** [1] 48/12
**retroactively** [1] 52/17
**return** [2] 47/19 93/10
**revenue** [15] 22/21 23/10 23/12 23/15 25/7 27/12 29/20 30/4 54/16 54/16 54/25 55/5 55/5 55/12 90/23
**reverse** [1] 49/4
**review** [2] 62/8 127/9
**reviewed** [1] 113/6
**rewarding** [1] 121/4
**right** [38] 2/13 3/8 9/1 10/21 17/13 22/8 22/9 26/12 27/11 32/13 38/2 42/9 42/19 47/4 47/6 49/16 50/25 55/9 56/17 56/23 57/2 63/6 63/21 70/14 77/8 77/20 84/8 86/18 87/7 87/10 87/25 100/9 105/9 115/20 116/15 117/6 129/11 132/10
**rights** [9] 6/10 13/6 13/12 13/13 39/25 40/8 56/6 95/8 119/24
**ripe** [3] 111/14 111/19 111/24
**rise** [4] 67/24 77/25 100/12 132/19
**risk** [1] 6/16
**RMR** [2] 1/23 133/16
**road** [1] 74/21
**romanette** [1] 99/25

**Ronda** [3] 1/23 133/4 133/16
**room** [2] 114/16 117/14
**Ross** [1] 123/13
**roughly** [1] 29/24
**rule** [4] 57/17 63/9 79/3 130/5
**ruled** [3] 34/15 34/18 61/11
**rules** [6] 55/9 55/14 57/3 57/22 59/13 60/11
**ruling** [7] 34/20 65/24 100/18 130/7 130/17 131/10 131/19
**rulings** [2] 38/11 130/16
**run** [5] 28/1 83/10 86/7 97/10 127/18
**runs** [3] 22/13 56/8 61/24

**S**

**sacrosanct** [1] 66/12
**safety** [3] 66/21 88/6 115/7
**said** [54] 6/7 6/14 6/21 9/14 10/24 10/25 13/3 14/20 18/24 20/16 20/20 21/7 25/14 26/3 31/1 31/7 34/6 35/20 37/19 38/13 50/5 61/23 62/6 67/15 67/15 69/3 69/19 69/24 70/10 72/2 72/7 73/2 73/20 74/18 78/11 78/18 79/15 84/18 86/3 88/7 89/20 90/3 91/25 92/19 93/25 94/5 94/8 94/24 95/11 96/2 100/5 116/22 130/22 130/25
**sale** [22] 10/15 12/14 14/4 16/14 21/18 22/3 24/6 24/9 37/2 38/2 39/12 43/4 50/4 52/9 69/1 73/16 73/17 73/25 92/9 124/23 125/24 125/25
**Salerno** [1] 66/2
**sales** [22] 20/12 20/13 26/20 26/25 30/19 49/25 68/21 89/7 89/9 96/3 96/6 96/20 97/1 108/21 124/13 124/16 125/23 125/25 126/1 126/5 126/8 126/14
**same** [35] 14/23 19/13 19/14 19/20 23/6 23/24 23/24 23/24 23/25 24/1 24/2 24/10 24/20 31/21 36/16 40/15 43/11 46/2 51/9 51/18 53/13 53/14 54/5 54/5 54/9 54/10 67/18 69/14 71/10 90/11 91/7 95/22 99/9 107/6 115/2
**sanctions** [2] 90/8 110/17
**Sanofi** [5] 5/19 37/19 104/8 116/6 116/21
**Sanofi-Aventis** [2] 104/8 116/6
**Santa** [3] 5/22 48/20 115/13
**satisfactory** [1] 90/6
**satisfied** [2] 105/17 105/18
**say** [50] 12/2 15/12 17/1 17/16 18/11 22/4 25/14 27/3 27/9 28/3 28/16 28/22 30/20 31/21 33/21 36/7 37/5 42/11 43/3 46/12 49/5 49/13 49/19 51/6 51/10 55/17 57/3 57/10 60/20 63/16 73/7 80/23 81/3 82/5 85/12 87/23 89/17 90/16 90/22 91/21 92/8 92/22 94/13 94/21 97/3 112/7 120/21 125/24 129/4 131/16
**saying** [17] 10/20 17/15 28/8 31/10 46/7 80/16 86/7 86/24 87/7 87/12 87/18 87/20 87/24 88/18 89/19 90/20 91/8
**says** [26] 15/3 15/14 16/21 17/5 17/19 22/24 23/3 26/24 36/12 36/20 39/24 40/20 41/25 42/18 45/15 45/20 49/10 55/11 58/15 66/10 69/19 72/21 75/18 76/19 79/23 95/14
**Scalia** [1] 15/2
**Scalia's** [1] 18/10
**scattered** [1] 123/9
**scheduled** [1] 3/19
**Scheidler's** [1] 44/9
**scheme** [8] 35/18 47/17 47/17 59/21 59/22 113/14 119/23 120/4
**Scheulen** [4] 10/18 12/18 16/2 78/23
**school** [1] 52/24
**scope** [10] 57/4 71/8 76/22 76/22 84/24 85/10 85/21 86/22 110/18 120/25
**SDNY** [1] 111/20
**se** [7] 43/11 43/12 43/14 43/16 43/21 43/23 44/2
**seated** [2] 2/3 100/15
**second** [25] 8/1 9/23 12/1 22/15 25/5 36/21 37/8 39/20 43/13 43/19 44/13 45/4 47/25 53/10 55/7 57/15 62/15 69/7 80/19 88/17 93/10 93/22 107/8 125/6 125/17
**secret** [2] 53/2 59/8
**Secretary** [3] 30/9 57/3 57/5
**section** [6] 16/23 26/11 43/2 67/14 67/23 100/1
**secure** [1] 95/7
**security** [1] 93/3
**see** [12] 10/2 37/11 53/10 53/25 55/20 62/13 77/18 79/6 85/7 126/25 127/10 131/5

**seek** [6] 13/13 70/18 102/17 105/2 115/16 129/6
**seeking** [6] 101/2 101/3 102/11 118/6 128/25
**seem** [3] 13/1 87/24 89/19
**seemed** [1] 90/20
**seemingly** [1] 67/13
**seems** [2] 58/23 87/6
**seen** [3] 5/17 5/21 30/15
**sees** [1] 68/19
**segment** [1] 94/19
**segregated** [3] 51/22 60/13 61/7
**sell** [32] 9/11 14/24 35/22 35/25 37/10 37/14 39/2 39/15 40/8 45/3 46/12 46/25 55/14 63/10 63/20 64/17 69/16 84/21 89/6 91/20 92/9 92/20 92/20 93/15 93/19 93/20 95/25 96/9 96/11 96/21 101/23 103/15
**selling** [4] 10/12 44/14 96/15 119/18
**sense** [7] 5/20 25/17 25/23 28/23 86/6 109/21 130/5
**sentence** [1] 8/1
**sentences** [1] 7/22
**separate** [4] 51/11 87/16 90/19 132/13
**separation** [1] 82/10
**September** [3] 1/6 130/15 133/12
**series** [1] 126/4
**serious** [1] 58/24
**seriousness** [1] 111/9
**serve** [2] 4/6 128/15
**served** [3] 101/16 128/19 128/23
**serves** [2] 57/18 107/14
**services** [6] 17/7 40/2 101/22 102/4 102/16 107/4
**servicing** [3] 65/22 75/9 84/22
**set** [19] 5/25 10/21 10/23 12/18 15/13 26/1 49/9 73/6 73/6 82/25 83/15 84/23 87/3 120/12 120/20 121/1 124/12 126/15 127/10
**sets** [2] 25/22 124/15
**setting** [1] 25/17
**settled** [1] 38/10
**seven** [1] 53/4
**several** [7] 3/17 15/10 101/5 101/15 104/8 122/2 125/2
**severe** [2] 32/21 109/1
**severely** [2] 57/25 58/5
**shake** [1] 90/19
**shall** [13] 7/12 8/1 8/2 8/8 10/1 10/8 58/17 69/19 79/23 86/5 106/5 110/11 112/4
**shall-offer** [6] 7/12 8/1 8/8 10/1 10/8 86/5
**shape** [1] 6/15
**shared** [1] 50/22
**shareholder** [1] 123/17
**shareholders** [4] 123/2 123/8 123/9 123/12
**shares** [2] 122/24 123/6
**shark** [2] 32/7 32/8
**sharply** [1] 5/17
**she** [2] 52/24 52/25
**shelf** [3] 51/22 53/14 54/1
**shift** [1] 120/17
**shifts** [1] 55/12
**ship** [2] 51/14 85/3
**shipment** [1] 51/17
**shipped** [3] 28/10 53/11 53/25
**short** [4] 2/12 81/7 110/7 121/19
**should** [10] 18/19 19/20 60/8 64/23 76/18 80/6 80/24 82/22 87/9 90/22
**show** [13] 50/24 53/15 54/3 58/11 58/13 62/1 67/20 75/23 78/12 114/15 114/24 118/3 121/9
**showed** [1] 59/4
**showing** [10] 105/18 108/25 109/18 109/21 114/7 119/6 125/11 126/20 127/5 128/22
**shown** [1] 109/2
**shows** [4] 50/20 53/21 75/1 86/25
**shy** [1] 99/22
**sic** [2] 9/11 109/4
**side** [2] 36/22 77/2
**sides** [1] 33/12
**sign** [3] 7/23 84/19 84/20
**signatories** [1] 102/25
**signed** [3] 29/12 30/8 85/4
**significant** [3] 11/8 125/9 126/22
**significantly** [1] 106/15
**signing** [1] 30/8
**silence** [6] 18/6 18/7 67/18 116/14 116/17 117/12

**S**

**silent [14]** 10/12 16/14 67/21 67/22 70/3 71/12 76/18 99/5 99/7 116/5 116/12 116/16 117/11
**similar [11]** 23/10 24/19 25/14 75/12 108/8 113/4 126/6 126/21 127/2 127/25 132/7
**similarly [1]** 125/8
**simple [1]** 64/2
**simply [5]** 10/22 19/15 31/19 127/19 132/9
**since [7]** 17/8 17/9 36/10 80/22 103/3 128/9 131/18
**single [5]** 40/11 58/7 86/18 87/7 123/16
**sit [1]** 35/13
**site [1]** 75/20
**situation [5]** 14/6 40/13 40/16 112/13 131/3
**slide [11]** 51/1 51/6 51/13 51/19 52/4 52/15 53/7 53/19 53/21 58/11 58/14
**slides [3]** 50/24 53/15 54/3
**slideshows [1]** 54/14
**slightly [1]** 89/21
**small [1]** 50/21
**smaller [1]** 24/24
**so [126]** 3/8 3/25 4/14 4/18 6/2 6/24 7/5 7/22 8/11 8/19 8/23 9/1 10/16 11/16 12/17 13/15 14/5 16/19 17/8 18/4 19/1 20/16 20/21 21/2 21/12 21/19 21/23 22/6 22/22 23/13 23/15 24/15 25/3 25/21 25/23 26/15 27/18 27/24 28/3 28/16 29/10 29/23 30/3 31/2 32/5 32/15 33/3 33/11 33/24 34/7 35/1 37/24 38/13 43/7 43/23 46/16 46/20 51/10 54/21 56/3 56/22 56/25 57/21 58/1 58/4 58/6 58/12 59/16 62/11 68/3 69/9 70/14 71/6 73/12 74/19 75/19 77/5 79/17 80/6 80/18 82/21 84/2 84/14 84/16 84/18 86/17 87/11 88/15 88/19 89/11 89/25 90/4 90/9 91/22 93/18 93/20 94/19 95/7 96/7 97/11 97/24 98/13 98/14 98/19 98/24 98/25 98/25 99/12 99/15 99/21 100/20 106/11 106/15 108/24 109/1 112/8 114/7 114/25 117/9 126/18 129/25 130/1 130/6 132/8 132/13
**sold [14]** 31/24 36/15 37/2 37/3 37/8 43/5 45/2 54/2 55/15 56/19 92/10 102/5 103/20 119/20
**sold if [1]** 92/10
**sole [2]** 94/6 107/11
**solely [1]** 32/1
**some [48]** 3/22 3/23 3/23 4/7 4/19 4/24 5/1 6/3 8/15 11/1 15/8 17/11 18/22 26/15 28/23 30/20 30/22 31/23 32/20 36/2 40/7 40/9 41/15 42/5 44/18 46/6 57/6 62/12 62/25 66/3 78/12 82/18 82/21 83/23 85/12 86/10 86/19 90/10 92/14 93/3 95/23 102/13 108/16 110/14 115/11 116/15 118/11 129/23
**somebody [1]** 11/8
**somehow [2]** 70/22 116/18
**someone [12]** 12/10 12/19 24/4 43/7 45/17 45/20 46/13 57/12 57/19 61/16 62/16 62/21
**something [30]** 11/7 12/2 12/24 12/25 13/3 13/18 15/6 16/19 17/11 18/12 19/7 19/21 25/14 26/3 31/3 35/18 35/19 40/14 41/15 49/9 57/20 63/1 68/14 72/3 86/12 87/5 90/17 100/6 130/24 131/9
**sometimes [5]** 5/7 43/10 43/13 51/20 83/14
**son [1]** 32/5
**sorry [9]** 7/16 15/19 43/18 56/8 72/24 77/11 86/13 92/15 118/20
**sort [14]** 24/16 27/25 56/17 58/6 58/25 59/8 62/13 64/9 65/20 82/10 90/10 116/15 116/23 120/24
**sorts [1]** 80/2
**sought [3]** 19/6 21/8 21/25
**sounds [4]** 4/17 13/3 13/4 59/14
**source [2]** 7/21 54/25
**sourced [1]** 95/21
**Southern [4]** 107/20 108/5 113/3 118/9
**sovereign [6]** 33/23 40/13 40/15 74/14 94/5 94/24
**sovereigns [1]** 42/6
**spamming [1]** 19/15
**speak [3]** 75/10 114/10 130/24
**speaking [3]** 78/3 83/5 117/10
**special [2]** 3/23 53/11
**specific [6]** 8/3 8/4 11/23 80/15 83/13

84/23
**specifically [9]** 44/22 68/7 97/9 107/1 116/7 116/9 120/2 120/14 122/13
**specified [1]** 66/25
**spending [1]** 42/10
**split [1]** 4/7
**spoken [1]** 70/2
**spread [3]** 54/15 55/1 103/22
**spreading [1]** 72/17
**stage [5]** 76/1 105/15 109/17 118/21 121/18
**stake [1]** 55/11
**stand [1]** 117/5
**standards [1]** 113/12
**stands [4]** 109/13 115/25 117/20 118/3
**stark [1]** 14/11
**start [4]** 5/2 51/1 69/23 105/24
**started [3]** 43/1 85/13 96/18
**state [169]**
**state's [17]** 14/14 17/24 22/15 25/6 34/1 36/12 36/21 38/5 42/25 66/21 80/18 81/12 81/13 108/17 117/8 122/20 122/21
**state-imposed [1]** 29/5
**stated [2]** 99/23 122/10
**statement [1]** 73/25
**statements [1]** 14/23
**states [44]** 1/1 7/5 11/3 19/5 30/5 31/19 33/5 34/13 34/21 35/1 41/5 41/13 48/1 48/10 48/12 64/3 66/2 67/5 67/8 67/21 74/1 74/4 75/10 75/11 75/21 83/19 85/6 85/7 91/6 91/8 101/25 106/3 107/18 110/15 111/17 113/12 114/16 117/14 122/2 122/11 125/8 126/22 133/5 133/11
**status [3]** 52/8 108/15 132/5
**statute [179]**
**statute's [2]** 81/1 127/22
**statutes [5]** 78/15 118/2 126/21 128/4 128/5
**statutorily [1]** 5/5
**statutorily-identified [1]** 5/5
**statutory [8]** 15/5 18/6 62/18 67/18 102/6 119/23 120/4 120/8
**stay [1]** 130/16
**stayed [1]** 34/18
**stays [1]** 28/25
**stenographically [1]** 133/8
**stenographically-reported [1]** 133/8
**stenotype [1]** 1/22
**step [2]** 56/14 70/9
**steps [1]** 98/25
**still [5]** 3/17 32/21 34/20 38/6 129/16
**stipulation [1]** 130/2
**stock [1]** 51/19
**stood [1]** 100/5
**stored [1]** 28/10
**street [2]** 1/24 73/20
**strengthen [1]** 6/22
**strict [1]** 60/21
**strike [1]** 36/13
**Strikingly [1]** 5/8
**structure [1]** 4/9
**stuff [6]** 42/11 45/20 45/21 55/6 92/20 93/19
**subject [12]** 20/7 21/2 54/6 57/17 58/16 71/3 82/22 99/16 104/23 112/21 115/2 129/2
**subjects [1]** 27/6
**submit [1]** 74/21
**subsection [7]** 7/2 11/15 16/25 17/1 17/2 58/17 99/20
**subsequent [1]** 74/14
**subsidy [2]** 5/3 11/22
**substance [4]** 15/4 28/4 65/1 72/21
**substantial [1]** 6/17
**substantially [3]** 103/4 108/7 113/4
**substantive [2]** 14/25 18/13
**succeed [8]** 65/25 93/7 105/10 111/24 112/2 117/17 119/8 126/19
**success [9]** 64/5 64/7 70/8 105/15 105/22 110/7 110/9 128/6 128/9
**succinctly [1]** 20/19
**such [6]** 8/2 23/8 54/8 94/25 110/20 118/1
**sued [1]** 40/15
**suffer [1]** 105/11
**sufficiently [3]** 51/3 62/7 127/7
**suggest [4]** 21/5 89/4 108/24 109/5
**suggesting [1]** 55/23
**suggests [3]** 44/9 109/7 118/11
**suing [1]** 115/16

**suit [4]** 74/13 86/14 101/5 101/8
**Sullivan [1]** 107/8
**sum [2]** 119/9 119/18
**summarize [1]** 54/4
**summary [2]** 45/1 121/18
**supplement [1]** 114/17
**supplied [1]** 81/18
**support [5]** 67/11 90/11 108/19 108/20 119/13
**supports [1]** 84/5
**suppose [1]** 52/23
**supposed [3]** 38/24 47/14 52/11
**suppression [2]** 127/21 128/1
**Supremacy [4]** 67/5 83/19 112/3 115/8
**supreme [36]** 5/21 5/24 6/2 6/7 6/14 6/19 6/21 18/15 19/10 30/10 31/17 33/7 38/10 38/13 38/16 39/3 43/10 47/20 48/7 48/20 82/4 88/7 106/22 109/9 109/24 111/17 112/5 115/9 115/12 115/14 117/24 122/4 122/10 122/14 127/15 127/17
**sure [13]** 3/25 4/15 6/16 7/18 8/24 25/11 42/8 46/10 78/23 89/18 90/1 98/24 120/11
**Surely [1]** 8/12
**surplusage [1]** 15/21
**surreply [2]** 16/11 131/18
**surrounding [2]** 109/5 121/25
**swallowing [1]** 85/17
**sweeping [1]** 123/20
**system [8]** 12/7 12/9 12/15 13/12 16/12 52/2 74/5 115/1

---

**T**

**table [1]** 132/8
**Taco [1]** 31/2
**take [15]** 15/22 57/22 58/7 59/24 81/12 82/5 87/18 91/1 93/4 94/5 98/25 107/10 115/12 131/3 131/10
**taken [3]** 100/14 106/5 106/5
**takeover [1]** 122/24
**takes [4]** 5/17 43/6 122/20 125/6
**taking [51]** 9/10 36/1 36/24 37/9 38/9 39/4 40/15 42/1 43/1 43/8 43/8 43/11 43/12 43/13 43/13 43/14 43/16 43/21 43/24 44/2 44/3 44/6 44/7 50/6 50/15 56/6 63/19 74/7 74/12 74/14 76/24 87/11 87/13 93/20 106/7 106/11 106/24 107/2 107/22 108/2 108/8 108/25 109/2 109/8 109/10 109/19 109/19 109/20 109/22 109/22 109/25
**takings [32]** 4/25 35/11 36/2 36/5 36/7 36/13 37/7 39/8 41/1 41/24 42/15 42/19 42/20 42/25 44/25 45/7 45/11 46/1 47/7 50/9 73/15 73/24 93/8 93/10 93/13 94/8 95/21 105/24 106/1 106/4 107/9 110/8
**Talebnejad [1]** 75/21
**talk [18]** 21/23 22/19 23/10 23/11 23/18 25/6 27/6 27/9 27/12 29/19 33/4 44/4 45/11 45/25 47/9 80/21 89/22 90/23
**talked [2]** 33/8 64/9
**talking [12]** 17/20 22/1 22/2 22/7 23/6 23/16 23/21 29/21 34/23 34/25 54/15 88/24
**talks [4]** 21/20 27/6 30/2 89/23
**tamperproof [1]** 31/25
**target [3]** 120/24 123/11 124/2
**targeted [5]** 120/11 120/12 125/20 125/25 126/1
**targeting [2]** 126/7 127/11
**targets [1]** 124/6
**tax [2]** 47/23 48/6
**taxation [1]** 48/12
**taxes [1]** 48/9
**tease [1]** 78/16
**tell [4]** 42/3 78/24 80/14 80/16
**telling [2]** 26/17 59/8
**tells [2]** 42/21 42/22
**TelTech [1]** 19/14
**temperature [2]** 49/20 93/4
**temperature-controlled [1]** 49/20
**Ten [1]** 77/23
**tend [2]** 103/9 128/18
**tendency [1]** 45/11
**tender [4]** 123/6 123/11 123/13 123/16
**tension [1]** 121/5
**term [8]** 15/8 16/21 16/21 62/18 68/18 99/1 99/1 100/1
**terminate [1]** 88/14
**terminates [1]** 88/10
**termination [1]** 102/7
**terms [31]** 8/13 8/13 8/15 8/15 8/17 9/17

**T**

**terms... [26]**   8/11 8/15 11/01 15/25 16/9
16/13 34/13 38/16 68/1 69/25 71/6 71/14
85/8 96/11 96/11 96/24 97/1 97/25 99/9
99/10 117/10 124/9 124/13 125/20 126/15
**test [2]**   128/8 128/13
**Texas [1]**   111/17
**Texas v. United [1]**   111/17
**text [9]**   4/11 15/13 15/25 17/2 46/7
58/14 67/5 67/7 69/6
**Thacker's [1]**   43/17
**than [29]**   5/16 10/6 11/18 11/22 14/7
14/9 17/25 20/19 23/1 23/4 35/19 38/22
49/11 55/15 56/1 60/15 64/20 66/4 69/16
83/9 85/15 85/16 86/20 89/9 90/2 92/18
98/21 120/15 132/13
**thank [30]**   3/3 4/5 4/18 20/3 20/4 35/5
35/6 63/21 63/24 63/25 77/8 77/9 77/21
78/8 87/25 88/2 88/3 91/10 91/11 91/12
97/4 97/5 100/9 100/10 100/15 130/11
131/12 131/22 132/16 132/17
**Thanks [1]**   130/3
**that [899]**
**that's [150]**
**their [73]**   3/18 3/18 9/11 13/2 13/2 13/6
13/12 13/13 14/19 15/25 15/25 16/1 16/14
16/19 17/10 17/12 17/24 17/25 18/2 20/10
20/21 20/24 21/9 23/14 24/4 27/3 27/5
37/6 39/22 40/21 40/23 41/6 43/2 45/5
48/10 51/11 52/5 52/21 54/17 58/22 59/7
63/12 64/3 64/16 67/21 75/9 79/4 80/16
82/18 86/23 88/25 90/22 91/4 92/5 94/23
96/6 98/1 98/2 101/19 101/23 103/8
103/15 103/19 104/12 108/10 113/7 116/21
117/14 118/18 119/8 126/19 126/25 129/8
**them [44]**   14/3 14/4 16/6 20/11 27/18
28/15 29/13 30/12 34/3 37/23 38/4 38/7
39/15 39/16 41/3 41/20 45/21 46/14 49/13
51/14 51/14 53/4 54/12 56/2 57/16 60/2
61/25 63/12 63/12 63/13 68/18 82/13
86/24 87/19 91/16 91/20 95/3 95/4 95/5
96/10 96/13 101/13 103/1 113/6
**themselves [5]**   32/22 41/16 61/17 74/17
102/14
**then [45]**   4/3 8/6 9/4 9/14 13/13 15/7
21/5 23/6 24/12 26/11 28/5 30/20 31/7
31/10 32/7 36/18 39/2 40/14 46/21 48/1
51/9 53/7 53/7 53/20 53/21 57/23 59/21
60/19 61/15 61/17 61/18 63/2 63/3 78/18
78/20 82/15 90/4 91/22 93/5 96/19 99/19
103/17 120/17 123/14 131/17
**theory [3]**   16/19 17/10 115/17
**there [76]**   3/22 6/23 9/6 9/18 9/25 10/15
10/25 11/10 12/4 12/14 12/14 12/15 14/25
16/14 18/6 18/10 25/10 27/20 30/16 32/17
33/18 34/15 34/17 34/21 36/2 36/19 39/6
41/11 42/2 46/6 48/2 54/8 61/20 62/14
64/2 64/5 66/20 69/5 69/21 70/20 70/22
71/6 71/15 71/17 71/22 72/6 72/9 73/15
73/24 75/10 75/23 76/6 76/19 78/2 78/13
79/2 80/6 81/21 82/8 83/23 84/1 86/6
91/15 91/23 93/10 94/16 94/22 94/24
95/23 100/4 112/19 118/14 129/11 130/9
130/11 130/23
**there's [39]**   13/14 14/4 14/21 17/15
18/16 21/15 25/16 26/16 27/22 33/13
33/14 33/24 34/3 34/19 39/25 41/11 42/6
56/17 61/5 61/13 62/3 62/10 69/21 70/4
70/20 73/4 74/23 75/22 76/2 78/15 79/24
88/7 89/8 89/13 98/9 99/4 99/14 99/21
126/20
**thereafter [2]**   78/14 104/12
**thereby [3]**   35/2 49/6 120/8
**therefore [3]**   36/15 37/3 39/12
**these [66]**   5/23 6/23 9/21 13/25 16/4
16/17 25/4 26/20 26/24 27/5 29/19 30/19
32/23 34/8 34/21 41/21 44/11 46/25 51/3
51/11 53/22 59/2 60/21 63/3 63/7 63/14
63/20 65/3 66/3 66/11 67/2 68/13 69/9
69/23 69/25 70/20 71/15 74/18 74/25
78/19 78/22 81/16 81/21 86/10 87/2 92/9
96/25 97/1 97/2 103/7 104/5 104/7 104/8
105/19 108/1 108/13 108/15 112/2 113/2
116/10 117/5 117/16 121/6 125/12 128/20
129/9
**they [161]**
**they'd [1]**   78/5
**they're [31]**   13/25 14/1 14/15 14/16
14/22 17/15 18/2 22/17 23/24 23/25 24/1
28/8 29/20 46/21 46/21 47/14 53/12 55/2

55/3 59/9 63/11 63/13 76/1 82/1 86/12
86/17 86/24 87/17 95/3 95/5 99/7
**they've [8]**   13/22 17/10 18/4 63/13 83/22
91/3 98/1 98/2 98/3
**thing [23]**   19/14 22/15 23/18 31/21 31/25
36/4 37/5 41/23 42/18 42/24 48/7 48/18
50/3 53/20 54/8 55/7 57/15 59/6 77/17
91/7 93/22 94/21 98/18
**things [19]**   18/22 26/5 36/6 36/6 41/3
41/15 43/11 54/23 61/8 61/21 62/6 73/14
80/2 82/12 84/23 87/2 87/3 88/24 93/11
**think [109]**   4/10 4/25 13/8 14/19 16/11
16/17 17/14 17/21 20/18 22/17 23/15
23/19 24/17 25/4 25/13 25/14 26/16 27/18
27/24 27/25 28/18 28/21 31/12 32/15
33/12 34/22 35/13 36/4 36/10 39/18 41/7
43/9 43/18 44/5 44/24 46/6 46/7 46/9
47/4 47/13 48/16 50/8 50/12 50/15 50/19
51/3 56/10 56/12 56/14 57/20 57/21 58/12
60/6 64/10 70/20 70/22 72/4 72/16 73/18
76/9 77/11 78/4 78/10 78/11 78/18 80/6
81/9 81/23 82/23 83/2 83/11 83/20 84/2
84/18 85/23 86/2 86/9 86/13 88/17 88/23
89/3 89/13 89/21 91/17 92/13 92/14 92/19
92/23 93/5 94/21 94/23 95/13 95/20 95/20
95/23 96/2 96/8 97/25 98/4 98/20 99/13
100/4 100/4 100/7 130/24 131/3 131/12
132/4 132/12
**thinks [3]**   79/2 79/14 91/15
**third [35]**   5/19 8/6 8/20 10/11 10/24
23/18 24/5 24/5 25/7 26/22 35/23 37/18
38/1 44/17 45/7 45/24 49/5 52/17 59/7
63/5 66/9 71/1 81/19 94/21 95/4 99/6
103/16 103/21 115/17 116/7 116/21 125/7
126/20 126/20 128/13
**third-party [9]**   24/5 24/5 35/23 52/17
59/7 81/19 103/16 103/21 115/17
**this [244]**
**Thomas [3]**   1/23 133/4 133/16
**those [71]**   3/18 4/19 4/24 5/8 6/2 8/7
10/14 10/16 10/21 10/23 11/6 16/5 20/13
21/8 27/8 27/22 31/15 31/22 32/1 32/12
33/6 36/10 36/11 37/13 40/23 40/24 41/1
41/4 41/16 41/23 44/24 51/8 53/5 53/8
53/11 54/24 54/25 56/3 57/10 59/12 62/14
66/13 66/15 68/10 76/14 76/14 78/13
78/16 80/17 81/20 82/18 82/21 84/5 84/22
89/24 92/10 96/11 96/17 98/17 99/10
106/21 112/24 116/11 120/12 121/1 123/5
126/14 126/15 129/12 130/7 131/17
**though [5]**   34/22 38/7 74/3 94/7 107/12
**thought [4]**   53/20 61/9 92/4 99/13
**thousand [2]**   53/17 60/25
**threat [1]**   76/1
**threatened [1]**   90/7
**three [14]**   21/3 25/4 36/6 36/6 36/9
57/20 78/9 86/15 88/3 91/15 105/12
106/19 106/21 111/2
**through [28]**   11/11 11/12 12/14 15/5
15/24 28/1 32/22 36/5 39/21 44/10 49/15
50/23 56/24 64/21 65/17 66/8 70/12 71/24
80/4 91/4 103/16 108/21 112/8 112/8
112/11 114/4 117/15 120/22
**throughout [2]**   18/5 66/3
**Thus [3]**   116/4 121/8 123/18
**ticket [1]**   59/1
**tied [1]**   9/7
**time [26]**   3/17 5/1 12/25 14/20 19/25
20/1 21/2 25/15 33/16 57/18 60/13 60/24
70/24 72/3 77/6 77/7 77/12 77/16 78/5
93/16 95/16 99/14 100/6 100/18 103/4
129/23
**times [1]**   4/7
**tips [1]**   105/13
**title [11]**   45/8 51/23 60/12 61/7 61/15
61/23 62/1 65/16 76/16 101/25 104/22
**today [24]**   3/13 19/25 60/10 65/24 66/16
68/17 69/18 72/18 75/3 77/19 78/11 88/4
89/21 90/3 90/9 90/13 91/17 92/23 96/2
96/9 98/18 101/13 130/22 132/17
**today's [2]**   130/15 131/19
**together [1]**   66/18
**told [1]**   34/2
**too [3]**   2/14 32/2 39/10
**took [6]**   21/10 40/13 94/23 95/6 104/5
104/16
**top [2]**   34/24 91/2
**topic [2]**   69/24 79/22
**topics [1]**   71/10
**totally [2]**   88/20 90/1

**touch [5]**   24/8 83/22 83/22 83/24 127/13
**touchstone [1]**   112/15
**toward [2]**   60/12 112/8
**towards [3]**   8/14 81/19/24 88/12
**trade [1]**   104/21
**traditional [3]**   66/21 117/9 117/14
**traditionally [3]**   65/5 114/20 115/5
**transaction [2]**   12/15 81/21
**transactions [25]**   48/18 64/18 65/14 75/8
75/16 81/10 81/16 82/7 82/13 82/21 123/4
123/23 124/2 124/3 124/7 124/10 124/15
125/7 125/18 125/21 126/4 126/7 126/15
127/6 127/12
**transcript [4]**   78/10 78/14 133/8 133/9
**transcription [1]**   1/22
**transfer [14]**   5/6 36/1 38/8 38/11 38/19
40/8 44/20 45/18 58/18 65/16 94/1 95/9
107/23 108/9
**transferred [2]**   61/16 108/21
**transferring [2]**   94/6 107/11
**transfers [3]**   5/4 38/16 104/1
**transitioning [1]**   32/14
**Transportation [1]**   106/23
**transported [1]**   49/19
**treated [1]**   62/22
**tremendous [2]**   85/18 86/22
**tremendously [1]**   85/20
**tried [2]**   4/6 36/6
**tries [3]**   12/10 12/10 82/7
**trigged [1]**   125/15
**triggered [2]**   125/5 125/15
**trouble [1]**   28/11
**truck [1]**   49/20
**trucks [1]**   23/25
**true [9]**   16/7 26/5 37/5 40/25 41/7 55/4
91/22 99/9 133/7
**truth [1]**   74/7
**try [4]**   15/6 31/10 58/7 58/8
**trying [12]**   11/18 11/20 14/5 30/24 32/4
61/2 63/15 83/11 85/8 86/22 95/9 97/2
**turn [6]**   23/8 51/6 51/13 52/4 53/25 81/8
**turned [1]**   40/14
**turning [5]**   66/17 111/25 117/18 120/5
121/21
**turns [3]**   6/4 7/9 107/14
**two [41]**   6/8 7/12 7/22 8/7 9/18 11/19
11/23 14/23 21/6 26/5 27/8 27/25 34/18
35/13 36/19 37/12 39/18 43/11 48/1 50/12
51/11 54/3 54/23 61/6 61/21 62/23 63/8
63/8 66/13 70/22 73/7 77/12 81/23 86/15
91/15 96/25 98/25 99/19 105/11 106/17
111/1
**type [7]**   5/6 12/22 12/23 32/20 79/7
79/18 83/23
**types [4]**   5/5 66/18 80/4 87/2
**typically [1]**   8/17

**U**

**U.S [9]**   17/6 66/2 68/2 74/11 101/22
105/20 107/4 112/3 122/3
**U.S.C [3]**   7/11 7/18 133/7
**ultimate [1]**   112/15
**ultimately [14]**   22/12 35/24 39/12 59/23
62/15 62/20 63/15 63/20 64/23 73/2 76/22
114/15 114/24 128/25
**unable [1]**   6/15
**unanimously [1]**   63/8
**unauthorized [1]**   18/18
**unavailable [1]**   22/20
**unconstitutional [12]**   9/10 33/20 46/10
46/16 66/1 66/1 92/21 105/5 107/21 108/8
124/11 127/20
**unconstitutionally [1]**   111/7
**uncontroversial [1]**   120/2
**under [85]**   6/10 8/7 8/7 8/21 9/2 10/1
10/9 11/14 11/16 13/5 13/11 17/1 17/15
18/18 20/10 20/21 21/15 23/7 23/22 26/7
26/11 26/19 27/17 27/17 27/22 28/7 28/11
29/5 29/15 29/21 33/15 37/20 39/13 46/13
49/12 54/7 58/16 58/24 59/4 59/21 60/21
62/17 63/20 67/2 69/11 70/16 71/2 71/4
71/19 73/15 74/19 76/4 80/5 83/18 85/5
87/2 87/3 90/24 91/5 91/18 91/20 92/9
93/15 93/18 93/23 94/12 95/23 95/24
96/23 97/1 97/15 97/19 99/14 99/16 99/17
99/20 99/25 103/11 104/22 107/24 109/19
111/18 115/8 115/16 122/2
**under-resourced [1]**   103/11
**underinsured [1]**   101/16
**undermines [1]**   35/3
**undermining [1]**   31/16

**U**

underread [1]   72/10
underscores [1]   93/5
underserved [2]   101/16 102/4
understand [11]   8/24 9/21 12/21 26/4 41/10 61/1 87/20 99/21 129/11 129/15 131/13
understanding [4]   34/6 34/7 72/5 91/25
Understood [1]   33/10
undesirable [1]   35/2
undifferentiated [2]   51/17 51/19
undiscounted [1]   22/25
undisputed [1]   60/6
unduly [1]   41/22
unfair [1]   104/21
unfettered [2]   56/23 57/2
Unfortunately [1]   22/24
unified [1]   113/14
uniform [1]   86/3
unilateral [1]   59/6
unique [2]   5/3 19/3
unit [1]   5/9
UNITED [17]   1/1 7/5 11/3 41/5 48/1 48/9 66/2 74/4 75/20 83/19 101/25 107/18 110/15 111/17 113/12 133/5 133/11
units [2]   51/7 51/9
universally [1]   66/11
universe [1]   30/19
unlawful [5]   38/12 46/12 56/7 61/3 104/1
unlawfully [1]   102/10
unless [3]   36/1 45/25 47/7
unlike [3]   41/12 48/4 126/16
unlikely [1]   64/7
unlimited [6]   37/16 38/4 60/22 63/6 104/11 116/25
unmistakably [3]   21/4 23/20 88/24
unquote [1]   94/11
unrecoverable [1]   33/14
until [5]   60/11 92/4 111/19 130/17 132/8
unusual [1]   110/12
unveiling [1]   110/10
up [36]   4/7 4/15 10/8 12/2 24/3 29/12 30/4 30/8 30/24 30/25 32/4 32/6 33/9 39/25 40/7 40/14 42/11 42/22 43/3 43/20 43/21 44/1 44/2 51/7 63/23 72/16 73/13 73/20 74/6 83/15 84/19 84/20 85/4 99/13 100/5 120/20
upon [16]   5/15 22/17 34/18 47/1 48/10 70/15 98/6 111/12 111/14 116/4 118/18 124/18 127/9 127/15 127/21 128/8
upset [1]   121/12
upsets [1]   121/9
upstream [3]   125/21 126/5 126/7
urban [1]   19/19
urge [3]   41/8 55/7 56/4
us [24]   26/17 27/14 39/14 43/7 44/11 54/20 55/3 55/14 58/6 59/8 59/19 59/19 62/1 62/3 74/6 80/2 86/19 89/6 90/21 91/24 92/20 93/15 93/19 131/23
USA [4]   115/13 115/14 115/25 116/4
use [28]   21/2 31/19 38/17 39/3 42/21 43/10 44/19 46/21 47/3 58/6 63/7 69/15 69/17 74/13 77/5 77/16 88/19 88/20 93/23 94/13 94/19 95/17 103/25 106/5 106/8 106/13 106/14 109/23
used [2]   13/20 89/1
USFDA [1]   110/19
using [2]   43/22 47/15
usual [1]   44/18
usually [2]   24/3 24/4

**V**

v. [3]   107/18 111/17 113/12
valuable [1]   50/11
value [4]   24/13 43/15 43/23 44/20
various [4]   3/22 87/2 98/6 119/11
vehicle [1]   19/17
vendors [2]   31/2 31/16
version [2]   81/14 81/18
versions [1]   91/16
versus [5]   54/16 61/4 80/10 80/24 93/12
very [31]   4/3 6/19 17/19 20/14 21/14 33/22 39/6 40/19 50/6 50/21 52/21 56/10 56/21 58/13 58/21 60/16 61/10 63/2 63/21 65/17 83/13 84/3 85/20 92/24 95/22 99/7 127/3 130/3 130/22 131/9 132/4
vested [1]   48/15
vests [1]   115/21
veterans [1]   31/4
via [2]   102/11 106/3

vice [1]   35/15
view [5]   50/15 59/24 92/25 95/7 130/25
windfall [1]   78/3
violate [11]   20/21 64/19 83/16 90/4 93/1 96/17 96/18 98/11 116/9 129/3 129/5
violated [3]   104/6 123/3 125/3
violates [3]   13/8 98/12 106/1
violating [1]   46/23
violation [12]   17/2 22/7 28/7 56/5 68/5 75/8 76/4 89/15 89/17 89/24 98/14 104/6
violations [4]   7/4 86/5 104/21 111/13
vis [2]   128/2 128/2
visually [1]   51/4
Vitkus [1]   105/21
Volkswagen [2]   15/10 19/17
voluntarily [5]   32/12 42/16 106/24 108/11 108/14
voluntary [15]   9/8 9/12 31/19 33/6 39/20 39/23 40/12 40/21 42/1 42/5 45/4 84/16 91/1 106/25 107/25
vs [1]   1/5

**W**

waddling [1]   28/17
waiting [1]   100/17
waived [1]   75/6
Walgreen's [2]   35/24 52/16
Walgreens [1]   39/1
walk [2]   36/5 50/22
walked [1]   50/8
walks [1]   28/4
want [48]   14/7 14/8 16/5 18/24 22/15 23/18 31/1 31/5 31/5 32/19 35/12 35/25 37/22 37/23 38/8 39/15 44/3 45/9 47/9 47/10 47/11 47/18 47/19 49/8 50/5 50/18 55/15 57/19 58/13 59/24 60/10 63/16 63/20 65/11 73/20 76/8 77/1 77/5 77/16 77/20 78/8 93/16 93/20 93/24 95/22 96/13 98/9 98/11
wanted [7]   19/7 42/8 50/10 59/1 86/4 93/8 95/10
wants [5]   12/19 28/15 51/9 62/1 75/15
warrant [1]   46/6
was [82]   5/22 5/24 7/2 7/8 8/4 8/7 10/21 10/25 13/17 13/21 14/19 14/19 16/17 18/19 19/4 24/6 26/22 29/11 30/16 30/20 30/24 30/25 32/4 37/1 37/25 38/19 39/6 41/10 41/25 47/23 47/24 47/25 48/2 48/3 48/6 48/7 52/24 56/14 63/1 63/5 63/8 63/9 65/20 69/5 70/24 71/11 71/12 71/15 71/22 72/6 74/3 78/2 79/22 80/11 80/12 81/13 86/18 88/18 91/17 93/10 93/23 99/13 100/14 103/3 103/19 107/19 110/24 111/6 120/15 120/18 121/12 122/18 123/11 123/13 123/18 124/20 125/5 126/3 126/6 127/20 129/17 129/24
wasn't [8]   21/14 37/2 41/7 62/7 62/21 70/25 71/12 80/11
water [1]   63/23
watermark [2]   38/15 93/25
Waxman [1]   120/1
way [40]   3/18 9/6 14/18 14/21 15/7 22/9 23/24 23/24 23/25 24/1 24/2 24/10 24/21 25/21 25/22 27/8 28/3 28/9 28/12 31/21 33/13 33/24 34/3 34/8 46/17 49/20 51/15 55/15 58/2 59/9 62/15 82/18 87/9 89/18 95/7 98/9 100/7 125/18 126/25 127/1
ways [4]   21/6 27/25 61/6 90/19
we [180]
we'd [2]   42/12 81/6
we'll [3]   85/7 90/9 130/1
we're [23]   17/20 22/1 22/2 22/7 23/16 23/21 31/10 34/7 34/23 34/25 46/23 51/24 51/25 76/9 77/12 80/16 84/3 86/19 88/24 90/10 93/18 96/3 96/14
we've [8]   25/3 37/8 50/22 64/9 67/15 73/14 90/11 97/25
website [1]   17/4
Wednesday [1]   130/15
weeds [2]   47/14 59/2
week [2]   129/23 129/25
weeks [3]   5/12 14/17 78/11
weigh [1]   110/23
welfare [1]   109/13
well [24]   3/11 27/8 29/14 35/4 36/25 38/5 38/23 46/2 53/20 61/1 68/11 83/11 87/23 97/8 97/24 98/1 100/4 105/4 105/7 111/8 115/3 117/23 126/20 127/3
well-established [2]   105/7 115/3
went [3]   11/11 32/10 60/24

were [32]   3/17 3/18 6/23 9/18 22/20 38/20 41/17 41/23 44/3 46/15 50/14 53/4 53/7 54/23 55/11 55/16 59/2 59/3 60/9 60/11 61/8 61/9 69/3 71/10 72/3 78/13 83/4 100/5 109/7 122/25 126/24 128/4
what [151]
what's [9]   17/3 22/2 48/16 60/15 69/2 72/18 72/18 75/11 85/24
whatever [3]   52/7 62/17 62/19
wheel [2]   59/4 63/12
when [50]   13/24 15/3 18/11 19/6 19/20 20/20 22/3 25/15 28/16 29/12 30/7 39/15 42/20 42/22 42/22 48/8 50/4 50/5 54/21 60/7 63/3 66/25 67/25 68/9 71/18 72/10 72/25 73/5 74/13 77/17 79/24 81/2 82/6 83/21 84/19 84/20 84/21 85/4 85/6 85/19 86/19 88/14 92/23 99/13 106/7 106/12 107/22 114/3 114/18 117/8
whenever [1]   37/24
where [31]   6/19 10/4 13/16 14/6 25/25 33/9 40/13 41/7 42/4 43/1 70/7 76/5 76/17 78/24 79/7 83/23 91/14 96/18 99/24 100/2 106/24 107/2 108/7 109/10 112/9 113/3 117/19 120/14 126/1 128/12
whether [25]   20/15 24/6 24/24 28/23 28/25 29/2 32/17 43/20 46/3 56/18 62/3 62/9 64/23 72/13 73/13 89/24 90/14 92/24 92/25 95/18 107/14 110/23 113/11 122/21 131/6
which [78]   5/14 7/1 9/3 9/19 10/17 17/4 21/20 23/20 25/5 25/6 25/12 28/1 30/16 32/22 37/13 37/23 38/2 38/15 38/25 39/7 40/4 46/3 47/21 49/7 55/25 57/7 58/14 59/2 60/3 61/8 61/25 66/11 66/13 67/1 69/24 72/11 73/6 74/8 74/9 74/21 76/20 79/7 79/24 80/21 81/24 81/25 82/23 84/12 84/13 86/2 89/23 92/8 94/14 95/1 96/4 96/15 96/18 100/7 101/23 102/25 103/16 104/4 104/13 104/16 106/3 106/17 107/19 111/21 116/16 119/17 122/18 123/16 126/25 130/23 130/25 131/3 131/9
While [1]   20/6
White [1]   112/16
Whiting [1]   68/2
who [32]   4/1 28/25 29/1 31/1 31/15 31/22 32/1 32/12 33/6 39/1 52/1 52/6 52/11 56/19 58/18 59/5 60/4 60/9 61/17 61/18 61/24 62/16 62/21 75/10 76/14 85/25 94/16 95/3 95/6 108/11 119/24 128/20
who's [1]   38/24
whoever [2]   14/2 58/22
whole [6]   24/14 38/22 53/20 84/24 94/4 94/19
wholesale [5]   81/19 120/14 120/17 125/22 126/4
wholesaler [4]   24/9 24/12 24/14 124/22
wholesalers [6]   12/4 12/8 123/24 124/7 124/10 126/14
wholly [3]   122/8 122/21 123/5
whom [3]   48/11 54/18 54/18
whose [1]   22/16
why [15]   8/1 10/2 11/11 13/21 13/22 56/15 61/11 69/22 76/9 79/25 86/16 86/18 86/18 89/13 90/25
wide [1]   31/23
widely [1]   19/15
will [35]   2/9 4/1 4/11 4/19 4/24 9/10 13/7 16/6 28/1 33/22 37/14 46/24 49/20 55/25 57/15 57/19 77/4 77/15 78/24 87/21 87/23 88/13 91/20 98/24 101/14 101/14 105/22 110/20 111/12 123/21 127/6 127/25 129/10 129/19 131/12
willing [2]   12/20 40/8
win [1]   83/15
Winter [2]   105/19 128/11
Wisconsin [1]   106/12
wish [1]   132/9
wishes [1]   48/24
withdrawal [1]   102/9
within [6]   31/24 66/21 110/18 120/25 122/22 125/6
without [11]   9/9 39/1 57/12 59/8 59/10 63/7 63/13 64/9 106/6 112/14 132/10
won't [4]   55/19 84/13 86/13 96/11
word [9]   8/20 45/10 62/17 95/14 95/15 95/17 95/19 96/4 96/5
words [12]   10/22 15/4 16/13 35/16 52/23 57/16 64/25 72/21 79/14 98/20 127/22 131/4
work [5]   18/19 21/15 32/8 60/8 60/10

## W

**workers [1]** 18/18
**works [10]** 12/16 15/8 16/12 27/18 47/15
50/12 51/5 51/5 52/2 74/4
**world [1]** 85/3
**worry [1]** 96/3
**worth [2]** 55/10 55/16
**would [121]** 6/17 10/25 15/12 16/24 18/21
18/22 20/21 20/25 21/20 21/24 22/4 22/5
27/2 27/11 27/13 27/16 31/25 32/2 32/9
32/21 34/4 34/24 35/8 37/3 38/16 39/5
41/8 41/20 43/4 44/5 44/11 46/10 46/15
46/16 47/3 49/17 49/22 49/22 50/10 50/11
50/19 50/23 52/7 53/20 55/7 56/4 56/7
56/9 56/25 58/2 58/2 58/9 58/12 59/5
60/19 61/16 61/17 61/20 61/21 62/3 62/15
62/22 64/19 68/1 68/5 69/17 70/17 71/9
71/13 71/16 74/21 74/21 81/5 82/19 89/1
89/17 89/23 90/5 90/25 92/10 92/16 92/20
92/21 92/24 93/23 94/22 94/24 95/1 95/19
97/6 97/10 98/10 98/14 98/22 99/19 104/4
107/6 117/3 120/17 123/16 125/8 126/22
126/25 127/1 128/14 128/18 128/23 129/23
130/14 130/22 130/23 130/24 131/3 131/6
131/8 131/9 131/14 131/16 131/17 132/10
132/12
**wouldn't [5]** 18/23 26/8 46/14 55/4 58/10
**writing [1]** 95/17
**written [3]** 15/2 116/3 131/13
**wrong [3]** 17/13 28/9 57/19

## Y

**Yeah [4]** 61/1 84/11 87/10 132/12
**year [9]** 8/5 23/4 23/12 65/4 85/8 104/15
108/6 112/25 127/17
**years [11]** 10/5 13/18 52/25 53/1 53/1
53/1 57/20 63/4 101/15 103/13 104/2
**yes [8]** 22/14 25/11 63/24 77/24 84/15
92/13 97/3 130/20
**yesterday [1]** 130/14
**yet [1]** 74/25
**yield [4]** 18/4 19/25 77/6 83/2
**York [1]** 106/23
**you [230]**
**you'll [8]** 53/10 54/23 55/20 79/17 82/6
84/13 86/23 131/18
**you're [12]** 4/15 8/24 28/16 42/4 83/13
85/21 86/9 87/11 87/20 87/25 92/12 96/12
**you've [9]** 47/10 74/24 88/4 96/8 98/6
98/7 98/10 130/22 130/25
**your [109]** 2/10 2/14 2/15 2/18 2/21 2/23
3/1 3/5 4/2 4/5 5/11 10/22 11/23 14/18
16/17 17/17 17/23 18/4 19/24 20/4 22/9
27/24 28/1 28/21 28/22 31/3 31/9 32/15
33/3 34/15 34/17 35/6 35/7 37/5 39/25
40/7 40/9 43/15 45/20 45/21 46/12 46/23
49/7 52/23 53/15 53/17 56/21 59/14 60/12
61/5 63/22 63/25 65/12 65/20 66/18 67/13
69/5 70/8 70/12 70/19 70/24 71/6 71/17
72/1 72/2 72/18 73/2 73/7 73/9 73/14
75/2 76/9 77/10 77/16 77/21 78/3 78/8
78/19 83/3 83/12 84/6 86/3 86/14 87/18
87/25 88/3 91/12 95/10 97/7 97/23 99/14
100/18 129/22 130/11 130/13 130/19
130/21 130/25 131/10 131/22 131/23
131/25 132/2 132/4 132/15 132/16 132/17
132/18 132/18
**yourselves [1]** 2/9

## Z

**zero [1]** 43/15